UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        CASE No. 1:19-CR-117

        HON. ROBERT J. JONKER

LARRY CHARLES INMAN,

        Defendant.
_____/

# ORDER

## INTRODUCTION

Legislators sometimes must vote on politically perilous measures. When they do, it is only natural that they weigh the political consequences of their decision on how to vote. One aspect of political consequence is the impact on campaign coffers. This case raises the question of at what point the campaign calculus crosses the line to criminal attempted extortion and solicitation of a bribe.

A Grand Jury charges that Defendant Larry Inman crossed the line by sending a series of text messages to a labor union asking for a maximum contribution to his campaign account in exchange for a "no" vote on pending legislation that the union opposed. As expressed during oral argument on the matter, the Court believes the case inevitably raises First Amendment issues about the line between criminal bribery or extortion, on the one hand, and protected political activity on the other hand. After review, however, the Court is satisfied those concerns are best addressed through a careful crafting of jury instructions, rather than dismissal of the indictment. For the

reasons expressed below, therefore, the Court **DENIES** the remainder[1] of the pending motion to dismiss.

## BACKGROUND

Defendant Larry Inman is an elected member of the Michigan House of Representatives. In June 2018, he confronted a vote on repealing Michigan's Public Act 166 of 1965, commonly known as the "prevailing wage" law. Supporters of repeal claimed it would save taxpayer dollars. Those in opposition, including several organized labor groups, argued repeal would result in a shortage of skilled labor. Kathleen Gray, *Prevailing Wage Repealed by Republicans in the Michigan Legislature*, Detroit Free Press (June 6, 2018, 8:30 p.m.), https://www.freep.com/story/news/2018/06/06/prevailing-wage-repealed-gop-michigan-legislature/678292002/.

The government alleges that before the vote Defendant Inman reached out via a series of text messages to the Michigan Regional Council of Carpenters and Millwrights ("MRCCM"), a labor union opposed to repeal and whose political action committee had previously contributed to Defendant's campaign committee. In the text messages, Defendant Inman expressed a willingness to vote against the prevailing wage repeal but stated he and other like-minded representatives "need[ed] some more help." This "help," the government contends, took the form of a request for a maximum contribution to his campaign account. When the "help" failed to materialize, Defendant Inman voted in favor of repealing the prevailing wage law. Ultimately the repeal vote passed by a narrow margin, and the prevailing wage law was subsequently repealed.

---

[1] The Court has already denied the defense motion to dismiss Count 3, which charges Defendant with lying to an FBI agent. The Court has also rejected Defendant's arguments to the extent they challenge the validity of the Grand Jury process.

To the Defendant all of this is part of legitimate, albeit perhaps unsavory, legislative sausage making. But the government disagrees and argues Defendant Inman engaged in a criminal attempt to extort money from the MRCCM and to corruptly solicit a campaign contribution in exchange for an official act. A Grand Jury has charged Defendant Inman with Hobbs Act extortion and solicitation of a bribe. The Indictment adds a third count for making a false statement to the FBI based on Defendant Inman's allegedly false representations during the course of the government's investigation.

Defendant Inman moves to dismiss the Indictment. He argues the Indictment is fatally flawed in that the government has not alleged and cannot establish critical elements relating to each of the three counts charged in the Indictment. The government has filed a brief in opposition, and both parties have filed supplemental briefs in response to questions the Court has raised with respect to federalism and First Amendment concerns. The Court heard argument on the motions on August 9, 2019. Following the argument, the Court denied the motion, in part, from the bench with respect to Count 3 and with respect to certain other requests, such as for a bill of particulars, Defendant made in the motion. The Court took the remainder of the motion—namely the request for dismissal of Counts 1 and 2 of the Indictment—under advisement. The matter is ready for decision.

## LEGAL STANDARDS

The defense brings the motion under FED. R. CRIM. P. 12(b)(2), as a motion to dismiss the Indictment for lack of jurisdiction, and under FED. R. CRIM. P. 12(b)(3)(B)(v), as a motion to dismiss the Indictment for failure to state an offense.[2] On a motion to dismiss an Indictment, the

---

[2] The motion is also brought under FED. R. CRIM P. 12(B)(3)(A)(v) which relates to a motion to dismiss for an error in the grand-jury proceeding or preliminary hearing. To the extent defendant

3

Court must view the Indictment's factual allegations as true and must determine only whether the Indictment is "valid on its face." *Costello v. United States,* 350 U.S. 359, 363 (1956). "If an indictment is valid on its face, it may not be dismissed on the ground that it is based on inadequate or insufficient evidence." *United States v. Walters*, No. 3:15-CR-14-GFVT-REW, 2016 WL 1453069, at *3 (E.D. Ky. Apr. 12, 2016) (citing FED. R. CRIM. P. 12(b)(2) n.2; *United States v. Knox*, 396 U.S. 77, 83 n.7 (1969)); *see also United States v. Marra*, 481 F.2d 1196, 1199-1200 (6th Cir. 1973) (approving the district court's comment that "[a] motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.").

"Generally, motions are capable of determination before trial if they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). "[W]here the defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged in an indictment, the Court is reviewing a question of law, not fact." *United States v. Vertz*, 40 F. App'x 69, 70 (6th Cir. 2002) (citing *United States v. Bowman*, 173 F.3d 595 (6th Cir. 1999)). A reviewing court is permitted to "make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992).

## DISCUSSION

### 1. Defendant's Jurisdictional Challenges are Meritless

Defendant Inman first seeks to dismiss Counts 1 and 2 of the Indictment on the basis that the Indictment is jurisdictionally defective. For the reasons set out below, the Court disagrees.

---

seeks dismissal on this basis, it is meritless for the reasons the Court articulated from the bench during the hearing on the motion.

4

### A. Count 1 – Attempted Extortion under Color of Official Right

With respect to Count 1, Defendant Inman argues that the "indictment does not allege any effect on commerce through" his vote on the prevailing wage law. (ECF No. 14, PageID.38). He asserts his offer to vote no, had no "realistic probability to affect commerce." (*Id.* at PageID.40). Had he cast a "no" vote, instead of the "yes" vote he actually cast, Defendant Inman contends, the repeal measure would still have had sufficient votes to pass the Michigan House of Representatives. And even if the measure failed, he further states, the initiative would merely have proceeded to the Michigan electorate for a vote in the next general election. Either way, Defendant stresses, there was no impact—*de minimis* or otherwise—on interstate commerce.

The statute underlying Defendant's charge in Count 1 provides in relevant part as follows:

> **(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> **(b)** As used in this section—
>
> \*\*\*
>
> **(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
>
> **(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia, and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

5

18 U.S.C. § 1951.  The commerce element, which is Defendant's focus here, has been described by the Supreme Court as "unmistakably broad. It reaches any obstruction, delay, or other effect on commerce, even if small, and the Act's definition of commerce encompasses all . . . commerce over which the United States has jurisdiction."  *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (internal quotation marks omitted).  In cases alleging attempt, the requirement "has been read broadly to allow purely intrastate activity to be regulated under the theory that there was a *realistic probability* that the activity would have affected interstate commerce."  *United States v. Peete*, 919 F.2d 1168, 1175 (6th Cir. 1990) (emphasis in original).

While Defendant contends his legislative vote is too far afield from even this encompassing language, his aim misses the mark.  In *United States v. DiCarlantonio*, 870 F.2d 1058 (6th Cir. 1989), the Sixth Circuit Court of Appeals upheld the appellants' convictions for Hobbs Act conspiracy, noting that "a reasonable jury clearly could have found that appellants had conspired to extort money . . . and that, if successful, this scheme would have affected commerce by depleting the assets of an enterprise in interstate commerce."  *Id.* at 1061-62.  Here, the Indictment alleges that the MRCCM is engaged in operations affecting interstate commerce.  (Indictment ¶ 13, ECF NO. 1, PageID.5).  Provided that the government can establish as much at trial, the interstate commerce question is "eas[ily]" answered "because the government [will have] alleged and proved that the [union that Defendant extorted] was engaged in interstate commerce."  *Peete*, 919 F.2d at 1175; *see also United States v. Hooks*, No. 05-20329 B, 2005 WL 3370549 (W.D. Tenn. Dec. 12, 2005) (denying motion to dismiss charge of attempted Hobbs Act extortion where "the indictment alleges that [the defendant] solicited and received funds from a business he believed to be engaged in interstate commerce.").  For this reason, Defendant's challenge to Count 1 of the Indictment based on an alleged jurisdictional deficit fails.

### B. *Count 2 – Solicitation of a Bribe*

Count 2 of the Indictment alleges that Defendant "being an agent of a State government that received benefits in excess of $10,000 . . . did corruptly solicit and demand a thing of value, namely, a political campaign contribution of money from the MRCCM[.]" (Indictment ¶ 17, ECF No. 1, PageID.6). The statute reaches the criminal activity of an agent only if the "organization, government, or agency" involved received federal benefits exceeding $10,000 in the timeframe at issue. *See* 18 U.S.C. § 666(b); *see also Hooks*, 2005 WL 3370549, at *11. Defendant contends that the Indictment must be dismissed because the government cannot show that the Michigan House of Representatives received more than $10,000 in federal benefits. Defendant emphasizes that he is a member of the Michigan House of Representatives which is distinct, he says, from the State of Michigan. For this reason, he contends he is not an agent of the State of Michigan. The difference matters, Defendant further argues, because only the State of Michigan receives benefits in excess of $10,000 under a Federal program in any given year. *See* 18 U.S.C. § 666(b). He produces records demonstrating the Michigan House of Representatives received no federal benefits in the timeframe at issue. Finally, Defendant maintains that his vote did not belong to either the Michigan House of Representatives or the State of Michigan nor was it within the care, custody, or control of either of those two bodies.

Defendant's challenges here are not persuasive. They generally seek to test the sufficiency of the evidence that Defendant believes will be adduced against him at trial, rather than demonstrate any deficiency in the Indictment. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Coss*, 677 F.3d 278, 287 (6th Cir. 2012)

(quoting *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010)); *see also* FED. R. CRIM. P. 7(c) (noting "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" The Indictment in this case passes muster under this authority.

With respect to Defendant's first argument, whether he may be considered an agent of the State of Michigan, Defendant seeks too narrow of a focus. The plain language of the statute demonstrates that he may properly be considered an agent of the State: "the term 'agent' means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and *representative*." 18 U.S.C. § 666(d)(1) (emphasis added). Courts interpreting this language have concluded "Congress clearly sought to apply § 666 to legislative-branch officials." *United States v. Lipscomb*, 299 F.3d 303, 333 (5th Cir. 2002); *see also United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013) (finding legislator serving in the Senate of the Commonwealth of Puerto Rico may be considered an agent of the Commonwealth of Puerto Rico). Defendant's related argument that the Michigan House of Representatives does not receive federal benefits in excess of $10,000 in any given year fails by the same logic. The government avers that Defendant, being a legislator, is an agent of the State of Michigan—a conclusion supported both by the statute and the case law—and that the State government has received benefits in excess of $10,000 in a one-year period. All this satisfies the requirements of Rule 7. Defendant is, of course, free to test the sufficiency of the government's evidence at trial. *See United States v Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019) (noting that not all funds constitute benefits and distinguishing testimony from Defendant's first trial that Puerto Rico Senate received $20,000 in federal benefits for

childcare from stipulation in second trial that Commonwealth of Puerto Rico received over $10,000 in federal funds).

Defendant's final contention that the Indictment must be dismissed because the property at issue—his vote—was not under the care, custody, or control of the State of Michigan fails for a different reason. The Indictment in this case charges Defendant with solicitation of a bribe under 18 U.S.C. § 666(a)(1)(B). The statutory language that Defendant depends upon, however, is found only in Section 666(a)(1)(A)(ii), a provision (unlike the bribery section) relating to the theft of property that is owned by, under the care, custody, or control of the organization. Defendant does not disagree, but he contends that the provision "still support[s]" his position that the prohibited act—a solicitation of a bribe—be tied to property connected to an entity receiving federal funds. (ECF No. 14, PageID.43). The Court disagrees. An indictment is not flawed for failing to contain an element that is not a part of the charge. Defendant's construction would read out of the statute any legislator who solicits a bribe in exchange for a vote. Such a construction has no support in the statute or the case law.

Accordingly, Defendant's challenge to Count 2 based on an alleged jurisdictional defect fails.

**2. Defendant's Challenge to the Indictment for Failure to State an Offense is Best Addressed in Jury Instructions.**

Finally, Defendant contends that the Indictment should be dismissed because the facially lawful campaign activities of a legislator—including solicitation of an otherwise lawful campaign contribution—and the subsequent exercise of his duties through a legislative vote, are not activities that are covered by Hobbs Act extortion of the bribery statute. To conclude otherwise, he maintains, would be to permit a nearly boundless reading of the statute that would chill routine and lawful political discussion between legislators and parties interested in legislation. How, asks

Defendant, does a legislator or lobbyist know when discussing a piece of pending legislation in the context of lawful campaign contributions is prudent politics, or attempted solicitation of a bribe or extortion?  According to Defendant, if what the Indictment alleges here amounts to a crime, then much of what passes as politics as usual in Lansing is at least potentially within the scope of a future federal Indictment if a federal prosecutor wishes to present the matter to a Grand Jury.  Should federal prosecutors really be able to exert that kind of threat over political activity in the halls of a State Capitol?

"[N]ot all quid pro quos are made of the same stuff."  *United States v. Abbey*, 560 F.3d 513, 517 (6th Cir. 2009).  The starting point is the language of the statute, which has been broadly construed:

> As noted by the Supreme Court, the words of the [Hobbs] Act "manifest[ ] a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion . . ." *United States v. Culbert,* 435 U.S. 371, 373 (1978) (quoting *Stirone,* 361 U.S. at 215).  Rather than drawing a line at the conduct of local officials, the words "do not lend themselves to restrictive interpretation," but reach all extortion which "in any way or degree, obstructs, delays or affects commerce." *Id.;* 18 U.S.C. § 1951(a); *see also City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 378-79 (1991) (referring to the Hobbs Act as a Congressional act "aimed at combating corruption in state and local governments.").  Further, the Court notes the long history of application of the Hobbs Act to the conduct of local officials. *See e.g., Evans v. United States,* 504 U.S. 255, 257 (1992) (affirming Hobbs Act conviction of an elected member of the Board of Commissioners of DeKalb County, Georgia); *Peete,* 919 F.2d at 1172-76 (affirming Hobbs Act conviction of an elected local city councilman); *United States v. Hall,* 536 F.2d 313 (10th Cir. 1976) (upholding state governor's Hobbs Act conviction); *United States v. Kenny,* 462 F.2d 1205, 1211 (3rd Cir. 1972) (upholding Hobbs Act convictions of public officials and political leaders in Jersey City and Hudson County, New Jersey)

*Hooks*, 2005 WL 3370549, at *10 (alterations to *Culbert* in original).

Against this broad backdrop lies the specific context of this case, which involves campaign contributions. The Supreme Court has remarked that such situations auger in favor of some caution "because almost all lawful contributions are given to influence future legislative or executive actions." *Abbey*, 560 F.3d at 516 (citing *McCormick v. United States*, 500 U.S. 257 (1991)). Indeed, as expressed by the Supreme Court:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

*McCormick v. United States*, 500 U.S. at 272–73.

Other authority, including some recent cases, warn against too zealous of an application in the campaign contribution context to prevent the chilling of free speech. *See Buckley v. Valeo*, 424 U.S. 1 (1976); *see also McCutcheon v. Federal Election Comm'n*, 572 U.S. 185 (2014); *Randall v. Sorrell*, 548 U.S. 230 (2006). These lines of cases recognize that strong First Amendment interests are at stake in the arena of campaign contributions and expenditures. And in *Citizens United*, the Supreme Court made clear that political spending is a form of speech entitled to First Amendment protections. *Citizens United v. Federal Election Comm'n*, 558 U.S.

11

310 (2010).  If some of the direct restrictions in these lines are unconstitutional on their face, then it stands to reason that criminal laws that might indirectly infringe on the same thing could be vulnerable as well and have a chilling effect on speech.  For this reason, the Court does see the need for special care in policing the parameters of Hobbs Act extortion and corrupt solicitation of a bribe in the context of a legislator soliciting an otherwise lawful campaign contribution.

Yet, alongside these precedents the Supreme Court has consistently held that direct quid pro quo corruption may be prohibited with criminal sanctions.  *McCormick*, 500 U.S. 257; *Evans v. United States*, 504 U.S. 255, 268 (1992).  As applied to campaign contributions, such contributions may "run afoul of the Hobbs Act if they are induced by the use of force, violence, or fear," or when they, "having been taken under color of official right . . . are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'" *Abbey*, 560 F.3d at 517 (quoting *McCormick*, 500 U.S. at 274).  Thus in order to sustain a Hobbs Act conviction, "it is sufficient if the public official understood that he or she was expected to exercise some influence of the payor's behalf as opportunities arose." *Id.* (citing *United States v. Bradley*, 173 F.3d 224, 231-32 (3d Cir. 1999); *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993)).  The same reasoning applies to the solicitation of a bribe charged in Count 2.  And all of this is consistent with Congress's intent that Hobbs Act extortion and the bribery statute be applied to legislators. *Hooks*, 2005 WL 3370549, at *10; *Lipscomb*, 299 F.3d at 333.

Defendant raises legitimate concerns with respect to too broad a reading of the statute especially in situations where, as here, the allegations at issue reach into otherwise facially valid campaign activities and not, as in other cases, a mix of contributions and under-the-table transactions.  The Court is satisfied, however, that the way to address these concerns is not through the dismissal of the Indictment that in all other respects complies with the Federal Rules.  Rather

12

it is through a judicious and well-thought-out instruction to the jury. The case law provides a good start. *See Evans*, 504 U.S. at 257-58; *Abbey*, 560 F.3d at 519.

## CONCLUSION

Accordingly, for the reasons detailed in this Order, as well as the reasons expressed from the bench during the August 9, 2019, hearing, **IT IS ORDERED** that Defendant's Motion to Dismiss (ECF No. 13) is **DENIED.**

The Court will set a date for a final pretrial conference and jury trial by separate order.


Dated:    October 15, 2019            /s/ Robert J. Jonker
                                                           ROBERT J. JONKER
                                                           CHIEF UNITED STATES DISTRICT JUDGE