**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,                    No. 1:19-CR-117-RJJ

v.                                      Hon. Robert J. Jonker
                                      Chief U.S. District Judge

LARRY CHARLES INMAN,

               Defendant.

_____/

## GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through United States Attorney Andrew Byerly Birge and Assistant United States Attorneys Christopher O'Connor and Ronald Stella, submits this summary of the expected proofs and applicable law.

## I.   SUMMARY OF ANTICIPATED PROOFS

A grand jury returned a three-count indictment against the Defendant, Larry Charles Inman, charging him with: (1) attempted extortion under color of official right, in violation of 18 U.S.C. § 1951 (the "Hobbs Act"); (2) solicitation of a bribe, in violation of 18 U.S.C. § 666(a)(1)(B); and (3) making a false statement to the FBI, in violation of 18 U.S.C. § 1001.

The following is a summary of some of the evidence the government anticipates it will introduce in its case-in-chief in support of those charges:

Inman, an elected member of the Michigan House of Representatives, was facing a contested re-election campaign in 2018 and was very concerned that he had only $30,000 in his campaign account. In late May 2018, Inman stated that he needed to raise $40,000 in campaign contributions by September to fund his campaign. Around the same time, he also stated that he was "undecided" on whether the state should repeal Public Act 166 of 1965, commonly known as the "prevailing wage" law, which regulated pay and benefits for workers on state construction projects. If the Michigan legislature did not repeal the law, the proposal would appear on the ballot in the November 2018 statewide general election.

The Michigan Regional Council of Carpenters and Millwrights (MRRCM), a labor union that opposed repeal of the prevailing wage law, engaged in efforts to educate legislators on the benefits of the law and the risks of its repeal. The International Brotherhood of Electrical Workers Local 498 (IBEW) and other labor unions that opposed repeal of the prevailing wage law also lobbied legislators, including Inman, on the benefits of the law. MRCCM and lobbyists it retained met with several legislators it hoped would support the prevailing wage law, including Inman. In November 2017, MRCCM and others hosted an event at the Capitol Prime restaurant where Lisa Canada, the political and legislative director of MRCCM, met Inman for the first time and discussed the prevailing wage law.

The MRCCM's political action committee made campaign contributions to many legislators, including Inman. Between October 2017 and May 16, 2018, Inman received a total of $6,000 in donations from the MRCCM in four separate campaign contributions. Inman deposited three MRCCM checks totaling $2,000 in 2017, but never deposited the fourth check dated May 16, 2018, in the amount of $4,000.

In June 2018, Inman learned that he would soon be voting on the prevailing wage issue in the House of Representatives. In a June 1, 2018 text message to a representative of the IBEW, Inman said that he remained "undecided" on the issue and: "If I take the vote no to send it to the ballott, I am going to need alot of help and a ton of campaign money." When asked how much Inman needed, Inman told the IBEW that "It will have to come from all the trade unions associations, they told me $30,000. I got $5,000. :)" Inman told the IBEW that there was a "dirty dozen" that might vote against repeal, but that "the R party will be all over my ass" and "Me I need money , and then help with votes!" The IBEW did not send Inman money in response to his messages.

Two days later, on June 3, 2018, Inman sent a text message to Lisa Canada, MRCCM's political and legislative director. Citing the impending prevailing wage vote, Inman said: "We all need some more help!" Inman then expressed a belief that $30,000 was available for legislators who might oppose repeal of the law, but that most only received about $5,000: "It's not

worth losing assignments and staff for $5,000, in the end. They will give you the check back." Inman suggested that the union "max out" everyone because "[p]eople will not go down for $5,000, not that we dont appreciate it." Inman concluded the text with, "we never had this discussion, Larry." Inman sent a nearly identical text message to Jim Kirsch, a lobbyist at Kelley Cawthorne who was retained by MRCCM to assist with its efforts to prevent repeal of the prevailing wage law.  Inman ended the text message with, "we never had this discussion, get with Lisa Canada, L".

Neither Canada nor Kirsch responded to those text messages, and MRCCM did not send Inman an additional campaign contribution. Instead, on June 4, 2018, Canada reported Inman's text messages to law enforcement. Inman also sent text messages to Canada and Kirsch stating: "I will text you tomorrow to make sure we have a solid 12 no votes to block prevailing wage , Larry." And the day before the vote, on June 5, Inman invited Canada and Kirsch to a "Breakfast event" at the Karoub lobbying firm and stated, "see if there are checks you can get , thanks ! Larry Inman."

On June 6, 2018, Inman cast a "Yes" vote in the House of Representatives in favor of repealing the prevailing wage law. Afterwards, Inman sent a text message to Lisa Canada apologizing for his "Yes" vote.  He claimed that he had to vote to repeal the law because four legislators "dropped" (meaning, they switched from a "No" to a "Yes") and that he had to "save" Representative Joseph Bellino, who Inman claimed was "going yes, but

4

to save his seat they needed one more to put bellino as a no to save his seat." The government will introduce evidence that calls into doubt those claims.

As soon as Inman voted "Yes," he immediately began seeking help with securing money for his re-election campaign from individuals who had encouraged him to vote in favor of repealing the prevailing wage law.  Inman told one fellow legislator on June 6, "Now I need hug[e] help with Door help and shit load of money."

On June 19, 2018, with the assistance of the FBI, Lisa Canada placed a recorded phone call to Inman and asked him questions about his June 3 text message to her. Canada indicated that she was alarmed and insulted by his message, and felt like it questioned her integrity. Inman apologized for the message and said that he was panicked and concerned that there would not be enough "No" votes on the prevailing wage law and that the only way he could figure it out was to get more checks for legislators who might vote "No."

When Canada told Inman she felt his text message was just about getting more money, Inman replied:  "Well guess what, it was just . . . you know I was in a panic, I should have never sent it. Uh, and I only had mentioned to you and Kirsch, um, that, you know, if we could have maybe spent more time with these people and gotten them more checks that may have made a difference." When Canada asked Inman if he would have changed his vote had the MRCCM come up with $30,000, Inman said "I can't

judge that. I really can't. I can't judge it today." When Canada told Inman she felt he was trying to obtain $30,000 in exchange for his vote, Inman initially claimed that his request for $30,000 wasn't for him, but eventually responded: "Well, I guess I find out I'm not perfect."

Inman also told Canada that his text to her and Kirsch was confidential and should not get out, but that if anybody ever questions her integrity that he would say "I didn't do it properly . . . ." During the call, Inman offered to return the $4,000 check that the MRCCM sent him in May that he did not deposit, which he said was still sitting on his counter. In July 2018, Inman returned the $4,000 check to MRCCM.

On August 1, 2018, FBI agents executed a federal search warrant at Inman's residence to seize and search his cell phone. Inman agreed to a voluntary interview during the search. During the interview, Inman recalled discussing the prevailing wage issue with Lisa Canada and other union representatives in the months leading up to the vote. Inman specifically recalled details concerning MRCCM's presentation to him and others in November 2017 at the Capitol Prime restaurant, including that he met with Lisa Canada at the event. Inman claimed that Canada told him that $30,000 was available for campaign contributions. He also recalled talking to Canada on the phone about prevailing wage. With respect to campaign contributions, Inman also recalled the contributions made by MRCCM and others to his campaign, including the $4,000 MRCCM contribution he did not deposit.

Inman said he did not deposit that check because he was not sure how he was going to vote on the prevailing wage repeal.  He eventually returned that check to MRCCM after he voted "Yes" to repeal the prevailing wage law.

During the interview, Inman flatly denied soliciting campaign contributions from Lisa Canada or the MRCCM before casting his vote on the prevailing wage law. Specifically, Inman denied having any conversation with Canada about receiving $10,000 or any other amount in connection with his vote on the prevailing wage repeal. He denied sending any text messages regarding $30,000.  He denied having any conversation with Lisa Canada, or anyone else, about receiving a campaign contribution in return for a specific vote on prevailing wage. Inman denied ever asking Canada for more money during the time leading up to the prevailing wage vote. Inman specifically denied sending text messages seeking more money from Canada or the MRCCM, denied sending a text message referring to $30,000, denied asking Canada for $30,000, and denied asking for any money from any trade committee, or from Canada. At the conclusion of the interview, Inman said that everything he told the FBI was the truth.

In October 2018, Inman contacted the FBI agent who interviewed him in August. Inman told the agent that he panicked leading up to the prevailing wage vote and that his text messages indicated that he pressured the carpenters' union for money.

In a second interview with the FBI in December 2018, Inman claimed he had no memory of the June 2018 text messages he sent to Lisa Canada and Jim Kirsch referencing $30,000.  But he did recall sending Canada a text message inviting her to a fundraising event at Karoub (including the request that she bring checks) and recalled Lisa Canada calling him after the vote on prevailing wage to discuss his vote to repeal the law.

## II.  ELEMENTS OF THE OFFENSES AND APPLICABLE LAW

### A.  Count 1:  Attempted Extortion under Color of Official Right

As applicable to this case, the Hobbs Act prohibits anyone from attempting to obstruct, delay, or affect commerce, in any way or degree, through obtaining property from another, with consent, under color of official right. The indictment alleges that, between June 3, 2018, and June 5, 2018, Inman attempted to unlawfully seek money from the Michigan Regional Council of Carpenters and Millwrights in exchange for his vote in the Michigan House of Representatives on repealing the prevailing wage law. (R.1: PageID.5)

The elements of the offense as charged in the indictment are: (1) the defendant was a public official; (2) the defendant attempted to obtain or receive property (a campaign contribution of money) that he was not lawfully entitled to from the MRCCM with its consent; (3) the defendant knew the campaign contribution of money would be obtained or received in exchange for an official act; and (4) the MRCCM was engaged in interstate commerce.

*See generally* Sixth Circuit Pattern Instruction 17.02; *McCormick v. United States*, 500 U.S. 257 (1991) (campaign contributions to state representative run afoul of the Hobbs Act if they are made in return for a promise or undertaking by the public official to perform or not to perform an official act (a "quid pro quo")); *Evans v. United States*, 504 U.S. 255, 268 (1992) (Hobbs Act extortion includes "taking a bribe" even if it is in the form of a campaign contribution); *McDonnell v. United States*, 136 S. Ct. 2355 (2016) (describing what qualifies as an "official act" in Hobbs Act prosecution); *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) (affirming Hobbs Act conviction of city administrator for extortion under color of official right).

In *Abbey*, the Sixth Circuit clarified the quid pro quo requirement set forth in *McCormick*, finding that the "official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Abbey*, 560 F.3d at 518 (citation omitted). The inducement is criminal if it is either express or implied from the public official's words and actions, if that is what he intends. *Id.*

A violation of the statute is complete upon the solicitation of money for the performance of an official act. *See McDonnell*, 136 S. Ct. at 2370; *United States v. Peete*, 919 F.2d 1168, 1175-76 (6th Cir. 1990) (attempted extortion under Hobbs Act complete when defendant city councilman solicited payment from developer in exchange for ensuring sufficient votes to pass proposed project). A claim that the public official would not have followed through with

9

the official act is not a defense.  *See Evans*, 504 U.S. at 268 (fulfillment of quid pro quo not an element of offense); *Abbey*, 560 F.3d at 518 ("The public official need not even have any intention of actually exerting his influence on the payor's behalf . . . .") (internal quotation omitted).  "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*. The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question."  *McDonnell*, 136 S. Ct. at 2371.

The Supreme Court has described the "commerce" element as "unmistakably broad."  *Taylor v. United* States, __ U.S. __, 136 S. Ct. 2074, 2019 (2016) (holding that "proof of defendant's conduct in and of itself affected or threatened commerce is not needed"). The government need not prove an actual effect on interstate commerce.  *See United States v. Taylor*, 272 F.3d 380, 384-85 (6th Cir. 2001) (citing *United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir. 1989)).  The government need only show a "*realistic probability* that an extortion will have an effect on interstate commerce."  *Peete*, 919 F.2d at 1174 (citations omitted).  "That requirement, especially in cases of attempts, has been read broadly to allow purely intrastate activity to be regulated under the theory that there was a *realistic probability* that the activity would have affected interstate commerce."  *Id.* The government can meet its burden by introducing evidence that the

business or entity the public official solicited "was engaged in interstate commerce." *Id.* at 1175.

The government's burden of proof on the commerce element can be met with evidence that MRCCM purchased goods or services from outside the State of Michigan or that it engaged in business outside the State of Michigan, and that there was a realistic probability that commerce would have been affected had Inman succeeded in obtaining money from the union in June 2018. *See Peete*, 919 F.2d at 1174; *Mills*, 204 F.3d at 673 (any effect on interstate commerce, whether detrimental or beneficial, satisfies the Hobbs Act). In this Court's order denying Inman's motion to dismiss count 1, the Court observed that:

> Here, the Indictment alleges that the MRCCM is engaged in operations affecting interstate commerce. (Indictment ¶ 13, ECF NO. 1, PageID.5). Provided that the government can establish as much at trial, the interstate commerce question is "eas[ily]" answered "because the government [will have] alleged and proved that the [union that Defendant extorted] was engaged in interstate commerce." *Peete*, 919 F.2d at 1175; *see also United States v. Hooks*, No. 05-20329 B, 2005 WL 3370549 (W.D. Tenn. Dec. 12, 2005) (denying motion to dismiss charge of attempted Hobbs Act extortion where "the indictment alleges that [the defendant] solicited and received funds from a business he believed to be engaged in interstate commerce.").

(R.53: Order, PageID.378)

## B.  Count 2:  Solicitation of a Bribe

Count 2 charges Inman with corruptly soliciting or demanding a thing of value (here, a campaign contribution) from MRCCM intending to be

influenced or rewarded in connection with a business or transaction of the
government involving a thing of value of $5,000 or more, namely, his vote in
the House of Representatives on the 2018 petition to repeal the state's
prevailing wage law. *See* 18 U.S.C. § 666(a)(1)(B).

The elements of the offense as charged in the indictment are: (1) the
defendant is an agent of the State of Michigan; (2) the defendant corruptly
solicited or demanded for the benefit of any person any thing of value
intending to be influenced or rewarded in connection with any business or
transaction of the state government (his vote in the Michigan House of
Representatives on the legislative petition to repeal the state's prevailing
wage law); (3) the business or transaction (his vote on the legislative petition)
was worth $5,000 or more; and (4) the state government received, in a one-
year period, benefits in excess of $10,000 under a federal program. *See*
*Abbey*, 560 F.3d at 521; *see also United States v. Porter*, 886 F.3d 562, 565-66
(6th Cir. 2018). This statute is "expansive" both as to the conduct that is
forbidden and the entities covered by it. *See Salinas v. United States*, 522
U.S. 52, 56 (1997).

The Sixth Circuit has found that neither Congress nor the Supreme
Court has distinguished between public officials who receive campaign
contributions and those who do not (e.g., appointed officials):

> That a bribe doubles as a campaign contribution does not
> by itself insulate it from scrutiny. No doubt, a
> contribution is more likely to be a duty-free gift than a
> bribe because a contribution has a legitimate alternative

> explanation: The donor supports the candidate's election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe.

*United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (affirming convictions for honest services fraud where state court judge accepted things of value in return for official acts) (citation omitted).  In a bribery case, the jury may consider the defendant's "words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them."  *Id.*

As to the allegation that Inman is an agent of the State of Michigan, this Court has held that:

> The plain language of the statute demonstrates that [Inman] may properly be considered an agent of the State: "the term 'agent' means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1) (emphasis added). Courts interpreting this language have concluded "Congress clearly sought to apply § 666 to legislative-branch officials." *United States v. Lipscomb*, 299 F.3d 303, 333 (5th Cir. 2002); *see also United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013) (finding legislator serving in the Senate of the Commonwealth of Puerto Rico may be considered an agent of the Commonwealth of Puerto Rico).

(R.53: Order, PageID.380)

To establish federal jurisdiction, the government need not show that the alleged criminal conduct had an effect on federal funds or that federal money was involved in the corrupt transaction. *Lipscomb*, 299 F.3d at 309-

13

310. Instead, the government need only establish that the State of Michigan received over $10,000 in federal benefits involving "a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance" in any one year period. 18 U.S.C. § 666(b). The government anticipates that a State of Michigan employee will testify that, in 2018, Michigan received more than $10,000 in federal "benefits," as that term has been construed by the Supreme Court. *See Fischer v. United States*, 529 U.S. 667, 681 (2000) (holding that Medicare funds ultimately paid to participating health care organizations constitute "benefits" within the meaning of Section 666(b)).

### C.  Count 3:  False Statement to the FBI

Count 3 charges Inman with making a false statement to the FBI during its investigation of Inman's solicitation of money from unions in the days preceding the prevailing wage vote.

The elements of the offense as charged are:  (1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent; (3) the statement was material; (4) the defendant acted knowingly and willfully; and (5) the statement pertained to a matter within the jurisdiction of the FBI. *See generally* Sixth Circuit Pattern Instruction 13.02; *Bryan v. United States*, 524 U.S. 184, 191, 194 (1988); *United States v. Rodgers*, 466 U.S. 475, 479-80 (1984). The government does not need to prove that Inman knew of the particular federal statute prohibiting lying to the FBI. The government need

14

only show that he acted with bad purpose with the general understanding that lying to a federal investigator is contrary to law.

## IV.  ANTICIPATED EVIDENTIARY ISSUES

### A. Inman's Statements

Federal Rule of Evidence 801(d)(2)(A) allows the government to admit the defendant's statements.  Inman has made a variety of oral and written statements that are admissible when offered by the government because they are admissions of a party-opponent, including:

- Written statements he made in text messages he sent to third parties, including representatives of the IBEW and MRCCM.

- Oral statements he made to Lisa Canada during a consensually-monitored and recorded telephone call on or about June 19, 2018; and

- Oral statements he made to an FBI agent on or about August 1, 2018; October 16, 2018, October 17, 2018, and December 7, 2018.

Of course, Inman cannot seek the admission of portions of his statements through Rules 801 and 106 because they are not "offered against an opposing party" and constitute inadmissible hearsay. *See United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013). In other words, what defendant believes to be exculpatory hearsay "may not come in solely on the basis of completeness."

15

*Id.* (quoting *United States v. Shaver*, 89 F. App'x 529, 533 (6th Cir. 2004)).

Additionally, Inman cannot avoid testifying under oath by seeking to admit

certain prior out-of-court statements that he wishes the jury to hear that the

government is not introducing into evidence in its case-in-chief.

### B. Text Messages Between Inman and the IBEW

The government filed a motion in limine to admit in its case-in-chief

text messages sent by Inman to a representative of the International

Brotherhood of Electrical Workers (IBEW) on June 1, 2018. (R.39: Gov.'s

Mot., PageID.265-76) Those messages are admissible because they are

inextricably intertwined with the charged offenses and, alternatively, as

"other acts" under Fed. R. Evid. 404(b) to demonstrate Inman's intent and

absence of mistake. Inman opposes the motion but elected not to file a brief in

response. The motion is ripe for decision.

### C.  Summary Charts of Text Message Evidence

The government filed a motion in limine to admit in its case-in-chief

summary charts of pertinent text messages exchanged between Inman and

witnesses the government presently intends to call at trial.[1] (R.36: Gov. Mot.,

PageID.223-63) The proposed summary charts are admissible under Fed. R.

Evid. 1006. Inman opposed the motion but elected not to file a brief in

---

[1] After filing the motion, the government learned that its time conversion for
Coordinated Universal Time (UTC) used in the forensic report to Eastern Daylight
Time (EDT) in the summary charts should have been minus four hours, not five. The
summary charts in the government's exhibit books have been corrected to display
the correct dates and times of day the messages were sent and received.

response. In an email dated November 7, 2019, Inman's counsel indicated that he will agree to the format of the exhibits, provided the FBI forensic examiner testifies as to the "foundation for the extraction." Inman also wishes to "reserve objection as to the admissibility of the exhibits without a foundation laid by the sender or recipient and relevance." The motion is ripe for decision.

### D.  Expert Testimony Concerning Inman's Use of Prescription Medication

Inman has filed a notice of intent to present evidence of his diminished cognitive ability as a result of the use of prescription pain medicine. (R.16: Def.'s Notice, PageID.66-67) The government has moved in limine to exclude Inman's proposed expert testimony of Dr. Bruce Baker on the issue of Inman's alleged diminished capacity because the opinions disclosed to date are not relevant to that issue and Inman has otherwise failed to comply with Federal Rule of Criminal Procedure 16. (R.55-2: Gov. Mot., PageID.392-93) That motion remains pending.

If the Court permits Inman to introduce evidence concerning his use of prescription medication, the government anticipates calling up to two expert witnesses in its rebuttal case: Dr. Daniel Berland, MD, University of Michigan Medicine (Ann Arbor), who is a Fellow of the American College of Physicians and a member of the American Society of Addiction Medicine, and Dr. Bryan Judge, MD, toxicologist, Med Tox Consulting, PLLC. Additionally, if Inman does not call his medical treatment providers as part of his case

17

presentation, the government may call one or more of those witnesses in its rebuttal case to testify concerning Inman's physical and mental condition between June 1, 2018, and August 1, 2018, the relevant period of Inman's criminal conduct.

To the extent the jury hears evidence relating to Inman's alleged diminished capacity at the time of the offense conduct, that evidence is only relevant to count 3 (lying to the FBI). (R.19, Gov. Br. PageID.91-104) The government requests that the Court instruct the jury that such evidence is irrelevant as to the crimes charged in counts 1 and 2, and may only be considered in determining whether Inman acted "knowingly and willfully" when the jury deliberates on count 3. *See United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001); *United States v. Gonyea*, 140 F.3d 649, 650 (6th Cir. 1998) (concluding that "diminished capacity" defense to mens rea survived enactment of insanity defense codified at 18 U.S.C. § 17, but only for specific intent crimes).

### E. Records of a Regularly Conducted Activity ("Business Records")

The government will seek to admit certain documents and records under the "business-record" exception to the hearsay rule. A business record must satisfy the following requirements in order to be admissible under Rule 803(6):  (1) the record was made at or near the time by, or from information transmitted by, someone with knowledge; (2) the record was kept in the course of a regularly conducted business-like activity; and (3) making the record was a regular practice of that activity. If those requirements are met, the record is admissible unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6); *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003).

It is not necessary that the authenticating witness be the actual recorder of the data or have personal knowledge of it. All that is required is that the witness be familiar with the record keeping system. *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986). Business records also may be self-authenticating under Federal Rule of Evidence 902(11) even if they contain information provided by a third party. *See United States v. Smith-Kilpatrick*, __ F.3d__, No. 18-1671, slip op. at 8 (6th Cir. Nov. 7, 2019) ("self-authentication is not concerned with the accuracy of a record, but rather, providing a streamlined method of ensuring that a document is indeed what its proponent claims it is.") (citing Fed. R. Evid. 901(a)).  Doubts about the accuracy of business records go to the weight of the evidence, not its

admissibility.  *Id.* at 6.  The Federal Rules of Evidence allow the use of duplicates to the same extent as originals unless there is a genuine question as to their authenticity.  Fed. R. Evid. 1003. Federal Rule of Evidence 1001(e) defines "duplicate" to include photocopies.

### F. Stipulations

Inman's counsel has indicated that Inman will stipulate to the authenticity of certain Huntington Bank records and their admissibility pursuant to Federal Rules of Evidence 803(6) and 1003 as records of regularly conducted business activity.  No records custodian will be necessary. The government has pursued other stipulations to further streamline the presentation of evidence at trial, but to date Inman has not agreed to those proposals.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney


Dated:  November 8, 2019

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
RONALD M. STELLA
Assistant United States Attorneys

United States Attorney's Office
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404
christopher.oconnor@usdoj.gov
ron.stella@usdoj.gov

20