1                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3  _____

4  UNITED STATES OF AMERICA,

5                 Plaintiff,
                          DOCKET NO. 1:19-cr-117
6  vs.

7

8  LARRY CHARLES INMAN,

                 Defendant.
9  _____/

10

11      EXCERPT TRANSCRIPT OF VOLUME III OF JURY TRIAL

12         TESTIMONY OF JEREMY ASHCROFT

13    BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

14           GRAND RAPIDS, MICHIGAN

15             December 5, 2019

16

17  Court Reporter:       Glenda Trexler
                      Official Court Reporter
18                   United States District Court
                      685 Federal Building
19                   110 Michigan Street, N.W.
                      Grand Rapids, Michigan 49503
20

21  Proceedings reported by stenotype, transcript produced by

22  computer-aided transcription.

23

24

25

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3        MR. CHRISTOPHER M. O'CONNOR
          UNITED STATES ATTORNEY'S OFFICE
 4        330 Ionia Avenue, N.W.
          P.O. Box 208
 5        Grand Rapids, Michigan 49501-0208
          Phone:  (616) 456-2404
 6        Email:  Christopher.m.o'connor@usdoj.gov

 7        MR. RONALD M. STELLA
          UNITED STATES ATTORNEY'S OFFICE
 8        330 Ionia Avenue, N.W.
          P.O. Box 208
 9        Grand Rapids, Michigan 49501-0208
          Phone:  (616) 456-2404
10        Email: ron.stella@usdoj.gov

11   FOR THE DEFENDANT:

12        MR. CHRISTOPHER K. COOKE
          NEUMANN LAW GROUP
13        300 Front Street, Suite 460
          Traverse City, Michigan 49684
14        Phone:  (231) 221-0052
          Email:  chris@cookemail.com

15

16                        *   *   *   *   *

17                              Grand Rapids, Michigan

18                              December 5, 2019

19                  EXCERPT OF PROCEEDINGS

20        MR. O'CONNOR:  The government calls Jeremy Ashcroft.

21                    JEREMY ASHCROFT

22              (The oath was administered)

23        THE WITNESS:  Yes.

24

25
```

1                         DIRECT EXAMINATION

2     *BY MR. O'CONNOR:*

3     *Q.*   Good afternoon, sir.

4     *A.*   Good afternoon.

5     *Q.*   Would you please introduce yourself to the jury.

6     *A.*   Yes.  My name is Jeremy Ashcroft, and I'm a special agent

7     with the FBI.  I'm currently assigned to the Detroit field

8     office, their Lansing resident agency, so that's the small

9     office we have in the Lansing area.

10    *Q.*   Okay.  How long have you been a special agent with the

11    FBI?

12    *A.*   I've been an agent for a little over 17 years now.

13    *Q.*   And before becoming an FBI agent what did you do?

14    *A.*   I'm a mechanical engineer.

15    *Q.*   Did you attend college?

16    *A.*   I did.

17    *Q.*   Where did you go to college?

18    *A.*   I went to what was then General Motors -- well, it was

19    GMI, which stood for General Motors Institute of Technology.

20    It's now Kettering University in Flint, Michigan.

21    *Q.*   As a special agent with the FBI did you become involved in

22    an investigation of the defendant Larry Inman?

23    *A.*   Yes, I did.

24    *Q.*   And when did you start your investigation of Mr. Inman?

25    *A.*   We started our investigation on May 4th of 2018.  We

DIRECT EXAMINATION OF JEREMY ASHCROFT

1    received a referral from the Michigan State Police.  That

2    referral was eventually forwarded to me, and I took the next

3    steps of reaching out to the complainant, Lisa Canada, and

4    established a time to interview her.

5    Q.  I'm sorry, what month did you say you started in?

6    A.  It was May.

7    Q.  May?

8    A.  I'm sorry, pardon me?

9    Q.  May of when?

10   A.  I'm sorry, it was June of 2018.  June of 2018.

11   Q.  Okay.  So last year?

12   A.  Yes.

13   Q.  In June of 2018?

14   A.  In June of 2018 we received a referral from MSP.

15   Q.  Why did you -- how did you get that referral from Michigan

16   State Police?

17   A.  So Michigan State Police had received a complaint from

18   Ms. Canada.  We have a task force officer assigned to our

19   Detroit office.  That task force officer received the referral

20   from the post in Oak Park and then passed it on to the

21   management team of the Detroit FBI and then it came up to the

22   Lansing RA.

23   Q.  To your knowledge did the Michigan State Police

24   investigate anything or did they simply refer it to the FBI?

25   A.  No, it was simply referred to the FBI.

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   *Q.*   All right.  And what did you do upon receiving the

2   information from Michigan State Police?

3   *A.*   So after I received it on June 4th, I reviewed the

4   information that we received with my supervisor.  I then

5   attempted to schedule an interview with Lisa Canada.

6   *Q.*   All right.  Now, did you eventually meet with Ms. Canada?

7   *A.*   Yes, I did.

8   *Q.*   Was this meeting with Ms. Canada, was that before or after

9   the prevailing wage vote had occurred?

10  *A.*   It was after the prevailing wage vote had occurred.

11  *Q.*   Approximately when did you have your first interview with

12  Ms. Canada?

13  *A.*   It was June 12th of 2018.  It was a Tuesday.

14  *Q.*   Okay.  Did you interview her about the information she

15  provided to the Michigan State Police back earlier in June?

16  *A.*   Yes, I did.  She -- I gathered the details of the text

17  message that she had received and some steps that she did as

18  well.  Took photos of the text messages that she had exchanged

19  with -- or I'm sorry -- that she had received from Mr. Inman

20  and also photos of text messages she had exchanged with one of

21  the lobbyists that the carpenters union employed.

22  *Q.*   And was this an extensive interview with Ms. Canada?

23  *A.*   It was an interview that lasted probably about an hour and

24  a half to two hours or so.

25  *Q.*   All right.  And do you recall where you interviewed her?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   A.    I interviewed her in a law office in Royal Oak.

2   Q.    Did you ask her if she would give you permission to take

3   photographs of certain text messages on her cell phone?

4   A.    Yes, I did.

5   Q.    All right.  Now, at this point in time, is this your first

6   investigative, formal investigative step is this interview with

7   Ms. Canada?

8   A.    Yes, it was.  Aside from reviewing what was passed on to

9   me by the Michigan State Police, yes, that was the first real

10  action I took.

11  Q.    First interview?

12  A.    Correct.

13  Q.    All right.  At this point in time did you have probable

14  cause to get a search warrant for Ms. Canada's cell phone?

15  A.    I did not believe so, no.

16  Q.    Is that why you asked her for consent to look at

17  particular text messages on her phone?

18  A.    That's correct.

19  Q.    Did you have a basis to search her entire phone at that

20  point?

21  A.    No, I did not.

22  Q.    Did Ms. Canada show you text messages that she had

23  received from the defendant Mr. Inman?

24  A.    Yes, she did.

25  Q.    And did you take photographs of those text messages from

DIRECT EXAMINATION OF JEREMY ASHCROFT

1    her phone?

2    A.   Yes, I did.

3    Q.   We saw those, Exhibit 34, here today.  Did you do anything

4    to her phone before you took those photographs of those

5    messages to manipulate any of the information on the phone?

6    A.   No, those were exactly as displayed on the phone at the

7    time they were shown to me.

8    Q.   Based on your meeting with Ms. Canada and your review of

9    those messages, at this point did you have any evidence in your

10   investigation that other legislators had sent Ms. Canada a text

11   message soliciting campaign money in connection with the

12   prevailing wage vote?

13   A.   No, I had no other allegation that any lawmaker had made a

14   similar solicitation or any solicitation for that matter.

15   Q.   To this day have you developed any evidence that

16   legislators other than the defendant had solicited money by

17   text message to Ms. Canada in the days before the prevailing

18   wage vote?

19        MR. COOKE:  Leading question, Your Honor.

20        THE COURT:  It is, but I think it's okay in this

21   particular context.

22        Go ahead.

23        THE WITNESS:  No, we have not.

24   Q.   (BY MR. O'CONNOR)  Now, at some point in your

25   investigation did you ask Ms. Canada if she would agree to

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1  place a recorded phone call to Mr. Inman?

2  A.   Yes, I did.

3  Q.   And did she agree to do that?

4  A.   Yes, she did.

5  Q.   Tell the jury why you asked Ms. Canada to make a

6  phone call that you would monitor and record.

7  A.   We wanted to monitor a conversation that she had with

8  Mr. Inman so that we could develop facts and find out what

9  Mr. Inman may say about that text message, possibly develop

10  evidence, but really to just determine additional details

11  regarding that text message exchange and the communications in

12  that message.

13  Q.   And when did you have Ms. Canada make that recorded

14  phone call to Mr. Inman?

15  A.   That was June 19th, the morning of.  Midmorning

16  approximately.

17  Q.   Of 2018?

18  A.   Correct.

19  Q.   All right.  So this is within a few weeks of your initial

20  contact by Michigan State Police and the opening of your

21  investigation?

22  A.   Yes, that's right, it's 15 days after the first contact

23  and just the week after we interviewed Ms. Canada.

24  Q.   Did you meet with Ms. Canada before the call was placed to

25  discuss what would happen with the call, how the call would

DIRECT EXAMINATION OF JEREMY ASHCROFT

1    occur?

2    A.    Yes.  We took some time before that call to explain to her

3    how the FBI records the phone call, and then we also had a

4    conversation just about how to engage in that conversation with

5    Mr. Inman.

6    Q.    Did you give her a script, a written script of what to say

7    on that phone call?

8    A.    No, we did not provide a script.  In fact, I explained to

9    her that we didn't want to provide a script.  We wanted to have

10   kind of a natural conversation with topics that she was

11   comfortable with and to allow that conversation to free-flow,

12   if you will.

13   Q.    All right.  Did you discuss with her some of her concerns

14   with the text message in the context of assisting her with the

15   types of questions that she might ask Mr. Inman?

16   A.    Yes, we did.  We reviewed the text message content,

17   reviewed how that made her feel when she received it, and

18   things that she could say to Mr. Inman during that

19   conversation.  She was concerned about how that text message

20   made her reputation appear.  She was concerned about the

21   integrity, her integrity, because that text message, you know,

22   kind of put her in a situation where it looked like she could

23   have been amenable to paying for a vote.

24   Q.    And were those her concerns that she raised or --

25   A.    Yes, those were concerns that she raised.  And then we

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    used those to discuss how to have that conversation with

2    Mr. Inman.

3    Q.   All right.  And you were in court while the jury listened

4    to Exhibit 19, that recorded call.  Was that recorded call a

5    complete recording of the entire conversation between

6    Ms. Canada and Mr. Inman?

7    A.   Yes, that was a complete and accurate copy of that

8    recording.

9    Q.   Nothing was changed on the recording?

10   A.   Nothing was changed on that recording.

11   Q.   Was it a full, fair, and accurate record of the

12   conversation?

13   A.   Yes.

14   Q.   After that phone call was completed did you continue

15   investigative activities?

16   A.   Yes, we did.

17   Q.   And what did you do next?

18   A.   Um, after that phone call was completed, um, actually

19   started drafting a search warrant and applied for a search

20   warrant to conduct a search of Mr. Inman's home and person for

21   any cell phones that he may have.

22   Q.   And approximately when did you apply for a federal search

23   warrant for Mr. Inman's cell phone?

24   A.   Late July of 2018.

25   Q.   And in the search warrant what were you requesting

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1  authority to do?

2  *A.*   We were requesting the authority to, as I said, search his

3  person and his house for any cell phones he might have and upon

4  locating those cell phones we would seize them and extract the

5  data to do a search of the data stored on those phones.

6  *Q.*   Now, as part of the search warrant preparation and

7  application process did the FBI drive by the defendant's house?

8  *A.*   Yeah, actually in order to get the search warrant we have

9  to verify the person's residence.  We also have to provide a

10  description of that residence.  So I asked agents that are in

11  our Traverse City office to drive by Mr. Inman's residence,

12  obtain photos of it, provide a physical description that we

13  could use for our affidavit.  And we also upon execution -- or

14  just prior to executing the search warrant I had the same

15  agents drive by the residence and, you know, verify he was

16  home.  We do that sometimes by confirming a vehicle registered

17  in their name is home at that home and it's their primary

18  residence or at least a residence they are in at that time.  So

19  all of those steps were undertaken.

20  *Q.*   Do you want to make sure that you're going to execute a

21  search at the correct residence?

22  *A.*   We want to make sure it's the correct residence, and we

23  also would prefer to do it when they are home.  In this

24  instance in particular.  So, again, those were trips by the

25  house that were just momentary.

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   *Q.*   Do you recall approximately how many times that occurred?

2   *A.*   I believe it occurred four to five times.  The last week

3   of July and again at least the day before we executed the

4   search warrant on August 1st.

5   *Q.*   Okay.  And why would you drive by the day before?

6   *A.*   Again, we knew that session was out in the House, so it's

7   not uncommon for lawmakers to take vacations, so we wanted to

8   determine if he would be home, when he might be home in the

9   morning, and make sure that -- you know, I was driving up from

10  Lansing, as was our forensic examiner.  We didn't want to go up

11  there, spend time, and have nobody home for that day or that

12  week.  We wanted to minimize that effect.

13  *Q.*   Did the FBI conduct any spying on Mr. Inman?

14  *A.*   We did not spy on Mr. Inman.

15  *Q.*   Did you conduct any surveillance where the FBI would sit

16  and monitor that house for extended periods of time?

17  *A.*   No.  What we did, we commonly refer to them as spot-check

18  surveillance.  And that's literally -- and you'll see in the

19  reports when the spot-check surveillances were done.  It

20  typically states "On this date at this time, 11:15 a.m.,

21  observed" whatever they observed.  And that's what was used in

22  this instance.  So it was literally a car driving by the house.

23  Because of how Mr. Inman's neighborhood is laid out, it may

24  have actually been driven by twice because I think you have to

25  loop around to come back out of it.  That's the only type of

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1  surveillance we employed of Mr. Inman or his residence in this

2  case.

3  Q.  You weren't -- was the FBI listening in on Mr. Inman's

4  phone calls?

5  A.  No, only the one we recorded on June 19th with Ms. Canada.

6  No others.

7  Q.  Was there -- I guess the question I was asking, was there

8  a wiretap placed on Mr. Inman's phone?

9  A.  No, there was no wiretap, no electronic surveillance.  So

10  surveillance of any of his devices or communications conducted

11  in this case.

12  Q.  In what city does Mr. Inman reside?  Where was the search

13  warrant to be executed?

14  A.  Williamsburg, Michigan.  So just north of Traverse City.

15  Kind of north and east of Traverse City.

16  Q.  Did you participate in the execution of that search

17  warrant?

18  A.  The search team was comprised of three agents and one

19  forensic examiner.  I led the execution of that search warrant.

20  Q.  All right.  So three FBI agents?

21  A.  Yes.

22  Q.  And Mr. Sharp the forensic examiner?

23  A.  That's correct.

24  Q.  All right.  How were you dressed that day?

25  A.  So I actually instructed everybody that we wanted to have

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   what we commonly refer to as a soft presence.  So I think one

2   of us had a suit on, two others had polo shirts on.  We were

3   not wearing any FBI shirts or raid jackets.  None of our

4   vehicles were marked.  You know, we don't have lights or things

5   that are visible on the exterior of our vehicle.  So we had a

6   very soft presence.  So it was business casual with the

7   exception of one person that had a suit on.

8   *Q.*   Did you run up to the front door and knock it down with a

9   battering ram?

10  *A.*   No.  Actually we drove up, I and the two other agents went

11  to the front door.  I knocked on the door, waited for Mr. Inman

12  to answer the door.  I identified myself from the porch, told

13  him that we had a search warrant that we were there to execute.

14  And he allowed us into the building.  We did not have to force

15  any way into the building or into the house.

16  *Q.*   And when Mr. Inman let you into the home did you tell him

17  why you were there?

18  *A.*   Yeah, I told Mr. Inman that we had search warrants and

19  that those search warrants were going to allow us to search his

20  house and his person for his cell phone and seize that phone.

21  He indicated he understood.  He pointed out to me at that point

22  that he had one cell phone and that cell phone was plugged in

23  and charging on his kitchen counter when we arrived.

24  *Q.*   Let me back up for just a moment.  Approximately what time

25  of the day did you knock on his door to obtain his cell phone?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   *A.*   We knocked on his door, executed that search warrant at

2   just a little after 6:30 in the morning on August 1st.

3   *Q.*   Was it daylight at that point?

4   *A.*   It was daylight.  And we're required on the search

5   warrants to execute search warrants during daylight hours.

6   That's generally understood.  As from 6 a.m. to 10 p.m.

7   *Q.*   When you first encountered Mr. Inman did he appear to be

8   dizzy, drowsy, confused, physically challenged in any way?

9   *A.*   No.  Actually when he came to the door he was -- had some

10  shorts on.  We allowed him to get a shirt on, obviously.  But,

11  no, he was engaging and cooperative.  Seemed clear of mind.

12  Understood exactly what was going on.  And like I said, to a

13  degree was helpful in pointing out that he had one phone and

14  pointed out that location.  He also informed us that the phone

15  did not require a passcode to access it.

16  *Q.*   Now, we heard testimony in trial from the senior computer

17  forensic examiner, Walker Sharp, who was there that day on the

18  extraction of the data from his phone.  Did you obtain a copy

19  of that Cellebrite extraction report from Mr. Sharp at some

20  point during that day?

21  *A.*   Yes, I did.  Yes, I did.

22  *Q.*   And did you review the Cellebrite extraction report

23  containing all the data from Mr. Inman's phone that was seized

24  that day?

25  *A.*   Not on that day.  I did review it over the course of

DIRECT EXAMINATION OF JEREMY ASHCROFT

1    multiple days.

2    Q.   All right.  And did you review that report for evidence

3    related to the text message -- text messages that Ms. Canada

4    had provided to you back in June?

5    A.   So actually on the day that we executed the search warrant

6    and immediately after it was downloaded we did.  Mr. Sharp at

7    my direction did a text string search for 30,000, and we saw

8    some immediate messages that came up as a result of that text

9    string search that included 30,000 within the body of the text

10   for the most part.  I then did additional review of the rest of

11   the contents of that later when I returned to Lansing for just

12   additional information and data that was stored in that report.

13   Q.   All right.  So there was a brief start of the review of

14   that data and then that review continued?

15   A.   That's right.  That brief start was kind of to confirm

16   that there were certain messages that we knew existed at that

17   time stored in that phone, and so we did that and then I did a

18   more in-depth analysis later.

19   Q.   During your subsequent review of Mr. Inman's cell phone

20   through that Cellebrite extraction report did you find evidence

21   on his phone concerning his -- regarding his physical

22   activities on June 2nd and 3rd of 2018?

23   A.   Yes, I did.  There were a series of text messages that he

24   had exchanged with various people in early June.

25   Q.   Did it indicate -- did his phone indicate what he was

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   doing on June 2nd of 2018?

2   A.   Yes, it did.

3   Q.   And what did it indicate?

4   A.   There were various things he was doing on June 2nd.  He

5   had been at a fly-fishing expo in Kingsley.  There was some

6   work being done on his house.

7   Q.   And Kingsley, where is that located?

8   A.   Kingsley is a town just south of Traverse City.

9   Q.   So Mr. Inman was attending the Kingsley Fly-Fish Festival?

10  A.   It was the Adams Fly-Fishing Festival, yes.  He actually

11  had pictures posted of him in attendance with various people at

12  the festival.  There were also text messages exchanged.  I'm

13  not sure if it was during the festival or perhaps even after.

14  Where he, you know, sent them out to other people.  I think it

15  looked like maybe he wanted to have one posted on -- I'm

16  guessing it's his Facebook for his campaign, talking about what

17  a great time he had at the Kingsley Fly-Fishing Festival.

18  Q.   All right.  Did you find evidence of physical activities

19  on June 3rd regarding his home?

20  A.   Yes, I did.

21  Q.   What did you see?

22  A.   On June 3rd it appears he had a tree removed or at some

23  point the tree had been felled at his house.  And he had

24  enlisted the help of others to help cut that tree up.  I think

25  he said he had moved some brush piles.  But essentially was

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    dealing with the aftermath of having a tree taken down in his

2    yard.  He also posted pictures of that.

3    *Q.*   Okay.  As part of your continuing investigation of the

4    allegations made by Ms. Canada did you obtain documents

5    relevant to the investigation?

6    *A.*   Yes, we actually obtained bank and phone records.

7    *Q.*   If you could, sir, please turn in the book in front of you

8    to tab 26.

9    *A.*   Sorry, tab 26?

10   *Q.*   26.

11   *A.*   Okay.

12         *MR. O'CONNOR:*  Your Honor, I believe we have an

13   agreement regarding the admissibility of this to speed this

14   along regarding the Huntington Bank records.  Perhaps we could

15   just move these in?

16         *THE COURT:*  All right, 24, '5 and '6?

17         *MR. O'CONNOR:*  Let's see, it would be Exhibit 26 and

18   Exhibits 29, 30, 31.

19         *THE COURT:*  26, 29, 30, and 31?  Mr. Cooke?

20         *MR. COOKE:*  No objection.

21         *THE COURT:*  All right.  Those are admitted, then,

22   without objection.

23         *MR. O'CONNOR:*  Thank you.

24         Let's put up Exhibit 26, please.  And if we could, if

25   we could zoom in on this section here.

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    *Q.   (BY MR. O'CONNOR)*  Mr. Ashcroft, what are we looking at in

2  Exhibit 26?

3    *A.*   So this is a bank statement, a copy of a bank statement

4  from Huntington National Bank.  This is a statement for the

5  bank account in the name of Larry Inman for State Rep, and it

6  is the activity for June 1st, 2018, through June 30, 2018.

7    *Q.*   All right.  And what does this Huntington Bank statement

8  indicate is the balance in Mr. Inman's state representative

9  campaign account at the beginning of the statement, June 1st,

10  2018?

11    *A.*   Yes, the beginning balance in Larry Inman for State Rep on

12  June 1 is $31,341.41.

13    *Q.*   Did you investigate whether Mr. Inman had received

14  campaign contributions from the carpenters union?

15    *A.*   Yes, I did.

16        *MR. O'CONNOR:*  If we could turn to Exhibit 29,

17  please.

18    *Q.   (BY MR. O'CONNOR)*  Did you find records from Huntington

19  National Bank indicating that Mr. Inman had in fact deposited

20  campaign contributions from the Michigan Carpenters -- sorry --

21  the Michigan Regional Council of Carpenters?

22    *A.*   Yes, I did.

23    *Q.*   Let's zoom in right here.  And did you find a check

24  deposited from the Michigan Regional Council of Carpenters from

25  October of 2017 in the amount of $500?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    *A.*    Yes, I did.

2    *Q.*    Turning to Exhibit 30.

3          *MR. O'CONNOR:*   If we could blow that up, please.

4    *Q.*   *(BY MR. O'CONNOR)*   Mr. Ashcroft -- Agent Ashcroft, did you

5    also find another check in the amount of $500 that Mr. Inman

6    deposited into his Huntington bank account from the carpenters

7    union?

8    *A.*    Yes, I did.

9    *Q.*    And that's November 2017?

10   *A.*    The check is dated, yes, November 28, 2017, and it's in

11   the amount of $500.

12         *MR. O'CONNOR:*   And that was Exhibit 30?   31, please.

13   *Q.*   *(BY MR. O'CONNOR)*   And finally, Agent Ashcroft, looking at

14   Exhibit 31 --

15         *MR. O'CONNOR:*   If you could blow up the middle

16   section there.

17   *Q.*   *(BY MR. O'CONNOR)*   -- did you also find the document

18   indicating that Mr. Inman deposited the $1,000 campaign

19   contribution from the carpenters into his campaign account?

20   *A.*    Yes, that check is dated December 11, 2017, yes, for a

21   thousand dollars.   It was deposited.

22   *Q.*    Thank you.   If you could, sir, please turn to tab 36 in

23   your book.   Agent Ashcroft, as part of your investigation did

24   you obtain records from the State of Michigan?

25   *A.*    Yes, we did.

DIRECT EXAMINATION OF JEREMY ASHCROFT

1    *Q.*    And what do we see in Exhibit 36?

2    *A.*    Exhibit 36 is the 2018 Michigan Individual Income Tax

3    Return filed by Mr. Inman.

4    *Q.*    Did you issue a subpoena, serve a subpoena on the State of

5    Michigan Treasury Office to obtain Mr. Inman's tax return for

6    2018?

7    *A.*    My office did, yes.

8    *Q.*    Not you personally?

9    *A.*    Not me personally, correct.

10   *Q.*    And is this the document that was returned by the

11   Department of Treasury pursuant to that subpoena for the

12   record?

13   *A.*    Correct.

14          *MR. O'CONNOR:*  The government moves Exhibit 36 into

15   evidence.

16          *THE COURT:*  Any objections, Mr. Cooke?

17          *MR. COOKE:*  None, Your Honor.

18          *THE COURT:*  All right.  It can be admitted, then,

19   without objection.

20   *Q.*    *(BY MR. O'CONNOR)*  Looking at the first page of

21   Exhibit 36, does this indicate that this is Mr. Inman's

22   Michigan 1040 Tax Return for the tax year of 2018?

23   *A.*    Yes, Mr. Inman is listed as the filer on this document.

24   *Q.*    All right.  If we could just jump ahead to page 7, please.

25   Did the tax return indicate whether Mr. Inman earned any income

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   in the calendar year 2018?

2   A.   Yes, it did.

3   Q.   If we could zoom in here on Schedule W in the middle, what

4   did Mr. Inman report was the source of his employment income

5   for 2018?

6   A.   He identified his employer as the State of Michigan and

7   that he received wages, tips, and other compensation in the

8   amount of $57,242.

9   Q.   Thank you.  Okay.  Agent Ashcroft, taking you back to

10  August 1st of 2018.  At the time of the execution of the

11  warrant for Mr. Inman's phone did you ask Mr. Inman that day if

12  he would agree to be interviewed?

13  A.   Yes.  After I explained to him that we had a search

14  warrant and that we were there to execute it, I told him that I

15  would like to interview him.  I told him that his participation

16  in any interview was voluntary.  I informed him he was not

17  under arrest.  That if he chose not to be interviewed, we'd

18  finish executing our search warrant and we would depart.  But,

19  you know, again, that we wanted to interview him, and we made

20  it very clear it was voluntary.

21  Q.   Did it appear to you that Mr. Inman understood completely

22  what you were asking for that day?

23  A.   Yes, it did.

24  Q.   Did he ever indicate to you that he was not willing to be

25  interviewed that day?

1  *A.*   No.  Actually he told us that he would be willing to sit

2  down and do an interview with us.

3  *Q.*   And did you go ahead and conduct that interview at his

4  residence in Williamsburg?

5  *A.*   Yes, I interviewed him at his dining table in his kitchen.

6  *Q.*   And who was present for that interview?

7  *A.*   Mr. Inman, of course, was there.  I was there.  One of the

8  agents, Garrett Kruhn (sp), from our Traverse City office was

9  witnessing that interview with me.  The other agent from our

10  Traverse City office and Walker Sharp, you know, went through

11  our search protocols.

12  *Q.*   Okay.  And did you tell Mr. Inman -- aside from advising

13  him of the search warrant for his phone, did you tell him the

14  subject matter of what you wanted to talk about that day?

15  *A.*   Yeah, I told him that we were conducting an investigation

16  regarding the possibility of lawmakers selling their vote in

17  regard to the prevailing wage vote.

18  *Q.*   And did he indicate he understood the subject of what you

19  were asking about that?

20  *A.*   He told me he understood that and he told me that he had

21  not engaged in selling his vote.  And we started talking about

22  prevailing wage.  He told us right away that he was undecided

23  on prevailing wage.

24  *Q.*   And did you have a conversation with him about prevailing

25  wage?  Did he explain to you what prevailing wage was and what

1   the repeal issue was that he was facing in the Michigan

2   legislature?

3   *A.*    During the interview he did.  He gave us kind of a summary

4   of what the prevailing wage law was.  He told us how it was his

5   understanding from contact he had with contractors and business

6   owners in his district that there were complexities involved in

7   the compliance with prevailing wage.  He told us that some of

8   those companies explained to him that they had to hire a staff

9   that was trained and capable of hitting those compliance

10  requirements to comply with prevailing wage.

11  *Q.*    Did he -- sorry.

12  *A.*    I was going to say, he also at another point in the

13  interview told us about the prevailing wage ballot initiative.

14  Explained to us how it was being challenged, how it went

15  through a court process, ultimately going through the Court of

16  Appeals.

17  *Q.*    Okay.  Did he demonstrate to you a very solid grasp and

18  understanding of the intricacies of the prevailing wage repeal

19  issue that was percolating through the State of Michigan?

20  *A.*    To me he seemed versed both on the prevailing wage law as

21  well as the ballot initiative process associated with it, yes.

22  *Q.*    All right.  Now, did you ask Mr. Inman if he had any

23  contacts with unions regarding the prevailing wage repeal?

24  *A.*    Yes.  He told us that he had been in contact with the

25  Michigan Regional Council of Carpenters and Millwrights,

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    specifically recalled having contact with Lisa Canada and

2    lobbyists from Capitol Services.  He also told us that he met

3    with other folks in the trade in his district.  He met with

4    Associated Builders and Contractors which is not a trade entity

5    but was one of the units that -- or if you will, entities that

6    wanted to repeal prevailing wage.  He also told us that in the

7    leadup to that prevailing wage he had toured union training

8    facilities.

9    Q.   And did Mr. Inman talk about attending a presentation at

10   the Capital Prime Restaurant in Lansing in late 2017?

11   A.   Yes, he recalled in late 2017 he attended the event

12   at Capital Prime.  He recalled that Ms. Canada was giving a

13   presentation on the history and benefits of prevailing wage

14   when he got there.  He also recalled meeting Ms. Canada at the

15   end of that event.  Told us that was the first time he had

16   actually met her as well.

17   Q.   Did he remember talking with Ms. Canada after he met her

18   for the first time that night?

19   A.   Yes.  He told us that he had met her after her

20   presentation was done.  That they had a conversation about

21   prevailing wage.  And --

22   Q.   And did you ask Mr. Inman if Lisa Canada had asked him for

23   anything at that meeting?

24   A.   I did, and actually he told us she hadn't asked nor had

25   she offered him anything.

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   *Q.*   Did you ask Mr. Inman anything about whether there was a

2   conversation about campaign contributions at the Capital Prime

3   event?

4   *A.*   Yes.  He recalled that Ms. Canada said that the carpenters

5   union would be willing to support those politicians that

6   supported their position on preventing the repeal of prevailing

7   wage.  He told me that he recalled Ms. Canada mentioning that

8   there was $30,000 available to assist in campaigns.  And he

9   specifically recalled that when Ms. Canada mentioned that

10  $30,000 he told us his recollection was his response was "Oh,

11  that's nice."

12  *Q.*   And did you ask Mr. Inman a series of questions about

13  whether he received any campaign contributions from unions

14  leading up to the prevailing wage vote?

15  *A.*   I did, and he recalled getting $2,000 in contributions

16  from the carpenters.  He specifically recalled when he received

17  the $2,000 in contributions from the carpenters that he felt

18  conflicted.  He told us that he was still undecided on how he

19  would vote at that time of those contributions, and he felt

20  that unethical to accept those contributions if he did not

21  support the union's position.

22  *Q.*   Did he tell you whether he ultimately did accept

23  contributions from the carpenters?

24  *A.*   He did tell us that even though he was conflicted at the

25  time of the receipt of those $2,000 worth of contributions he

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   chose to deposit that money into his campaign.

2   Q.   Did he tell you about any other contributions he received

3   from other unions?

4   A.   He recalled getting some small-dollar contributions.  I

5   believe there was a thousand-dollar contribution he recalled

6   receiving from another union.  And he also recalled receiving I

7   believe it was a hundred or a couple hundred dollars from the

8   Associated Builders as well.

9   Q.   Did he also recall receiving a campaign contribution from

10  the carpenters union in the amount of $4,000?

11  A.   Yes.  And he told us about that after explaining to us

12  that the ballot initiative seeking the repeal of prevailing

13  wage was going through the court process and that the

14  signatures or the initiative -- I'm not sure what exactly --

15  but some part of it was challenged.  And he recalled that he

16  received a $4,000 check from the carpenters union and he

17  recalled that that -- that he received that right about the

18  time the appeal of the prevailing wage ballot initiative was

19  upheld by the appellate court.

20  Q.   Did he tell you whether or not he deposited that $4,000

21  check?

22  A.   He again told us that he was conflicted on what to do with

23  that check.  As a result he told us he decided to hold onto

24  that check and not deposit it.

25  Q.   Did you ask Mr. Inman if he was ever offered $30,000 in

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   campaign contributions in connection with the prevailing wage

2   vote?

3   *A.*   Yes, I did, and he denied that he was ever offered

4   $30,000.

5   *Q.*   What was his -- when he referred to the $30,000 that he

6   recalled being mentioned at the Capital Prime, did he express

7   any understanding of what he thought that that 30,000 was for?

8   *A.*   He told me that --

9           *MR. COOKE:*  Objection, leading question, Your Honor.

10          *THE COURT:*  It is leading, but it sets up the ability

11  of the agent to answer it, and I think for that purpose it's

12  fine.

13          Go ahead.

14          *THE WITNESS:*  He told us that his understanding of

15  that $30,000 that was referenced at the Capital Prime meeting

16  was that that was a total amount that the carpenters had to

17  spread out over all legislators that may be supportive of the

18  union's position.  It was a shared total, if you will.

19  *Q.*   *(BY MR. O'CONNOR)*  And did Mr. Inman talk about any

20  actions that he took personally to either support or not

21  support the prevailing wage vote?

22  *A.*   Actually Mr. Inman told me he took no action in regard to

23  prevailing wage.  When we talked about possible polling of

24  other lawmakers, he told me that it was actually another

25  lawmaker that polled the colleagues in the House.

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   Q.   And that was Representative Marino?

2   A.   That was Representative Marino, correct.

3   Q.   Did you eventually talk with Mr. Inman about what happened

4   on the day of the vote to repeal prevailing wage?

5   A.   Yes, I did, and he described to me that -- the details of

6   that day.  He told me he remained undecided as far as which way

7   he would vote on repeal up until the vote.  He had a

8   conversation with Mr. Marino the day of the vote, and it was

9   his belief that Mr. Marino had secured enough votes to prevent

10  the repeal of prevailing wage, allowing him to change -- or I

11  guess because he was undecided to actually choose to be a yes,

12  to vote yes to repeal prevailing wage.  He told us that he

13  informed Speaker Leonard of his decision to vote yes on

14  prevailing wage, and then he cast that yes vote to repeal

15  prevailing wage.

16  Q.   Did he describe at all how he believed his district wanted

17  him to vote on the repeal of prevailing wage?

18  A.   Yes.  He told us during the interview that it was his

19  belief or his position that his district wanted him to repeal

20  prevailing wage.

21  Q.   Did you ask Mr. Inman questions about whether he was

22  contacted by any lobbyists for the unions after he cast his yes

23  vote?

24  A.   I did, and he told me that he was contacted by union

25  representatives after the vote because they believed he was

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   going to vote no.  He told us that his response to those union

2   reps was that he voted the way his district wanted him to vote.

3   Q.   At any point in your interview with Mr. Inman that day did

4   he tell you he voted yes because he needed to save

5   Representative Bellino?

6   A.   No, he did not.

7   Q.   Did you ask Mr. Inman questions about whether he had a

8   conversation on the phone with Lisa Canada after the prevailing

9   wage vote?

10  A.   Yes.  He recalled that a few days after the vote on

11  prevailing wage he received a phone call from Ms. Canada.  He

12  told us that Ms. Canada called, she was unhappy with him, but

13  that she remained professional and calm during that

14  conversation.  He told us that they discussed the prevailing

15  wage vote during that phone conversation.  He told her that he

16  had not cashed the $4,000 check.  He offered to her, he told

17  us, to return that check, which he did after the phone call.

18  And he actually shared with us that he was surprised that

19  Ms. Canada did not ask for that check to be returned.  She did

20  not bring up money at all.  He actually told us that other than

21  that $4,000 check they did not discuss any money during that

22  phone call.

23  Q.   No discussion of any money on that phone call with

24  Lisa Canada?

25  A.   Other than the $4,000 check there was no discussion of any

1    other dollar amount or money according to Mr. Inman.

2    *Q.*    Did he tell you that after that phone call he in fact

3    returned that $4,000 check to Lisa Canada?

4    *A.*    Yes, he did.

5    *Q.*    Now, at the time of your interview with Mr. Inman you

6    already had a copy of the June 3rd text message that Mr. Inman

7    sent to Lisa Canada; is that right?

8    *A.*    That's correct.

9    *Q.*    Did you ask Mr. Inman a series of questions to determine

10   whether he would admit to sending that text message to

11   Lisa Canada?

12   *A.*    Yes, I actually asked him a series of questions really to

13   gauge his truthfulness of what he had told me that day.

14   *Q.*    Did you ask Mr. Inman if he had asked Lisa Canada for more

15   money in the time leading up to the vote on prevailing wage?

16   *A.*    Yes, I did, and he denied that.

17   *Q.*    Did you ask Mr. Inman if he sent any text messages that

18   sought more money from Lisa Canada or the carpenters union?

19   *A.*    Yes, I did, and he denied that.

20   *Q.*    Did you ask Mr. Inman if he sent a text message to

21   Lisa Canada that referred to $30,000?

22   *A.*    Yes, I did, and again he denied that.

23   *Q.*    Did you ask Mr. Inman if he had asked Lisa Canada for

24   $30,000 at any point in the period leading up to the prevailing

25   wage vote?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    *A.*   Yes, I did, and once again he denied having made that

2    request.

3    *Q.*   Did you ask him if he asked for any amount of money from

4    Lisa Canada leading up to the prevailing wage vote?

5    *A.*   In fact, I asked him if he had asked for any amount of

6    money from Lisa Canada or anybody else and he denied that as

7    well.

8    *Q.*   So there were two different questions, whether he asked

9    for any amount of money from Lisa Canada --

10   *A.*   Correct.

11   *Q.*   -- and if he asked any amount of money -- asked for any

12   amount of money from anyone else leading up to prevailing wage

13   vote.

14   *A.*   Correct, and he denied both of those.

15   *Q.*   At the conclusion of your interview with Mr. Inman did you

16   ask him if everything he told you that day was the truth?

17   *A.*   Yes, I did, and he told me that he was being truthful with

18   us throughout that interview.

19   *Q.*   Agent Ashcroft, during -- tell me, about how long did this

20   interview last?

21   *A.*   By estimation I would say that interview was probably,

22   again, close to two hours.  Hour and a half to two hours.

23   *Q.*   During that period of time when you're asking Mr. Inman

24   all these questions and he's providing this information did

25   Mr. Inman ever express or show any difficulties in

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   understanding the questions that you were asking him?

2   *A.*   No.  Again, he seemed very lucid, coherent.  You know,

3   formed what he told us.  It was clearly formed.  And, again,

4   seemed lucid and present.

5   *Q.*   Do you have experience as an FBI special agent in

6   interviewing people who are using excessive amounts of drugs?

7   *A.*   So in my years as an agent I worked a number of cases in

8   which I dealt with victims, and I had to interview victims and

9   witnesses, yes, some of whom were heroin addicts, opioid

10  addicts, cocaine addicts.  I've had to deal with those

11  instances a number of times in my career.

12  *Q.*   All right.  And you've been an agent for 17 years?

13  *A.*   A little over, yes.

14  *Q.*   Did Mr. Inman during this interview at his house over this

15  approximately two-hour period demonstrate any of the things

16  that you have seen that known drug addicts or opioid addicts

17  would behave or act like during a --

18            *MR. COOKE:*  Objection to foundation, Your Honor.

19            *THE COURT:*  You can expand it a little bit more if

20  you want.  He gave some general examples of interviews he's

21  conducted, but if you want to expand whatever training he's had

22  or what he noticed in those things, the foundation would be

23  stronger.

24            *MR. O'CONNOR:*  Certainly.

25  *Q.*   *(BY MR. O'CONNOR)*  Agent Ashcroft, when you've described

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    for us the number of witnesses or victims you've interviewed

2    that you knew to be opioid addicts, can you describe for the

3    jury some of the behaviors or indicators during that interview

4    that demonstrated to you that that was the case.

5    A.   I guess I'm a little unclear.  Of the prior addicts that I

6    had interviewed --

7    Q.   Yes.

8    A.   -- or of Mr. Inman?

9    Q.   No, the prior addicts.

10   A.   The prior addicts.  You know, there's oftentimes a

11   nervousness and a twitchiness, for lack of another better term.

12   Maybe an apparent focus issue.  Lots of distractions.  Nervous

13   ticks.  Are all some of the characteristics I've observed of

14   individuals that I knew to be drug addicts at the time I was

15   interviewing them.

16   Q.   All right.  And have you received any training in this

17   area in interviewing witnesses or victims with addictions?

18   A.   No, it was on-the-job training.

19   Q.   And so for how many years do you think you have

20   interviewed people like this that you have described, opiate

21   addicts?

22   A.   So from 2014 right up through 2016, 2017, I worked a

23   series of cases that involved that.  So it was over the course

24   of a couple of years.  And I would say a handful or so of the

25   victims I've dealt with have been opioid addicts.  In fact,

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    I've driven some of them to rehab facilities so that they can

2    start getting treatment.

3    Q.    During your interviews of any of those past witnesses or

4    victims with opioid addictions did they also demonstrate any

5    significant memory failures?

6    A.    Actually, surprisingly, I was able to -- they had great

7    recollection of the events that they were retelling me.  So I

8    did not observe any recall issues with those individuals.

9    Again, and those were individuals who were at times being

10   dropped off at rehabilitation facilities.

11   Q.    Going back to your interview with Mr. Inman on August 1st,

12   did Mr. Inman demonstrate to you any cognitive impairment?

13           *MR. COOKE:*  Your Honor, I object again.  There's not

14   a foundation to have him opine whether or not

15   Representative Inman was suffering from opioid addiction.

16           *THE COURT:*  He's already explained that he didn't see

17   any -- I think he described him as lucid, described him in

18   other words like that, so that seems to me repetitive.

19           Where you were going with the foundation was to see

20   if Mr. Inman displayed any of the same things that he observed

21   with known opioid addicts, and you can ask him about that.

22   Q.    *(BY MR. O'CONNOR)*  All right.  Did you observe with

23   Mr. Inman any of the observations you had previously observed

24   with individuals you had interviewed that were known opioid

25   addicts?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    A.    No, I did not observe that.

2    Q.    Was there any evidence that morning that Mr. Inman was

3    intoxicated at the time of the interview?

4    A.    I saw no indication of that.

5    Q.    Did you smell any alcohol on his breath that morning?

6    A.    I did not smell any alcohol on his breath.

7    Q.    At any point during your interview with him on August 1st

8    did he say anything to you that he was having memory failures,

9    serious memory failures during the course of your interview?

10   A.    No, he did not.

11   Q.    Did he ever tell you during this interview that he

12   couldn't recall significant conversations or communications

13   that he had with Lisa Canada at the carpenters union?

14   A.    No, he didn't.  And, frankly, I didn't recall him -- or I

15   don't recall him having to ask me for clarification of my

16   questions.  As I said, he seemed very much aware and

17   understanding of what I was saying and what he was relaying.

18   Q.    At any point during your interview with Mr. Inman on

19   August 1st did he say anything to you about being in pain that

20   morning?

21   A.    I don't recall him making any comments about being in pain

22   that morning.

23   Q.    In your observations of his physical demeanor that

24   morning, did it appear to you that Mr. Inman was in physical

25   pain during the interview?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    A.   No, he actually seemed relatively relaxed during the

2    course of the interview.

3    Q.   Did he tell you at any point during your interview that he

4    was taking lots of prescription pain medication?

5    A.   I don't recall him telling me he was taking any medication

6    at the time of the interview.

7    Q.   He didn't say anything about medication he was taking?

8    A.   No.   Correct.

9    Q.   And did he say anything to you -- strike that.

10        Did he tell you that day that he suffered from any side

11   effects from taking any prescription pain medication?

12   A.   No, he did not.

13   Q.   At any point during your interview did you have any

14   question in your mind about whether Mr. Inman was following

15   along and was providing you with answers to your questions?

16   A.   No, I thought he was following along with the questions

17   being asked and he was providing answers that were responsive

18   to those questions.

19   Q.   Did he have focus during the interview?

20   A.   He appeared to be focused, yes.

21   Q.   Was he staring out the window for long periods of time

22   during your interview?

23   A.   Not that I noticed, no.

24   Q.   Did you attempt to contact Mr. Inman after that day to do

25   a follow-up interview with him?

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1   *A.*   Yes, in October I attempted to contact Mr. Inman and

2   schedule a follow-up interview.

3   *Q.*   Okay.  And were you able to reach him the first time you

4   reached out to him?

5   *A.*   No, I actually called him and left a voicemail message for

6   him.

7   *Q.*   Did Mr. Inman return your phone call that you made to him?

8   *A.*   Yes, he did.

9   *Q.*   And approximately when did Mr. Inman contact you by phone?

10  *A.*   I believe it was October 18th or 19th of 2018.

11  *Q.*   And did you talk to him on the phone for a period?

12  *A.*   Yes, he called me and I was available and I answered that

13  call.

14  *Q.*   Do you recall where you were at the time that he called

15  you?

16  *A.*   Actually, I believe I was in my office.

17  *Q.*   Okay.  And how long -- approximately how long did this

18  conversation occur on the phone?

19  *A.*   It was a relatively brief conversation.  A few minutes

20  long I would estimate.

21  *Q.*   All right.  Did Mr. Inman indicate to you that he wanted

22  to meet with you again --

23          *MR. COOKE:*  Objection, leading question, Your Honor.

24          *THE COURT:*  Why don't we ask what he indicated to

25  him, unless there's more to the conversation that you need to

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    avoid.  But he said it was probably brief.  He can probably

2    just tell us.

3              MR. O'CONNOR:  Certainly.  I'll withdraw it.

4    Q.   (BY MR. O'CONNOR)  What did Mr. Inman tell you during that

5    phone call?

6    A.   He told me that after the FBI returned his cell phone he

7    reviewed his cell phone and the text messages in it.  After

8    conducting his own review of that phone, he found messages that

9    he had sent, text messages that he had sent to the carpenters.

10   He told me that he wanted to explain the context of those

11   messages.  He realized after reviewing them that it appeared

12   that he was pressuring the carpenters for money.  He also told

13   me that he wanted to come in for an interview because he wanted

14   to tell us the truth.

15   Q.   If you could, Agent Ashcroft, turn to tab 47 in your book.

16   A.   Tab 47?

17   Q.   Yes.

18   A.   Okay.

19   Q.   What's depicted in Government Exhibit 47?

20   A.   So this is a portion of the forensic report of the data

21   extracted from Mr. Inman's cell phone.

22   Q.   And what period of time in universal coordinated time does

23   this period cover?

24   A.   This is June 2nd through June 4th, 2018.

25   Q.   All right.  And I believe we heard testimony from

1    Walker Sharp that you have to subtract four hours from

2    universal coordinated time to get the Eastern Time Zone for

3    these text messages?

4    *A.*    During the daylight savings time period, yes, it's a

5    four-hour subtraction.

6    *Q.*    Have you had an opportunity to review these messages prior

7    to today?

8    *A.*    Yes, I have.

9         *MR. O'CONNOR:*  The government moves to admit.

10         *THE COURT:*  It's already in.

11         *MR. O'CONNOR:*  I'm sorry, it's already in.

12         If we can display Government Exhibit 47, please.

13    *Q.*    *(BY MR. O'CONNOR)*  Agent Ashcroft, a general question:  Is

14    this an eight-page document?

15    *A.*    Yes, it is.

16    *Q.*    And did you review all eight pages of this exhibit?

17    *A.*    Yes, I did.

18    *Q.*    Describe for the jury in general what you observed in the

19    string of text messages that appears in this exhibit on these

20    dates.

21    *A.*    Yeah, what I've observed is over the course of these few

22    days there's instances where Mr. Inman is sending a number of

23    texts.  Sometimes a message every couple of minutes or so.  In

24    general you're seeing kind of social and I guess professional

25    or sometimes political exchanges with various people.  Those

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    are messages that are both sent by Mr. Inman and received by

2    Mr. Inman.

3         In general he is talking about -- or included in these I

4    should say he is talking about campaign activities, he is

5    scheduling events and kind of carrying on what would seem to be

6    a normal life existence, if you will.

7    Q.   If we could look -- let's zoom in on this particular

8    content right here.  Were some of the text messages he was

9    sending on June in this time period reflected in 47 extensive,

10   detailed discussions of certain issues and events?

11   A.   Yes, they were.

12   Q.   And were there also -- did you also find examples where

13   there were much shorter text messages?

14   A.   Yes.

15           MR. O'CONNOR:  Turn to page 3, please.  This section

16   here.

17   Q.   (BY MR. O'CONNOR)  Did you find any evidence that

18   Mr. Inman was communicating with his campaign manager for his

19   re-election campaign?

20   A.   Yes, actually he had a number of contacts with his

21   campaign manager, Ashleigh Ackerman, about the logistics, about

22   the finances in his campaign account, and about events they may

23   be doing.

24   Q.   Was there evidence in here that Mr. Inman was coming up

25   with a campaign strategy and tactics for his re-election

*DIRECT EXAMINATION OF JEREMY ASHCROFT*

1    campaign?

2    A.   Yes.

3         MR. O'CONNOR:   Page 7, please.   This top section

4    here.

5    Q.   (BY MR. O'CONNOR)   Did you find evidence in this time

6    period that he was texting with his campaign manager

7    Ashleigh Ackerman about the money for his campaign?

8    A.   Yes, he was recalling, you know, how much he may have

9    raised at certain events and balances in his campaign account.

10   Q.   And in fact we're looking at one reference right here

11   where he's telling his campaign manager that he has $30,000 in

12   his campaign account; is that right?

13   A.   That's correct.

14        MR. O'CONNOR:   If we can zoom out and come back to

15   this message here.

16   Q.   (BY MR. O'CONNOR)   Did you find evidence that Mr. Inman

17   was asking his staff to schedule meetings with people during

18   this period of time?

19   A.   Yes, schedule meetings and engage with certain people on

20   certain topics, yes, I did find those.

21        MR. O'CONNOR:   Thank you.   If we could publish

22   Exhibit 48, please.

23   Q.   (BY MR. O'CONNOR)   Agent Ashcroft, did you review the

24   Cellebrite extraction report of Mr. Inman's phone for text

25   messages that covered August 1st, 2018?

1    *A.*    Actually, yes, the days leading up to August 1st and

2    August 1st, correct.

3    *Q.*    All right.  And this would be text messages Mr. Inman sent

4    and received in the time period leading up to your interview on

5    August 1st?

6    *A.*    Actually this portion of the report and the other one,

7    it's part of what's the timeline of the report.  So it includes

8    not just text messages but multimedia messages and call log

9    information.  So it's more than just text messages.

10   *Q.*    I see.  Okay.  And without going through in detail here,

11   did you find text messages in this time period indicating that

12   Mr. Inman was having text conversations with multiple

13   individuals about many different topics?

14   *A.*    Yes.  I believe he even had some in here where he was

15   talking about campaign door-knocking activities that they did

16   in the neighborhoods that they had visited on the 31st of July.

17   *Q.*    All right.  Did you find any evidence that Mr. Inman was

18   also participating in presentations with Amelia Earhart, his

19   Amelia Earhart interests?

20   *A.*    Yes, I did.

21   *Q.*    Thank you, Agent Ashcroft.  No further questions.

22            *THE COURT:*  All right.  We can go to Mr. Cooke's

23   cross.

24            *MR. COOKE:*  Yes, Your Honor.  Thank you.

25

```
1                        CROSS-EXAMINATION
2    BY MR. COOKE:
3    Q.   Good afternoon, sir.
4    A.   Good afternoon.
5    Q.   I'd like to start just by going back over a couple of
6    exhibits that Mr. O'Connor put up.  In that first --
7             MR. COOKE:  First can we see 38, please?
8             THE COURT:  I don't think 38 is in.  It must be a
9    different number.  That's 36.
10            MR. COOKE:  Six.  36.  Thank you, Your Honor.
11   Q.   (BY MR. COOKE)  Can you just tell us what the line --
12            MR. COOKE:  Can you focus on the adjusted gross
13   income for that year?
14            THE COURT:  You can also touch the screen and
15   highlight an issue.
16            MR. COOKE:  This one right here.  Can we do that?
17   Kind of blow it up?
18   Q.   (BY MR. COOKE)  So it says adjusted gross income for 2018
19   was $130,371,000, right?
20   A.   Correct.
21   Q.   Is there any reason you showed the 52,000 instead of the
22   130?
23   A.   Yes, we were showing where he was noting his employment
24   was from.  So those were the wages from his employment.
25   Q.   So there wasn't some indication that he didn't have
```

1    financial resources in 2018, is it?

2                 *MR. O'CONNOR:*  Objection.  This is argumentative.

3                 *THE COURT:*  I mean, this is one of those

4    building-block issues where when we get to the technical

5    elements of the charges the parties will have differences of

6    opinion about whether the government has made its burden.  And

7    the government is going to argue evidence of employment income

8    from the State of Michigan is part of the way it will meet its

9    burden, so --

10                 *MR. COOKE:*  Thank you, Your Honor.

11                 *THE COURT:*  -- it's a technical building-block issue.

12   Q.   *(BY MR. COOKE)*  All right.  To be clear, you weren't

13   introducing that to show that Representative Inman didn't have

14   sufficient finances in 2018?

15   A.   It was to show that he was an employee of the State of

16   Michigan and received salary from the State of Michigan.

17   Q.   All right.  I understand.  Thank you.

18                 *MR. COOKE:*  And then Exhibit 47, please.  Can we just

19   zoom in on this?

20   Q.   *(BY MR. COOKE)*  This is the text messages from June 2nd

21   and 3rd?  Is that what that is?  That's hard to read.

22   A.   The one you've got zoomed in is a message from June 2nd.

23   Q.   June 2nd.  All right.  And here Mr. Inman is reporting --

24   do we know who this is to?  Can we see that area over there?

25   No.  I think the recipient would be over here.

CROSS-EXAMINATION OF JEREMY ASHCROFT

1   *A.*   Actually, no, it's the third column from the right is the

2   recipient.  It shows his phone number and the name Art.

3   *Q.*   Oh.  So this doesn't have the --

4   *A.*   So that's who it's to.  So all of these would be from.  In

5   this instance that's to Art from Mr. Inman.

6   *Q.*   And here in the middle he says "I have 30,000 in my

7   campaign account, a fundraiser in Lansing on June 13th, and

8   another on July 6th in the district.  Each should get me 10,000

9   each.  I will have another event in Lansing, an event in

10  September, and a district event to get $70,000 total."  Right?

11  *A.*   That's what it states, yes.

12  *Q.*   All right.  So it looks like he had plans to raise the

13  money he needed?

14  *A.*   Plans, yes.

15  *Q.*   Well, did you follow up to see if he in fact raised the

16  money he needed in those events?

17  *A.*   Well, I saw a text message later where he raised $8,900

18  from that June 13th event.

19  *Q.*   All right.  But did you follow up with any of these others

20  to see how much he raised independent of any donations from the

21  House Republican caucus or campaign fund?

22  *A.*   No, I did not follow up specific to the event other than

23  seeing the June 13th claims of $8,900.

24  *Q.*   All right, sir.  And the bank account records were what?

25  They were the Huntington bank records showing the amount he had

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1  in his campaign of 38,000?

2  A.   The ending balance for June 2018 was 38,000 plus or minus.

3  Q.   And you did mention another record you found at

4  Huntington Bank that showed that Representative Inman was a

5  trustee of a large trust, right?

6  A.   Actually, I know that there were seven accounts that he

7  had with Huntington National Bank.  And there were three trusts

8  at Huntington National Bank.

9  Q.   Okay.  One was a Charles Fultz Trust that he was --

10 A.   No, two were actually Charles Fultz trusts.

11 Q.   Two.  Did you learn that he was trustee of those trusts?

12 A.   I did.

13 Q.   And those trusts had over a million dollars in them; is

14 that right?

15 A.   One was a little under a million and one was a little over

16 a million.

17 Q.   All right.  We haven't seen those records yet, have we?

18 A.   We did not put them up now, no.

19 Q.   And did you ever look at any trust documents from

20 Huntington Bank to see if Representative Inman had the ability

21 to compensate himself for his work as a trustee?

22 A.   I did review documents from Huntington, and I did see that

23 he made draws from those, the Charles Fultz Trust, and there

24 were checks cut to others from that trust as well.  It did not

25 appear to me that he was the sole recipient of funds from the

1    Fultz trusts.

2    Q.    Did you ever get the trust documents themselves that gave

3    him authority to do whatever he did with the trusts?

4    A.    I don't recall if those were produced by Huntington.

5    Q.    Well, they wouldn't have them.  Those would be probably

6    private documents.  Probably at Mr. Inman's home.

7          When you did your search warrant did you ask for anything

8    like that?

9    A.    I did not.  In fact, we didn't get the Huntington records

10   until after that search, so we did not know that he was a

11   trustee of a trust at the time of the search.  Nor were we

12   executing a search warrant for documents.  It was only for his

13   cell phone.

14   Q.    Understood.  But if Charles Fultz, the Charles Fultz

15   Trust, if he had appointed Representative Inman to be the

16   trustee over a million-dollar trust, at least from

17   Charles Fultz's perspective Representative Inman was very

18   trustworthy?

19   A.    I don't know how Mr. Fultz felt about that.  And I don't

20   know how he became the trustee of that account.

21   Q.    And you didn't do any investigation to find any of those

22   things out, did you?

23   A.    Regarding the Fultz trust?

24   Q.    Yes, sir.

25   A.    I did not explore the Fultz trust, no.

CROSS-EXAMINATION OF JEREMY ASHCROFT

1  Q.   There's another thing that I'm interested about, and that

2  is you looked at some -- a group of text messages around that

3  June 2nd and 3rd time period where it looks like

4  Representative Inman, according to your description as I

5  understand it, seems to be functioning normally.  Is that

6  correct?

7  A.   That was how I read those, yes.  They were seemingly

8  typical text messages.

9  Q.   And at some point during your investigation you met a

10  second time with Representative Inman and had a much longer

11  interview when I was present, correct?

12  A.   In December, yes.

13  Q.   December.  And in that -- that interview was conducted in

14  Lansing at your office?

15  A.   Correct.

16  Q.   All right.  And Representative Inman willingly came into

17  your office in Lansing to be interviewed a second time?

18  A.   That's correct.

19  Q.   And you had another staff member with you, another agent?

20  A.   I had another agent, yes.

21  Q.   And who was that?

22  A.   That was Special Agent Andrew Decoster.

23  Q.   Decoster.  And do you recall during the course of that

24  interview, which lasted what, about an hour and a half?

25  A.   I think that's a fair approximation.

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1   *Q.*   All right.  During the course of that hour-and-a-half

2   interview Representative Inman disclosed to you that he had a

3   bad problem with prescription medication abuse?

4   *A.*   What Mr. Inman told me was that beginning in about May of

5   2018 he started taking pain medications.  He told me that he

6   had actually gotten to a point after May of 2018 of taking 12

7   to 15 Norcos per day.  By the time of that interview in

8   December of 2018 he told me that he was wearing a fentanyl

9   patch and yet was still taking four Norco per day.

10   *Q.*   All right.  And then when he told you that, your reaction

11   to him was something along the lines of "I don't believe that

12   bullshit," right?

13   *A.*   I don't believe I ever swore at Mr. Inman during that

14   interview.

15   *Q.*   All right.  Is that your testimony under oath, sir, that

16   you didn't say "I don't believe that bullshit," something to

17   that effect?

18   *A.*   Well, I guess that's different, because if you're asking

19   me to that effect, that's different.  I will testify that I

20   never swore at Mr. Inman.  I did not say "I don't believe that

21   bullshit."

22   *Q.*   What did you say that had "bullshit" in it?

23   *A.*   I don't believe I said anything that said "bullshit."

24   *Q.*   Well, I was sitting right there as Representative Inman --

25                *THE COURT:*  Well, you're not going to testify, are

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1  you?

2  Q.    *(BY MR. COOKE)*  All right.  Well, in any event, when you

3  learned that Representative Inman was reporting that he had

4  this bad prescription medication issue, did you do any

5  investigation to determine whether or not he was suffering from

6  that at or around the time when this prevailing wage vote was

7  being taken?

8  A.    No.  And actually he told me that he was experiencing

9  pain.  He told me that, again, in May of 2018 is when he

10  started taking these Norco pills.  But actually he didn't share

11  with me during that interview that he was feeling any

12  impairment.  His only side effect was that he experienced dry

13  mouth and he asked for a glass of water.  We gave him a glass

14  of water.  He didn't share any indication of impairment, nor

15  did he share any indication of him being prescribed

16  incorrectly.  He told me that he was receiving those pills

17  under the guidance of a doctor and was being treated by a

18  doctor.

19  Q.    Did he also tell you at that time that he had a fentanyl

20  patch?

21  A.    Yes, he told me he was on a fentanyl patch.  That he had

22  actually gone from taking 12 to 15 Norco a day to a fentanyl

23  patch and four Norco a day.

24  Q.    Do you think 12 to 15 Norcos a day would be anything that

25  a doctor would prescribe?

1          *MR. O'CONNOR:*  Objection, foundation.

2          *THE COURT:*  Yeah, I mean, I don't know if he has any

3    foundation.  We can find out if he does.

4    *Q.*  *(BY MR. COOKE)*  Well, do you think that 12 to 15 --

5          *THE COURT:*  Well, it's not what he thinks.  He's not

6    a physician.  We have to find out if he's trained or has any

7    basis to understand what the prescription was.

8    *Q.*  *(BY MR. COOKE)*  You've testified that you've dealt with

9    opioid addicts; is that right?

10   *A.*  That's correct, heroin addicts primarily, yes.

11   *Q.*  Heroin.  Not prescription medication addicts?

12   *A.*  No, heroin addicts.

13   *Q.*  So my question is:  Have you ever dealt with someone who

14   was addicted to prescription medication?

15   *A.*  Heroin addicts is what I'm telling you I've dealt with.

16   *Q.*  I'm sorry.

17   *A.*  They will get it where they can.  Sometimes it's a pill.

18   Sometimes it's fentanyl.  The people I've dealt with were not

19   typically receiving that -- to my knowledge not getting it from

20   a doctor.

21   *Q.*  All right.  So how about those folks that receive

22   prescription medication from a physician that has an opioid

23   basis in it, have you dealt with anybody who has that kind of

24   an addiction problem?

25   *A.*  Clarify that for me again one more time.

1    *Q.*   Well, gets addicted to pain medication that's properly

2    prescribed.  That gets addicted to pain medication.  Have you

3    ever dealt with anybody that has that problem?

4    *A.*   No, people I've dealt with primarily had an addiction

5    stemming from heroin use.

6    *Q.*   So the answer would be "no" to my question?

7    *A.*   I just said "no."  Yes, it was heroin.

8    *Q.*   And so you don't -- when he reports he was taking 10 to 15

9    a day, you have no idea if that was proper, improper, or what

10   effect that might have had on him?

11   *A.*   It seemed like a lot, but truth be told, I didn't know

12   that Mr. Inman was being truthful with me at that time.  I

13   didn't necessarily believe him.  I was seeking a determination

14   as to whether Mr. Inman was going to be truthful.  He actually

15   was untruthful throughout that December interview with us.  So

16   if somebody is not truthful with me -- and this is why we use

17   these things we know as gauges of truthfulness like the text

18   messages -- it makes it really hard to believe a person if they

19   can't admit to those things that we've confronted him with.

20   And we've confronted him with those text messages and the

21   phone call with Ms. Canada.  And even after listening to that

22   phone call with Ms. Canada, he couldn't recall talking about

23   $30,000.  So his truthfulness was in question in my eyes

24   throughout that December interview.

25   *Q.*   Did you understand my question?

1    *A.*   Yes.

2    *Q.*   All right.  When you learned that Representative Inman was

3    saying he was taking 10 to 15 Norcos a day, did you do anything

4    as part your investigation to determine whether or not that was

5    an appropriate prescription?

6    *A.*   No.

7    *Q.*   Did you do anything as part of your investigation to

8    determine whether or not that would have an effect on his

9    cognitive abilities?

10   *A.*   Not until after it was raised as a potential defense.

11   *Q.*   Not until it was raised and the Court was notified that

12   that was an issue, then you took a look at it?

13   *A.*   Then it was explored.

14   *Q.*   All right.  So when -- you had Representative Inman's

15   cellular phone and all the data and information from his

16   cellular phone since August 1st of 2018, correct?

17   *A.*   Yes.

18   *Q.*   And then in December of two thousand and -- I'm sorry, was

19   that '18?

20   *A.*   Yes, December 2018, right.

21   *Q.*   Was the second interview where he reported having this

22   problem, right?

23   *A.*   Yes.

24   *Q.*   Did you ever take out that Cellebrite report and run a

25   search for pain or Norco?

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1   A.   No, I did not.

2   Q.   Is it your role as an investigator to uncover the truth,

3   sir?

4   A.   It is my role to uncover the truth.

5   Q.   All right.  And when -- the fact that Representative Inman

6   revealed this to you that he was taking these prescriptions,

7   did you feel it was important or might be important for you to

8   look in his cell phone to see if he was reporting problems

9   associated with something?

10  A.   Mr. Inman never made an allegation --

11  Q.   Sir, answer my question.

12  A.   Mr. Inman never made an allegation that there was any

13  wrongdoing in the prescribing of medication to him.

14  Q.   No, he didn't say that, but did he tell you he was taking

15  these large doses of prescriptions?

16  A.   He told me that in the past he had taken as much as 12 to

17  15.  At the time of the interview he was on a fentanyl patch

18  and taking four.  That it was being managed by a doctor.

19  Q.   All right, sir.  So I have a proposed exhibit here,

20  Defendant's Exhibit H.  Have you had a chance to review this

21  document?

22  A.   Sure.

23          MR. COOKE:  With the Court's permission?

24          THE COURT:  Have you seen it?

25          MR. O'CONNOR:  I object, Your Honor.  This is not

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1    admissible.

2            THE COURT:  Well, I don't know what it is, so

3    somebody better show me.

4            What is this?

5            MR. COOKE:  This is a search of the Cellebrite phone

6    if you run "Norco" and "pain," and these are some of the text

7    messages that come out from that between Representative Inman

8    and a variety of people that are close to him including his

9    physicians.

10           THE COURT:  All right.  Okay.  Well, I haven't looked

11   at it.  Your objection is hearsay?

12           MR. O'CONNOR:  Hearsay.

13           THE COURT:  And that would be my initial reaction.

14   There's too many pages to look at.  I'll look at it while you

15   go on to another topic.

16           MR. COOKE:  All right.  Thank you, Your Honor.

17   Q.   (BY MR. COOKE)  Have you ever heard the term

18   "functional alcoholics"?

19   A.   Yes.

20   Q.   What is your impression of a functional alcoholic?

21   A.   My personal impression of a functional alcoholic is just

22   that, somebody who can -- who has perhaps an alcohol addiction

23   but is able to function significantly for a significant part of

24   the day or their life.

25   Q.   Did you hear testimony from Representative Bellino that he

1   thought Representative Inman was a functional alcoholic?

2   A.   That's how -- yes, I did hear that.

3   Q.   Did you hear testimony from Trey Hines that he observed

4   Representative Inman to have difficulty and he believed it was

5   difficulty associated with taking too much prescription

6   medication?

7   A.   I recall hearing Trey Hines talk about some difficulty

8   that he observed -- difficulties he observed with Mr. Inman,

9   yes.

10   Q.   You interviewed Trey Hines on two occasions, right?

11   A.   Correct.

12   Q.   And on either one of those two occasions when you

13   interviewed Trey Hines did you ask him any questions that would

14   have led to the testimony he gave in front of this jury today

15   where he believed Representative Inman was taking too much

16   prescription pain medication?

17   A.   I don't recall him -- and actually I would be glad to

18   review my report -- but I don't recall him bringing up that

19   specific aspect with us.

20   Q.   Wouldn't that be interesting -- wouldn't that be important

21   for you to know that if you're searching for the truth?

22   A.   Yes.

23   Q.   As to whether people close to Representative Inman

24   observed problems with him.

25   A.   If somebody doesn't offer that to me, I can't read their

CROSS-EXAMINATION OF JEREMY ASHCROFT

1    mind.  If somebody doesn't tell me that, I don't know that.  I
2    would be glad to review my report to see if Mr. Hines reported
3    that to me.
4    Q.   Your last interview with Trey Hines was just a few weeks
5    ago, right?
6    A.   Correct.
7    Q.   And in the meantime you had interviewed numerous people
8    and asked them the same question as to whether or not they
9    observed any problem with Representative Inman's cognitive
10   abilities, true?
11   A.   True.
12   Q.   And I see that question being asked of every person who
13   might have come in contact with Representative Inman other than
14   Mr. Hines.  Why wouldn't you ask him?
15   A.   The first time I actually tried to interview -- well, not
16   actually -- the first interview of Mr. Hines I did try to ask
17   him about his observations of Mr. Inman and we would have
18   gotten into that.  He declined to answer those questions at
19   that time.
20   Q.   All right.  But the second interview?
21   A.   The second interview we actually were asking about his --
22   Mr. Inman's mental cognition and his ability to function.  It
23   was not specific as to drugs and alcohol use.  It was just
24   about his mental cognition.
25   Q.   And did Mr. Hines report to you those things that he said

1    from the witness stand today about mental cognition of

2    Representative Inman?

3              *MR. O'CONNOR:*  Objection, prior inconsistent

4    statement.  No basis for that.

5              *THE COURT:*  Well, I mean, I think we're talking now

6    about the second interview.

7              *MR. COOKE:*  Second interview, Your Honor.

8              *THE WITNESS:*  I can tell you I heard things today

9    from Mr. Hines that I had not heard in the interviews.  The

10   first -- this was the first I had heard him talk about his

11   observation of a fentanyl patch and prescription medications.

12   He did tell us about the physical difficulties Mr. Inman

13   experienced and his driving Mr. Inman down in January of 2018,

14   but there was not an extensive discussion regarding his

15   concerns over prescription medication use.

16   *Q.*   Well, he also told you that he observed

17   Representative Inman to be forgetful, correct?

18   *A.*   Yes, he did.

19   *Q.*   And he told you that he observed Representative Inman to

20   come back in the afternoon and crash on his couch?

21   *A.*   Correct.

22   *Q.*   And he told you that over the course of 2018 that seemed

23   to progress to a point where they were concerned about his

24   well-being; is that true?

25   *A.*   That's what he testified to today, correct.

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1    *Q.*    But you didn't explore that with him in your interview?

2    *A.*    He didn't mention that in the interview.

3    *Q.*    But you're the professional investigator.  Wasn't it

4    your -- important for you to understand if Representative Inman

5    really was suffering from a problem at the time of this vote?

6    *A.*    Well, the relevance to the investigation is not

7    necessarily there.  The investigation is regarding Mr. Inman's

8    attempt to sell his vote on prevailing wage.  His well-being

9    and -- physical well-being, if you will, in December of

10   2018/January of 2019 as testified to by Mr. Hines isn't

11   relevant to the June 2018 activity or that August 1 interview.

12   And as Mr. Hines testified, it progressed to a point that was

13   worse essentially after charging.  And, again, he hadn't shared

14   that with me in the interview, so I can't get to the bottom of

15   something that's really not disclosed to me.

16   *Q.*    Well, I thought Mr. Hines -- and correct me if I'm wrong

17   on this -- I thought Mr. Hines testified that from the time he

18   started driving Representative Inman back and forth from the

19   hospital --

20            *THE COURT:*  Well, you know, we've all heard the

21   testimony, and you're probably going to argue different things

22   about what it means.  So let's get additional information, if

23   there is any, and we can argue the meaning of what everybody

24   has heard to the jury down the road.  We're just kind of going

25   over stuff we've done before, right?  And we heard today.

1        *MR. COOKE:*  I defer to the Court.  All right, sir.

2    *Q.*  *(BY MR. COOKE)*  You first got involved in this

3    investigation when you received a referral from the

4    State Police; is that right?

5    *A.*  Actually it went through our Detroit office's management

6    and eventually got to me.  But yes, that is the catalyst, if

7    you will.

8    *Q.*  And did you talk to the State Police person who took the

9    report from Ms. Canada?

10   *A.*  She's a bureau task force officer, yeah.  Actually, strike

11   that.  There was no report taken by the Michigan State Police.

12   So I did talk to the person who sent the email to the FBI to

13   our management team making that referral.  So just to be clear,

14   there's no Michigan -- as I understand it and as I've been told

15   by Michigan State Police, there's no police report.

16   *Q.*  Oh.  I thought when you came in to report what you

17   perceived to be a crime that there would be a police report of

18   some kind.

19   *A.*  I don't work for the Michigan State Police.  I don't

20   handle their policies.  It was referred to the FBI.  The FBI

21   initiated an investigation.

22   *Q.*  All right.  So you don't know who Ms. Canada talked to at

23   whatever Michigan State Police post she went to?

24   *A.*  What's been conveyed to me is she went to somebody at the

25   Oak Park post.  That person directed her to a task force

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1    officer who is a Michigan State Police trooper assigned to the

2    FBI's public corruption task force, and it's that task force

3    officer that provided a summary of the allegations to the FBI.

4    Q.   All right.  And when you spoke to Ms. Canada did you know

5    at that time that she was very upset with Representative Inman?

6    A.   I found that out as a result of interviewing Ms. Canada.

7    Q.   And did you find out from her that this prevailing wage

8    issue was the number one ballot issue in 2018 for the unions?

9    A.   I knew that -- she did share with us that prevailing wage

10   was their top concern in 2018, yes.

11   Q.   And did she also share with you that when she sent these,

12   this text message, or received this text message from the

13   lobbyist and they had this group texting together, that she

14   indicated if he -- "If Representative Inman votes the wrong

15   way, I will spend every dollar I have on his opponent"?  Did

16   you see that text message at that first interview?

17   A.   Which one?  Can you show me that text message?

18   Q.   Sure.

19          *MR. COOKE:*  With the Court's permission, Your Honor?

20          *THE COURT:*  All right.

21          *MR. O'CONNOR:*  Number?  Which exhibit number are you

22   looking at?

23          *MR. COOKE:*  Well, it's attached to his report.  Oh,

24   it's your Exhibit I.  No, it's not.  I'm not sure which

25   exhibit.

1              MR. O'CONNOR:  Thank you.

2     Q.    (BY MR. COOKE)  I'm referencing the asterisk 1 down there

3     on the bottom.

4     A.    Okay.  If you could ask me your question again, please.

5     Q.    I just wondered if when you first talked to Ms. Canada if

6     she showed you that particular text message.

7     A.    Yes, this was from our first interview.  She showed this

8     message to me and she allowed me to take pictures of it.

9     Q.    All right.  And is there a statement that she --

10    attributable to her where she says "If he votes the wrong

11    way" --

12             MR. O'CONNOR:  Objection.

13             THE COURT:  This is cumulative again.  I mean, you

14    know, we all heard that.  And he just said he passed it on that

15    that's what he learned at the first interview.  So we need to

16    do new things.  We don't have to rehash things we've already

17    done.

18             Is there something else you want to find out about

19    that from this witness?

20             MR. COOKE:  Yes, Your Honor, there is.

21    Q.    (BY MR. COOKE)  Did she reveal to you that she had a --

22    did you feel like she had a vendetta against

23    Representative Inman?

24    A.    No, I did not.

25    Q.    And why so?

CROSS-EXAMINATION OF JEREMY ASHCROFT

1  *A.*   She actually came across very professional.  She felt and

2  believed strongly that what Mr. Inman did by soliciting $30,000

3  for his vote on prevailing wage was wrong.  She felt she needed

4  to report that.  But I would not describe the way she responded

5  as a vendetta.

6     She also, you know, wanted to take other certain steps,

7  but she was very reasonable about it in my opinion.

8  *Q.*   Sir, you continue to say that Representative Inman

9  solicited $30,000 from the union.  Where is your evidence of

10  that?  Where is your information that he solicited $30,000 from

11  the union?

12  *A.*   In this text message that he sent to Ms. Canada and the

13  text message he sent to Mr. Kirsch on June 3rd.

14  *Q.*   Does he say in this text message that the carpenters

15  have --

16     *THE COURT:*  Before we go into that, we're going to be

17  into a new topic, and I think we need to break for the day.

18     *MR. COOKE:*  Thank you, Your Honor.

19     *THE COURT:*  So are you still on track from the

20  government's perspective to rest tomorrow based on what you

21  think so far?

22     *MR. O'CONNOR:*  Yes.  Tomorrow morning.

23     *THE COURT:*  Okay.  All right.  So I'm going to send

24  you home now because it's 2:00.  We're obviously in the middle

25  of an exam, but that's what happens sometimes.

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1          Please come again tomorrow at 8:30, be ready to

2    start.  You never know for sure what happens.  Things develop

3    and change, but the best expectation of the parties right now,

4    as you just heard, is that the government will probably finish

5    its proofs sometime tomorrow.  Maybe tomorrow morning.  It

6    doesn't mean you're likely to get the case tomorrow, though.

7    Because even if the defense decides to put on no case, and

8    we'll find out what they decide to do -- remember, they don't

9    have to do anything -- but even if they decide to put on no

10   case, you still have to have instructions from me and an

11   opportunity for closing argument, and I'm not confident we'd be

12   able to get that ready for you in time to really submit it to

13   you tomorrow.  So count on 8:30 to 2 tomorrow.  We'll go as far

14   as we can.  If the defense has it's own case and the government

15   rests as it expects, we'll go into the defense case.  I think

16   you're likely to get the case Monday, possibly Tuesday, but

17   we'll know more about that when we get to the end of the day

18   tomorrow.  So tomorrow plan on 8:30 to 2 as we've been doing.

19   Thanks for your ongoing attentiveness, and I will see you and

20   look forward to seeing you tomorrow morning.

21          *(Jury exited the courtroom at 2:00 p.m.)*

22          **THE COURT:**  So I haven't had a chance to go through

23   all of H.  My initial reaction is there's some that's clearly

24   inadmissible and some that might be admissible under the

25   then-existing state of mind or condition exception.

1          For example, on the first page I don't know what the

2    basis would be for the first one which appears to be a message

3    to either a physician or a prescriber asking for a refill.

4          Similar, the next one really has things that I don't

5    think fit within the exception.

6          But the third one to Ms. Ackerman, "I'm so miserable

7    in my lower back and down the back of my legs" and so forth.  I

8    mean, that's probably a then-existing condition, might come in

9    under the hearsay exception.  Assuming the government agrees

10   that the extraction source is authentic.  And if it came from

11   the extraction report that everybody has been talking about,

12   that one might do it.

13         There are other ones that combine some statement

14   about pain but then start to get into historical facts.  You

15   know, that's outside the exception.  So the document as is I

16   don't think comes in.  But it might be possible to clean up

17   some of the entries that would fit within a legitimate hearsay

18   exception of a person's report of pain.

19         And alternatively, I don't know if anybody is going

20   to call Ashleigh Ackerman, but those kinds of things could come

21   up during testimony like that.

22         If there are other exhibits either like this or

23   others coming, you know, where we know we're going to have an

24   issue, let's try to clean it up.  I don't know whether we'll

25   have time today or not.  But clean it up in a way that we don't

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1   have to take up the jury's time once we're here.  But that's my

2   initial reaction as far as I've gotten on H.

3           From your perspective first, Mr. O'Connor, what about

4   that -- something like I guess it's the third entry on the

5   first page -- what about that wouldn't be at least potentially

6   admissible under the 803(3) exception?

7           MR. O'CONNOR:  Well, part of it includes statements

8   about what he will do in the future, and so, you know, my

9   principal objection is that there's lots in here where it's

10  mixed.

11          THE COURT:  Right.  What about the first line?  "I'm

12  so miserable in my lower back pain and down the back of my

13  legs."  I mean, that sounds like a then-existing physical

14  condition statement.

15          MR. O'CONNOR:  That does sound consistent with the

16  rule, Your Honor.  What I'm trying to avoid is --

17          THE COURT:  And the next might not be because that's

18  historical fact which is not within that exception.  I guess

19  the future thing isn't within the exception either.  Though I'm

20  not sure that one helps either side all that much.

21          So all I'm saying is there could be things that could

22  potentially be cleaned up that both sides would say, "Yeah,"

23  like that first sentence, "it can come in."  If you can't do

24  that, then the exhibit as is I wouldn't admit.  I'm just saying

25  there might be some pieces of it that could come in.

1        MR. O'CONNOR:  And the government is willing to work

2    with Mr. Cooke to try to reach an agreement on that.

3        THE COURT:  All right.

4        MR. O'CONNOR:  And I'm happy to meet with him this

5    afternoon.

6        THE COURT:  Turning to Mr. Cooke, your theory on

7    admission outside something like "I'm so miserable in my lower

8    back," something that would fall within 803(3), what other

9    exception would you be relying on for getting this in?

10        MR. COOKE:  Well, the other thing, Your Honor, is

11    it's to show what we believe to be a lack of a thorough

12    investigation by the FBI as it pertains to my client's

13    revelation that he was suffering from pain, taking Norco, and

14    had some cognitive dysfunction as a result of it.

15        THE COURT:  Okay.  So you're arguing there was a

16    nonhearsay purpose, that if all of this was on the -- or

17    available in the extraction, they could have found it and gone

18    on and done it?

19        MR. COOKE:  Yes, Your Honor.

20        THE COURT:  Okay.  I guess my reaction to that is

21    two-fold:  One, I don't think that's really very relevant and

22    certainly, I think, would be excludable on 403 grounds because

23    this is information that's equally available to both sides.  So

24    I don't -- you make the point and have made the point, and the

25    agent obviously didn't believe what Mr. Inman was telling him

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1  about certain things, but I think on that basis I would have

2  other grounds that I wouldn't allow you to put it in as is.

3           Would there be any other exception you would be

4  relying on or other --

5           *MR. COOKE:*  Those would be principally the two that I

6  would rely on.

7           *THE COURT:*  So you can work with Mr. O'Connor.  There

8  may be some entries that you both agree would fall within

9  803(3).  You might have some you want to disagree on, and I can

10 rule on them if I know in advance what the issues are.  And

11 then, you know, anything else that either side can reasonably

12 anticipate coming up like this, let me know as soon as possible

13 so I can start looking at it and be ready to rule without

14 taking any time out of the jury.

15          *MR. COOKE:*  Thank you, Your Honor.

16          *THE COURT:*  Okay.  Are there other issues like that

17 now that either of you expect?

18          *MR. COOKE:*  I don't anticipate another one like this,

19 Your Honor.

20          *THE COURT:*  Okay.  The one you were just looking

21 at -- well, I guess you're going on now to the emails that were

22 part of the Indictment, or the text messages, so that's a

23 different topic.

24          Once you're finished with the special agent, do you

25 have a preview of who is coming tomorrow?

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1          *MR. O'CONNOR:*  We need to discuss that tonight,

2    Your Honor.

3          *THE COURT:*  All right.

4          *MR. O'CONNOR:*  We're not prepared to commit to our

5    plan for tomorrow morning.

6          *THE COURT:*  So you have -- whatever it is probably

7    isn't going to take the whole day?

8          *MR. O'CONNOR:*  Yes.

9          *THE COURT:*  Okay.  Then when you rest, whenever that

10   is, I will take a break, no matter where we are in the case, so

11   you can make your Rule 29 motion.

12          You know, I want, to the extent possible, to have the

13   parties focus on whatever technical deficiencies you see in the

14   proofs.  You know, certainly make your record, but obviously

15   neither side needs to make their jury argument to me on the

16   fundamental issue.  But if you think from the defense

17   perspective there's been a failure of proof on something, I

18   should know what that is.

19          *MR. COOKE:*  Thank you, Your Honor.

20          *THE COURT:*  Okay.  And then do you know yet whether

21   you'll put on an affirmative case?  I was looking through the

22   witness list that you submitted which was helpful in advance,

23   and a lot of the people you had on it have already been called.

24          *MR. COOKE:*  True.

25          *THE COURT:*  Not quite everybody.

*CROSS-EXAMINATION OF JEREMY ASHCROFT*

1          *MR. COOKE:*  True.

2          *THE COURT:*  So do you know where you are on that?

3          *MR. COOKE:*  I do have some witnesses, Your Honor,

4     that I'll be calling.

5          *THE COURT:*  Okay.  And in terms of the overall time

6     frame -- and I know you still have to decide whether or not

7     Mr. Inman is going to testify -- but if the government finishes

8     let's say sometime before noon, that by noon we're up to your

9     side, when do you think you'd be in a position to rest in all

10    likelihood?

11         *MR. COOKE:*  Likely it will be still about a day and a

12    half would be my guess.

13         *THE COURT:*  So finishing up Friday and probably

14    Monday, putting the jury's decision on Tuesday.

15         *MR. COOKE:*  I would think.  That would be my best

16    guess.

17         *THE COURT:*  And I know you'll have to have the

18    ability to evaluate rebuttal.

19         *MR. O'CONNOR:*  Yes.

20         *THE COURT:*  Okay.  All right.  I don't think I had

21    anything else from my perspective.

22         Oh, the instruction set.  I think I've got it ready

23    to go in its new iteration.  We'll just hand that to you before

24    you leave today.  Basically we corrected the typos and mistakes

25    you found.  Thank you for that.

CROSS-EXAMINATION OF JEREMY ASHCROFT

1          We have changed -- we have taken out the word
2    "demand" in this set.  And I'm not making any final decisions
3    yet, but I think given the tenor of the case, that fits better.
4    We'll talk about that when we go forward.

5          I can't remember the other changes, but we've done
6    something in response to everybody's comment.  And you can see
7    where we are.  There will be a few other things that we
8    obviously still need to decide how to address once we know
9    whether Mr. Inman testifies or not.  And depending on where we
10   are tomorrow, we might have time to go through instructions.
11   So if you have time to look at that tonight, that would be
12   great.

13          MR. COOKE:  Very good.
14          THE COURT:  Okay.  Anything else for today?
15          MR. O'CONNOR:  No, Your Honor.  Thank you.
16          MR. COOKE:  I have nothing, Your Honor.
17          THE COURT:  Okay.  See you tomorrow.
18       (Proceeding adjourned at 2:10 p.m.)
19                    *   *   *   *   *
20
21
22
23
24
25

1    I certify that the foregoing is a correct excerpt

2 transcript from the record of proceedings in the above-entitled

3 matter.

4    I further certify that the transcript fees and format

5 comply with those prescribed by the court and the Judicial

6 Conference of the United States.

7 Date:  May 12, 2020

8

9        **/s/ Glenda Trexler**

         _____

10       Glenda Trexler, CSR-1436, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25