UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                      CASE NO. 1:19-CR-117

v.

                                        HON. ROBERT J. JONKER

LARRY CHARLES INMAN,

       Defendant.

_____/

**OPINION AND ORDER**

**INTRODUCTION**

    In February of 2018, the Michigan Legislature was preparing to vote on an initiative to repeal the prevailing wage law.  Union interests and Democrats generally opposed repeal.  Business interests and Republicans generally supported repeal.  Both sides considered the issue critical to their respective constituencies, and both sides anticipated that campaign contributions would inevitably reward the legislators who voted with the interests of the particular contributor.  That much is politics as usual, as crass and unseemly as it may sometimes seem.

    In this case, the government charged Larry Inman, a former Republican member of the Michigan House, with going beyond that and committing three federal felonies: 1) attempted extortion; 2) soliciting a bribe; and 3) lying to an FBI Special Agent about what he did.  After a six-day trial, the jury acquitted Mr. Inman of lying to the FBI Special Agent and hung on the extortion and bribery charges.  The government seeks to retry the extortion and bribery charges, as would normally be possible in the wake of a mistrial based on a hung jury.  The defense says,

however, that cannot be done in this case without violating Double Jeopardy in light of the full scope of the collateral estoppel effect that must be given to the jury's acquittal on the lying charge.

The Court agrees that on the highly unique facts and law involved in this case, retrial of the attempted extortion and solicitation of a bribe charges would be inappropriate.  The jury's acquittal on the lying charge requires collateral estoppel protection for Mr. Inman on the key issue of whether he truthfully denied trying to sell his vote on prevailing wage, as the defense argues.  It also eliminates a key factual predicate enabling a jury to consider whether Mr. Inman crossed the line from permitted First Amendment campaigning to illegal vote selling.  Mr. Inman was more blatant and less subtle than other more polished legislators and lobbyists.  But there was no evidence of under-the-table payments or solicitations; there was only the pursuit and payment of fully reportable campaign contributions like those made across-the-board on high profile issues like this one.  Without the "plus factor" of lying to the FBI, retrial here would inevitably risk chilling legitimate First Amendment solicitation of campaign contributions.  Moreover, it would also jeopardize core federalism interests at stake whenever the federal government uses criminal law to reach into the heart of a State's legislative and political activities.

For these reasons, the Court agrees with the defense that to give full effect to the jury's acquittal on Count 3, the government must be barred from retrying the other counts.  The government itself in closing argument emphasized the linkage between the charges:

> Ask yourselves: If he did nothing wrong, why is he lying to the FBI about it repeatedly? If he had nothing to hide, why is he lying about it? If he didn't do anything wrong, improper, why is he lying about it every time they ask him the questions?
>
> ***
>
> Ladies and gentlemen, the only way you can find the defendant not guilty in this trial is if you believe his testimony.  That's it.

2

(ECF No. 121, PageID.1555-56; 1568).

The jury then acquitted on the lying charge.  By the government's own logic, that must mean the jury believed Mr. Inman's testimony.  And for that reason, retrial of the remaining counts must be barred.

## BACKGROUND

### *1. The Prevailing Wage in General and the Leadup to the June 2018 Vote*

Enacted in 1965, and modeled after the federal Davis-Bacon Act of 1931, Michigan's prevailing wage law regulated the terms and conditions of employment on state construction jobs by providing that the state's Department of Labor would determine the prevailing wage and benefits to be paid to construction workers on state financed or sponsored construction projects. *Prevailing Wage*, MICHIGAN.GOV, https://www.michigan.gov/leo/0,5863,7-336-94422_59886_27706---,00.html (last visited Mar. 30, 2021); *see also* 1965 MICH. PUB. ACTS 166, § 2 (codified at MICH. COMP. LAWS § 408.551-558), *repealed by* 2018 Mich. Pub. Acts 171, § 1 (eff. June 6, 2018).  The Department of Labor was required to determine the prevailing wage by looking to union wages in the local jurisdiction. *Id.* at § 4 ("The commissioner shall establish prevailing wages and fringe benefits at the same rate that prevails on projects of a similar character in the locality under collective agreements or understandings between bona fide organizations of constructions mechanics and their employers.").

The legislation was a political lightning rod with fierce supporters and detractors.  Those in favor of the legislation viewed it as ensuring high-quality and high-skilled work at a fair wage for that work.  It stabilized local construction jobs (both union and non-union) by ensuring out of state competitors with low-skilled workers could not swoop in and under-bid on projects.  Detractors of the legislation viewed it as anathema to free-market principles, and as padding the

3

pockets of union interests at the expense of the taxpayers through inflated project costs.   Over the decades, supporters and detractors engaged in a protracted battle using tactical gamesmanship to either chip away at, or buttress, the legislation.   These efforts have taken place across various forums, including the public square, the state legislature, and the state and federal courts.[1]

In the 2010s, the makeup of the Michigan legislature was such that both supporters and opponents of prevailing wage believed that a vote to repeal the legislation might be successful. *See* Steve Carmody*, Analyst Says: Fresh from Election Victories, GOP May Move to Repeal Michigan's Prevailing Wage Law*, MICHIGANRADIO.ORG (Nov. 5, 2014), https://www.michiganradio.org/post/analyst-says-fresh-election-victories-gop-may-move-repeal-michigans-prevailing-wage-law.   In 2015 repeal efforts wound their way through two distinct legislative channels.   The first was the normal legislative process requiring approval by both the Michigan House and Senate, and the Governor's signature.   That year a three-bill package to repeal the prevailing wage was introduced, and passed, in the Michigan Senate.   Jonathan Oosting, *Michigan Senate Approves Prevailing Wage Repeal*, MLIVE.COM (May 14, 2015, *updated* Apr. 3, 2019),      https://www.mlive.com/lansing-news/2015/05/michigan_senate_approves_preva.html. For the package to become law, Michigan House approval and the Governor's signature were still needed.   *Id.*   But the governor at the time, Rick Snyder, did not support repealing the prevailing wage.   *Id.*   So proponents of repeal pursued a different approach.   The Michigan House of Representatives decided to await the outcome of the citizen-initiated ballot petition, the second legislative channel, before acting on the Senate bills.   Kathleen Gray, *Group Won't Get Prevailing Wage Repeal on November Ballot*, Detroit Free Press (May 27, 2016, 6:43 PM),

---

[1] For a period in the 1990s, for example, the legislation was not enforced after a federal court determined it was preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a).  *See Associated Builders & Contractors v. Perry*, 115 F.3d 386 (6th Cir. 1997).

4

https://www.freep.com/story/news/politics/2016/05/27/group-wont-get-prevailing-wage-repeal-november-ballot/85053248/.

The Michigan Constitution allows citizens to enact or repeal most types of laws, including prevailing wage, through a ballot-initiative process. "Proponents of a voter initiative must submit petitions bearing the signatures of a certain number of registered voters to the Bureau of Elections within a time frame set by the Legislature." *Protecting Michigan Taxpayers v. Board of State Canvassers*, 324 Mich. App. 240, 242, 919 N.W.2d 677 (Mich. Ct. App. 2018). Under the constitutional framework, an initiative garnering a sufficient number of signatures then goes to the Michigan legislature for approval or rejection. MICH. CONST. 1963, Art. II, § 9. If the legislature approves the initiative, it becomes law even without the Governor's signature or veto opportunity. *Id.* If the legislature rejects the initiative, the measure must be placed on the next general election ballot for the voting public's approval or rejection. *Id.* In the fall of 2015, supporters of repealing the prevailing wage began an initiative process and submitted signatures to the Bureau of Elections. But this initiative came up short on signatures and did not advance to the legislature or the 2016 general election ballot. Gray, *supra*.

In 2017, the two-front process began anew. The three-bill package was reintroduced in the Michigan Senate. Rick Pluta, *"Prevailing Wage" To Be An Issue Before New Legislature*, MICHIGANRADIO.ORG (Jan. 19, 2017), https://www.michiganradio.org/post/prevailing-wage-be-issue-new-legislature. And in the spring of 2017, proponents of repealing the prevailing wage began gathering signatures under the initiative provision of the Michigan Constitution. As with the previous efforts, the focus was on the initiative process, rather than the normal legislative process. In November 2017, the group Protecting Michigan Taxpayers, an organized ballot-question committee, turned in approximately 380,000 signatures for certification. Roughly

252,000 of those needed to be certified as valid to move the petition forward to the legislature. David Eggert, *Petitions Turned In To Repeal Michigan Prevailing Wage Law*, ASSOCIATED PRESS, Nov. 30, 2017, https://apnews.com/article/b5191fbdc5ab43c793a765c9b704cdc9. An initial review of a sampling of signatures fell short, but after further review the Bureau of Elections projected that Protecting Michigan Taxpayers had gathered 268,403 valid signatures, a sufficient number to move the initiative to the legislature and, if necessary, the ballot. *Protecting Michigan Taxpayers*, 324 Mich. App. at 242-43.

Final certification was up to the Michigan Board of State Canvassers, which deadlocked on a two to two vote. Lauren Gibbons, *Prevailing Wage Repeal Petition Stalls After State Board Deadlocks*, MLive.com (Apr. 26, 2018, *updated* Jan. 30, 2019), https://www.mlive.com/news/2018/04/prevailing_wage_repeal_petitio_1.html. Litigation ensued. On May 11, 2018, the Michigan Court of Appeals granted Protecting Michigan Taxpayer's mandamus request and directed the Board of State Canvassers to certify the petition. *Protecting Michigan Taxpayers v. Board of State Canvassers*, 324 Mich. App. 240 (Mich. Ct. App. 2018). Union backed groups opposed to repeal appealed the decision. After an initial stay, the Michigan Supreme Court denied the opponents leave to appeal, which meant that the Board of Canvassers was required to certify the petition. 501 Mich. 1087, 911 N.W.2d 803 (mem) (2018); David Eggert, *Prevailing Wage Bill To Proceed After Court Declines Appeal*, ASSOCIATED PRESS, May 30, 2018, https://apnews.com/article/c9cf2cf0aa28423889a21747b3a5a39f. It did so, sending the matter to the legislature. Beth LeBlanc & Jonathan Oosting, *Showdown Looms for Prevailing Wage Repeal Plan*, DETROIT NEWS (June 1, 2018, 3:15 PM), https://www.detroitnews.com/story/news/local/michigan/2018/06/01/repeal-plan-prevailing-

wage-moves-ahead/662804002/.  The next step was a vote in the legislature scheduled for June 6, 2018.

### 2.  *The Repeal Vote*

The initiative came up for a vote on June 6, 2018.  The vote passed the Michigan Senate 23 to 14 and the Michigan House 56 to 53.  Lindsay VanHulle, *Michigan Republicans Repeal Prevailing Wage Law*, BRIDGEMI.COM (June 6, 2018), https://www.bridgemi.com/michigan-government/michigan-republicans-repeal-prevailing-wage-law.  Because the legislature voted in favor of the initiative, it became law even without the Governor's signature or veto opportunity.  MICH. CONST. 1963, Art. II, § 9.[2]  Mr. Inman voted in favor of the repeal initiative, consistent with most Republican legislators.  His path to decision was less than direct, however, which ultimately led to this federal criminal case.

### 3.  *Campaign Contributions*

All this political and litigation activity required money to fuel the effort of each side.  One website compiled publicly available campaign contribution data for two of the principal committees involved—the Protecting Michigan Taxpayers committee (in support of repeal) and the Protecting Michigan Jobs committee (in opposition to repeal)—and pegged the total contributions to the two committees alone at $2,335,848.19.  *Michigan Repeal Prevailing Wages & Fringe Benefits on State Projects Initiative (2018)*, BALLOTPEDIA, https://ballotpedia.org/Michigan_Repeal_Prevailing_Wages_and_Fringe_Benefits_on_State_Pro

---

[2] There were further challenges in the courts.  Opponents of repeal questioned the constitutionality of the initiative.  A lawsuit brought by Protect Michigan Jobs, however, was dismissed in the Michigan Court of Claims.  *See* Lauren Gibbons, *Michigan Court of Claims Dismisses Challenge to Prevailing Wage Repeal*, MLIVE.COM (Feb. 25, 2019), https://www.mlive.com/news/2019/02/michigan-court-of-claims-dismisses-challenge-to-prevailing-wage-repeal.html.  The continued skirmishes underscore how crucial this issue was to each side.

jects_Initiative_(2018)#cite_note-supportfin-12 (last visited Mar. 30, 2021). This underscores not only the importance of the prevailing wage law (to both sides) in general, but also the special legislative interest in the initiative process as a means of eliminating the Governor from any formal role in the matter. Naturally, the focal point of lobbyist pressure and incentives were on the members of the Michigan legislature.

Outside supporters and detractors weren't the only ones thinking about dollars and cents. The Speaker of the Michigan House of Representatives—Lee Chatfield—testified that he tells his members there are three "C's" to weigh in deciding how to vote on a bill: the member's Conscience; the member's Constituents; and the member's Caucus. But other trial testimony made clear there was also a fourth C that was on the mind of legislators in advance of the vote on the prevailing wage repeal: Campaign Contributions. Several witnesses testified that supporters and opponents marshalled a full-court press on legislators to try to persuade them to support their respective positions. Indeed, members were literally wined and dined by the competing interests. Other groups signaled that the repeal vote was a "key vote" to their interests. *See, e.g.*, *Voting Record*, MICHIGAN CHAMBER OF COMMERCE, https://www.michamber.com/advocacy/voting-record/ (last visited Mar. 30, 2021) (displaying prevailing wage repeal as a key vote in the 2017-2018 legislative session). And Daniel Pero, a long time Lansing politico, testified that through all of this, members knew that campaign contributions would flow into campaign coffers based on this kind of vote. He testified that the business community in Michigan gives substantial sums of money to those who support their interests. "Lettuce," Mr. Pero said, "to feed the rabbits."[3]

---

[3] This is not to say that members always vote in line with their contributors. As one politician pithily put it: "If you can't eat [lobbyists'] food, drink their booze, . . . take their money and then vote against them, you've got no business being [in politics.]" *United States v. Terry*, 707 F.3d 607, 609 (6th Cir. 2013) (quoting 1960's Speaker of the California General Assembly, Jesse Unruh, *in* Bill Boyarsky, *Big Daddy: Jesse Unruh and the Art of Power Politics* 112 (2007)). But

### 4.  *The Indictment*

This case arose out of the special legislative focus on the prevailing wage vote, and campaign donations inevitably associated with it.  Mr. Inman, a Republican member of the Michigan House of Representatives, voted in favor of the repeal.  This was a position in line with most of his political caucus.  But the government says that Mr. Inman's "yes" vote came about only after he tried unsuccessfully to sell a "no" vote to the Michigan Regional Council of Carpenters & Millwrights ("MRCCM" or "carpenters union"), a labor union opposed to the repeal; and then lied to an FBI Special Agent about it.

The May 14, 2019, Indictment charged Mr. Inman with three counts:  Count 1 charged that between on or about June 3, 2018, and June 5, 2018, Mr. Inman attempted to obstruct, delay, and affect commerce by unlawfully soliciting a political campaign contribution of money from the MRCCM in exchange for an official act of voting "no" on the 2018 legislative initiative to repeal Michigan's prevailing wage law,  in violation of 18 U.S.C. § 1951.  (Count 1, Attempted Extortion Under Color of Official Right).  The Indictment further charged that on or about the same dates Mr. Inman, an agent of a State government that received benefits in excess of $10,000, corruptly solicited and demanded a thing of value, that is, a political campaign contribution from MRCCM in exchange for his vote on the repeal initiative, in violation of 18 U.S.C. § 666(a)(1)(B).  (Count 2, Solicitation of a Bribe).  Finally, the Indictment charged that on or about August 1, 2018, Mr. Inman knowingly and willfully made a materially false, fictitious, and fraudulent statement to a special agent of the Federal Bureau of Investigation, to wit, Mr. Inman denied soliciting $30,000

---

Mr. Pero also remarked, generally legislators' friends are those who "brought them to the dance," not those they met there.  A politician's friends, in other words, are those contributors who generally support the caucus's position.

in campaign contributions from the MRCCM before casting his vote on the repeal, in violation of 18 U.S.C. § 1001(a)(2).  (ECF No. 1).

### 5.  The Trial

Soliciting and making campaign contributions are not illegal in themselves.  To the contrary, they are an unavoidable reality of our current system of electing representatives.  The government's theory was that the activity here went beyond lawful solicitation and amounted to an unlawful quid pro quo vote selling scheme.  The line between the permissible and the impermissible can be subtle, but the focus of the government's argument was that Mr. Inman knew he was on the wrong side of it because he lied to a Special Agent of the FBI when later asked about his communications with the union on the topic.  In this way, the lying charge and the bribery and extortion theories were intertwined.

### A.  Attempted Quid Pro Quo

A six-day jury trial began on December 3, 2019.  The government's case in chief centered on two text messages that Mr. Inman sent to the MRCCM's union representative (Lisa Canada) and lobbyist (Jim Kirsch) on June 3, 2018, three days before the Michigan House of Representatives voted on the prevailing wage measure.  The text messages to Ms. Canada and Mr. Kirsch were similar in both form and substance.  Both text threads contained a discussion about the prevailing wage vote and campaign contributions.  They alluded to a dinner event sponsored by MRCCM in November 2017 to educate Mr. Inman and other legislators on the union position.  It was at that event where the subject of campaign contributions first arose.  The line between legitimate, albeit unseemly, solicitation of campaign contributions protected by the First Amendment, and illegal attempts at extortion or solicitation was the pivotal issue for the jury.  The legal test would be whether the activity amounted to a "quid pro quo."

10

The Supreme Court has held that proof of this concept—a payment made in return for an explicit promise or understanding—is critical, indeed required, to establish culpability under a Hobbs Act theory of extorting payments under color of official right. *McCormick v. United States*, 500 U.S. 257, 273 (1991) ("The receipt of such [campaign] contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking."). "To hold otherwise," the Supreme Court held "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id.* at 272. Today, the quid pro quo requirement serves to aid courts in policing the line between the permissible campaign contributions, and illegal extortion and solicitation of a bribe:

> There is a very real line between legitimate solicitation and bribery. It is the role of our-public corruption statutes to police that line. But, in undertaking those policing efforts, courts have articulated requirements designed to ensure that those statutes do not (even inadvertently) sweep a wide swath of routine political behavior into their purview. One such requirement is that, where campaign contributions are involved, the government must prove the existence of an explicit quid pro quo to convict someone of . . . Hobbs Act extortion.

*United States v. Sittenfeld*, Case No. 1:20-cr-142, 2021 WL 779136, at *12 (S.D. Ohio. Mar. 1, 2021).

The Sixth Circuit Court of Appeals, as well as the Supreme Court, has expanded on what a quid pro quo requires. "[N]o affirmative step towards the performance of the public official's promise need be taken." *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994)

("[F]ulfillment of the quid pro quo is not an element of the offense."). "The public official need only 'agree that his official conduct will be controlled by the terms of the promise or understanding.'" *Sittenfeld*, 2021 WL 779136, at *12 (quoting *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013)). The quid pro quo need be "explicit" but not "express." *Blandford*, 33 F.3d at 696 & 696 n.13 (contrasting the definitions of the two terms, and noting that explicit means, among other things, only "[c]lear in understanding" whereas express means "[m]anifested by direct and appropriate language, as distinguished from that which is inferred from conduct."). That the extortion statutes do not require an express agreement makes sense, because otherwise "the law's effect could be frustrated by knowing winks and nods." *United States v. Evans*, 504 U.S. 255, 274 (1992); *see also United States v. Porter*, 886 F.3d 562 (6th Cir. 2018) (concluding a quid pro quo is sufficient, but not necessary, under bribery statute, 18 U.S.C. § 666(a)(1)(B), and quoting *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009), for the proposition that "it is enough if a defendant 'corruptly solicits' 'anything of value' with the 'inten[t] to be influenced.").

> That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe. . . . If an official receives money through promises to improperly employ his public influence, he has accepted a bribe. A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions. No bribe thus occurs if the elected official later does something that benefits the donor. On the other hand, if a donor . . . makes a contribution so that an elected official will do what [the donor] asked him to do, and the official . . . accepts the payment with the same understanding, the donor and the official have formed a corrupt bargain. That agreement makes the difference between a run-of-the-mine contribution and a bribe.

*Terry*, 707 F.3d at 613 (internal citations and quotation marks omitted).

Terry involved a separate bribery statute for honest services fraud.  In that case a state court judge (Terry) who was appointed and seeking reelection for the first time, sought out the assistance of a local politician (Russo) for assistance. Russo (who was already under investigation) provided campaign contributions, but he also provided non-monetary help in the form of campaign materials, government employee help on the taxpayer's dime, and by hiring a woman Terry had fired, to temper negative publicity.  *Terry*, 707 F.3d at 614-615.  In return, Russo testified he expected that Terry would "do what I asked him to do," including dismissing a motion for summary judgment in one of Terry's pending cases.  *Id.* at 615.  In affirming the jury's guilty verdict, the Sixth Circuit found there was an agreement to exchange campaign contributions for help in official acts.  The court began by noting "[n]ot every campaign contribution . . . is a bribe in sheep's clothing.  *Without anything more*, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor."  *Id.* at 615 (emphasis added).  But the Court found there was enough in the record (to affirm the convictions) to "reject legitimate explanations for a contribution and infer that it flowed from a bribery agreement."  *Id.*

Before the jury's acquittal on the lying charge, this case fit the *Terry* rubric.  The "plus factor" in *Terry* involved providing value over and above campaign contributions.  The "plus factor" here was the alleged lie to the FBI about the solicited contributions.  The "plus factor" in this case is now gone, and so the case no longer fits the *Terry* paradigm.  Some kind of "plus" factor" is part of every reported case involving campaign contributions.  In *Terry* itself, there were government officials campaigning on government time.  *Terry¸* 707 F.3d at 610.  *Evans*, cited by *Terry*, involved a mix of reportable contributions as well as an under-the-table transaction.  *Evans v. United States*, 504 U.S. 255, 257 (1992) ($7,000 in cash plus $1,000 campaign contribution).

13

In *Whitfield*, also referenced by *Terry*, the defendants did not report loans that were deposited into campaign accounts, on their campaign disclosure, and at least one defendant used the funds for personal expenses.  *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009).  *Abbey* did not involve campaign contributions at all.  Rather it involved a developer (Rizzo) who gave a  piece of property to the defendant who was a city administrator in return for future official favors.  *United States v. Abbey*, 560 F.3d 513.   In all these cases, then, there was something more than a campaign contribution that permitted the government to rebut the explanation that the payments were legitimate campaign contributions.  This case, on the other hand, now lacks the "something more."

These concepts inform the Court's application of the scope of collateral estoppel protection necessary in this case.  The jury's acquittal on the lying charge leaves too little left for the government to establish that Mr. Inman's exchanges with the MRCCM crossed the line from protected campaign solicitations to felonious conduct.  As crass as Mr. Inman's conduct might have been as compared to other, more polished, legislators, "not every corrupt act by state or local officials is a federal crime."  *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020).  It may be the case that "[a]n agreement . . . is the dividing line between permissible and impermissible payments," *Terry*, 707 F.3d at 614 (examining challenge to honest services fraud statute), but "[n]ot every campaign contribution . . . is a bribe in sheep's clothing."  *Id.* at 615.  Here the lying charge in Count 3 was critical for the government to prove the communications between Mr. Inman and the MRCCM amounted to an unlawful quid pro quo agreement and not legitimate campaign activity, as the government's own closing argument underscored.

The government needed to prove beyond a reasonable doubt that Mr. Inman's messages to Lisa Canada and Jim Kirsch was an attempted quid pro quo that amounted to unlawful attempted extortion and solicitation of a bribe, not simply an inartful attempt to feel out whether a natural

political adversary might be turned by circumstances into an unexpected ally.[4]  The government's
overall theory was that Mr. Inman was motivated by a need for more money to fund his reelection
campaign.  He was facing a tough race, and he told those around him he needed at least $40,000
to run a successful campaign.  He knew the prevailing wage vote was contentious and the vote
tally would be close.  The government argued Mr. Inman first sought to fill his coffers from the
labor unions by asking in conversations and text messages for an aggregate $30,000 in campaign
donations from MRCCM and other like-minded unions.  Of course, a "no" vote would be the quid
pro quo payoff for the unions, in the government's view.  The government argued Mr. Inman knew
he had crossed the line by including a "we never had this discussion" coda on his text message to
the labor union, and by later lying to the FBI about it.[5]  But when he did not receive the

---

[4] In *Abbey*, the Sixth Circuit rejected the defendant's challenge to his bribery conviction that the
government failed to prove he contemplated a specific act when he received a bribe.  The Court of
Appeals stated that the text of 18 U.S.C. § 666(a)(1)(B) "says nothing of a quid pro quo
requirement to sustain a conviction, express or otherwise: while a '*quid pro quo* of money for a
specific act . . . is sufficient to violate the statute,' it is 'not necessary.'"  *Abbey*, 560 F.3d at 520
(quoting *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005)).  A quid pro quo, however, was
the government's theory as to Mr. Inman's culpability on the bribery charge:

> Count 2, solicitation of a bribe.  We're basically talking about the
> same thing.  It's a this for that.  Really all the evidence that you just
> heard that applies to Count 1 also applies to Count 2.  . . . He's
> solicited something of value from a person or entity.  The text
> messages to the carpenters.  He did so corruptly with the intent to
> influenced or rewarded in connection with a business or transaction
> of the government.  It's the this for that.  That's what we're talking
> about.  That's what's corrupt about this solicitation.  When a person
> acts at least in part with the understanding that something for value
> is to be given in exchange for an official act.  It's that this for that.

ECF No. 131, PageID.1563.  So in this case, the quid pro quo theory drives both the bribery and
the extortion charges.

[5] Mr. Inman's explanation for the tag during his trial testimony is that he did not want his own
caucus leadership to know he was talking to the other side about the issue and providing at least
some information on anticipated vote counts.

commitments from the MRCCM and other unions that he wanted, Mr. Inman went with the position of his caucus.  He knew from his party leaders that if he voted against repeal that there would be no contributions coming from the party or its regular constituencies.  If he voted in favor of repeal, he could then go directly to his party leadership to make sure they knew he would need help to fund a successful campaign.

Mr. Inman ultimately did vote "yes," consistent with his caucus's position.  He returned $4,000 in contributions one union had provided before the vote, reasoning that he could not in good conscience keep the money after voting against the union position on a key issue.  And he made clear to his party leadership that he felt he would be targeted by the other caucus because of his vote and would need assistance.  The trial record does not disclose whether he received campaign contributions from his party or its constituencies, but it does reflect that Mr. Inman won his campaign for reelection.

### B.  False Statement

After the vote in June of 2018, Ms. Canada of the MRCCM was upset.  The union had made the prevailing wage vote a priority, and losing the campaign was a bitter pill.  She felt particularly wronged by Mr. Inman, who in her view had led her down the path from the November 2017 union-sponsored event of thinking he might vote for the union and against his caucus, only to vote against the union and with his caucus after union donations he had solicited did not come through.  She reported her concerns to the FBI and provided copies of her text exchanges with Mr. Inman.  She also agreed to place a recorded call to Mr. Inman while an FBI Special Agent listened into the call and coached her on what to say.  Mr. Inman did not know the call was recorded or that the FBI was involved.  During the call, Mr. Inman repeatedly resisted Ms. Canada's invitations to characterize their pre-vote communications in quid pro quo terms.

A short time later, FBI Special Agent Jeremy Ashcroft reached out to Mr. Inman about the vote. It was during this interview that the government charged in Count 3 that Mr. Inman lied to the FBI. Agent Ashcroft testified that the FBI executed a search warrant on August 1, 2018, at Mr. Inman's home to retrieve Mr. Inman's cellphone. Mr. Inman let the agents inside and freely agreed to an interview. He did not know at the time that the Special Agent already had copies of the text exchanges, and the Special Agent did not tell him so. The agent asked Mr. Inman a series of questions about the June 3, 2018, text message to Ms. Canada. Among other things, the agent asked whether Mr. Inman had asked Ms. Canada for $30,000 at any point in the period leading up to the prevailing wage vote and Mr. Inman denied having made that request.

### C. The Defense's Case

The defense argued that Mr. Inman engaged in nothing more than ordinary and permissible campaign activities, albeit clumsily. It argued that if Mr. Inman really wanted to sell his vote, there were plenty of opportunities outside of the text messages to make the attempt. These included a closed-door meeting between Mr. Inman and union lobbyists where the prevailing wage vote was discussed, but no such campaign contribution discussion occurred. Moreover, there was no evidence of any solicitation of any under-the-table consideration at all; only otherwise lawful campaign contributions were in play.

The defense did not dispute that Mr. Inman needed campaign contributions for a tough reelection race. But the defense did dispute the government's characterization of the text messages that were sent to Lisa Canada and Jim Kirsch. Mr. Inman testified he did not tell Ms. Canada he would have voted against repeal if he had received any amount of money from the union. He also testified he would not have supported the union's position in exchange for money. This was consistent with his statements during the post-vote phone call that Ms. Canada placed and recorded

for the FBI. He said the reason he ultimately voted against the union was because of what he heard during conversations with companies in his district, as well as his belief that a Republican caucus colleague, Representative Bellino, needed cover for a vote against the caucus because of the makeup of his district. To the extent there was anything inartful or nebulous in the text messages, the defense attributed it to Mr. Inman's abuse of prescription drugs and alcohol following a series of surgeries. Mr. Inman testified that he had no recollection of sending the text messages, that they did not sound like him, that they were goofy, and that they came across as ranting and raving. Mr. Inman testified that during his interview with Agent Ashcroft he had no recollection of the text messages. The defense also noted that the agent already had a copy of the texts when he questioned Mr. Inman and never informed Mr. Inman of that fact. Nor did the FBI Special Agent ever ask Mr. Inman directly for his explanation of what the messages meant.

### 6. *The Jury's Deliberations and Partial Verdict*

Following instructions and closing arguments, the jury began deliberations at approximately 1:26 p.m. on December 9, 2019. The jury continued deliberations until 5:00 p.m., and then resumed deliberating the morning of December 10, 2019. The Court received a note from the jury late in the afternoon that they had reached a decision on Count 3, but they were hung on Counts 1 and 2. The Court denied a defense request for a mistrial, and provided a modified *Allen* instruction that asked the jury to continue deliberations. After the jury reported they were still at an impasse, both sides requested the Court accept the jury's verdict on Count 3, declare a mistrial on the remaining counts, and discharge the jury. The Court agreed, and subsequently accepted the jury's verdict of not guilty with respect to Count 3. The Court then declared a mistrial on the remaining counts, and discharged the jury.

### 7.  *Post-Trial Proceedings*

On December 12, 2019, the Court entered an Order memorializing the acceptance of the partial verdict.  The Court declared a mistrial as to Counts 1 and 2, and directed a judgment of acquittal on Count 3.  (ECF No. 99).  On January 10, 2020, the Court set a scheduling conference under Rule 16.1 to determine whether the government sought to retry Counts 1 and 2. (ECF No. 104).  Assuming the government would seek to retry the charges, the Court detailed several issues it expected would arise.  The Court particularly noted the First Amendment issues that were implicated in the case.  As noted in earlier pretrial proceedings, the allegations in this case involved otherwise facially valid campaign activities and not, as in the vast majority of the cases involving these charges, a mix of contributions and under-the-table transactions.  The Court further noted a concern that multiple trials on the same issue had a potential to chill legitimate campaign activities in a way that a single trial did not.

At the scheduling conference, the government indicated it intended to retry Counts 1 and 2.  The parties then requested an opportunity to brief the issues the Court detailed in its Order, as well as further issues that arose during the conference.  The Court set a briefing schedule and detailed the issues for the briefing, including whether a retrial would be precluded by principles of double jeopardy.  (ECF No. 106).  Both sides filed principal and responsive briefs.  In its briefing, the defense requested that the Court bar the government from retrying the extortion and bribery charges based on double jeopardy and issue preclusion.  (ECF Nos. 110 & 111).  The Court now takes up that request.

## LEGAL STANDARDS

### A.  Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]"  U.S. CONST. amend V. This clause "embodies two vitally important interests."  *Yeager v. United States*, 557 U.S. 110, 117 (2009).  The first interest signifies traditional principles of double jeopardy, namely, "the 'deeply ingrained' principle that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'"  *Id.* at 117-18 (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)); *accord United States v. Howe*, 590 F.3d 552, 555 (8th Cir. 2009).  "The first interest is implicated whenever the State seeks a second trial after its first attempt to obtain a conviction results in a mistrial because the jury has failed to reach a verdict.  In these circumstances, however, while the defendant has an interest in avoiding multiple trials, the [Double Jeopardy] Clause does not prevent the Government from seeking to reprosecute."  *Yeager*, 557 U.S. at 118.  This is so because "[t]he 'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial." *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 509 (1978)); *see also Richardson v. United States*, 468 U.S 317 (1984) (noting "the failure of the jury to reach a verdict is not an event that terminates jeopardy.").

The second interest that is implicated in the Double Jeopardy clause is the "preservation of the 'finality of judgments.'"  *Yeager*, 557 U.S. at 118 (quoting *Crist v. Bretz*, 437 U.S. 28, 33

(1978)).  This interest falls under the label of issue preclusion or collateral estoppel, and "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial."  *Id.* at 119 (citing *Ashe v. Swenson*, 397 U.S 436 (1970)).  In *Ashe*, the Supreme Court observed that "the advent of specificity in draftsmanship and the extraordinary proliferation of overlapping and related statutory offenses" in more recent times, meant that "it became possible for prosecutors to spin out a startlingly numerous series of offenses from a single alleged criminal transaction."  *Ashe*, 397 U.S. 445 n.10.  Accordingly, "Federal courts, cognizant of the increased potential for exposing defendants to multiple charges based on the same criminal episode, borrowed issue-preclusion principles from the civil context to bar relitigation of issues necessarily resolved against the government in a criminal trial."  *Currier v. Virginia*, 138 S. Ct. 2144, 2159 (2018) (Ginsburg, J., dissenting).

"[W]hen a jury acquits on some counts in a multicount indictment, principles of collateral estoppel may preclude retrial of charges upon which the jury was unable to agree at the earlier trial."  *United States v. Frazier*, 880 F.2d 878, 884 (6th Cir. 1989).  The doctrine "ordinarily bars relitigation of an issue of fact or law raised and necessarily resolved by a prior judgment."  *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358 (2016) (citing 18 C. Wright, A Miller, & E. Cooper, *Federal Practice and Procedure* § 4416 (2d ed. 2002)).  In other words, "the issue-preclusive aspect of the Double Jeopardy Clause prohibits the government from relitigating issues necessarily resolved in a defendant's favor at an earlier trial presenting factually related offenses."  *Currier v. Virginia*, 138 S. Ct. 2144, 2158 (2018) (Ginsburg, J., dissenting).

To analyze the issue preclusive effect of a jury's acquittal, that is, "[t]o decipher what a jury has necessarily decided . . . courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a

rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Yeager*, 557 U.S. at 119-120 (quoting *Ashe*, 397 U.S. at 444). This analysis must be applied with "realism and rationality." *Ashe*, 397 U.S. at 444; *accord Bravo-Fernandez*, 137 S. Ct. at 359. Relevant for purposes here, in *Yeager* the Supreme Court has held that courts may not consider the fact that a jury hung on a particular count, leading to a mistrial, as part of the collateral estoppel analysis. *Yeager*, 557 U.S. at 122 (holding "that the consideration of hung counts has no place in the issue-preclusion analysis."). This is so because "a jury speaks only through its verdict[.]" *Id.* at 121. "Any number of reasons—including confusion about the issues and sheer exhaustion" the Court observed in *Yeager*, "could cause a jury to hang." *Bravo-Fernandez*, 137 S. Ct. at 360. Accordingly, "[w]hen a jury acquits on one count while failing to reach a verdict on another count concerning the same issue of ultimate fact, the acquittal, and only the acquittal, counts for prelusion purposes." *Id.*

The burden is "on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling v. United States*, 493 U.S. 342, 350 (1990). The burden is a "demanding one." *Currier*, 138 S. Ct. at 2150 (majority op.). "A second trial 'is not precluded simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question." *Id.* (quoting *Yeager v. United States*, 557 U.S. 110, 133-134 (2009) (Alito, J., dissenting)). "To say that the second trial is tantamount to a trial of the same offense as the first and thus forbidden by the Double Jeopardy Clause, [courts] must be able to say that 'it would have been *irrational* for the jury' in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second." *Id.* (quoting *Yeager v. United States*, 557 U.S. 110, 127 (2009) (Kennedy, J., concurring in part) (emphasis in *Yeager*)). "[I]f multiple potential reasons for acquittal are evident in the record of the trial, [courts]

22

will not presume that the jury acquitted on the ground most favorable to the defendant." *United States v. Coughlin*, 610 F.3d 89, 97 (D.C. Cir. 2010).

### B.  First Amendment Context

The Court has repeatedly expressed concern in this case about the delicate line between protected First Amendment campaign contributions and potentially criminal quid pro quo arrangements that happen to involve campaign contributions.  Unlike all of the reported extortion cases involving campaign contributions as one part of the illegal quid pro quo, this case involves only otherwise lawful contributions as the illegal quid pro quo.  There was no evidence of any under-the-table payments, offers, or solicitations, as there is in the other reported cases.  That is why, in the Court's view, the claim that Mr. Inman lied to the FBI about the solicitations was so important to the government case, and why the jury's acquittal on that charge makes retrial on the other claims so problematic, in the Court's view.

These issues have been touched on, to various extents, in several Supreme Court decisions that express concern with expansive readings of federal criminal statutes that could chill legitimate political activity.  In these cases, the Court has noted that broad interpretations by the government of criminal statutes can raise significant constitutional concerns including Due Process and vagueness, the First Amendment, or principles of federalism.

In *McCormick v. United States*, 500 U.S. 257, 272 (1991), for example, the Court observed the reality that "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator" and that "campaigns must be run and financed.  Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *Id.*  The Court therefore required an explicit quid pro quo for a Hobbs Act conviction of

an elected legislator because "to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interest of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right." *Id.*  The Court further noted that "[t]o hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id.*

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court cited vagueness concerns in rejecting an expansive view of the honest services fraud statute applied to a corporate executive charged with deceiving investors about the company's financial performance. A penal statute, the Court observed, must "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 402-03 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *see also Kolender*, 461 U.S. 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)) ("Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'"). Around the same time as *Skilling*, the Court in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), concluded that First Amendment principles applied to political spending, and accordingly held that the government could not prevent corporations from spending money to support, or oppose, individual candidates.

24

In *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Court found that significant constitutional concerns, including those of federalism, were implicated under the government's expansive interpretation of "official act" in an honest services fraud and Hobbs Act extortion case involving the former governor of Virginia.  In construing the government's view of "official act" as encompassing nearly every act by a public official, the Court noted:

> The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or of the homeowners invited the official to join them on their annual outing to the ballgame.  Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

*Id* at 2372.  The Court went on to note that under principles of federalism, the State has "the prerogative to regulate the permissible scope of interactions between state officials and their constituents" and declined to "'construe the [bribery] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'"  *Id.* at 2373 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)).

Recently, in *Kelly v. United States*, 140 S. Ct. 1565 (2020), the Supreme Court reversed the convictions of state officials charged with committing wire fraud and conspiracy offenses because the scheme—involving an alteration of the traffic pattern of the George Washington Bridge to punish the mayor of a nearby city for failing to support the New Jersey Governor's reelection bid—"did not aim to obtain money or property."  *Id.* at 1574.  Similar to earlier cases, the Court found that under the government's expansive view of the statute, "the Federal

Government could use the criminal law to enforce (its view of) integrity in broad swaths of state and local policy making." *Id.* "The property fraud statutes," the Court held "do not countenance that outcome." Not every dirty trick, or "corrupt act by state or local officials is a federal crime." *Id.*

None of these cases precludes federal prosecution of a bribery or extortion case against a state public official on a quid pro quo theory involving campaign contributions. But at a minimum they counsel extra care to ensure that there is some factual predicate beyond the campaign contributions themselves to differentiate protected First Amendment activity from felonious conduct.

## DISCUSSION

The parties present the question before the Court as a straightforward application of collateral estoppel principles. To the defense, the government may not proceed with a retrial because to have acquitted Mr. Inman of making a false statement to the FBI, the jury necessarily had to determine that Mr. Inman did not lie to Special Agent Ashcroft when he denied soliciting $30,000 from Ms. Canada for his vote on the prevailing wage. The government, in contrast, argues the jury's acquittal on making a false statement to the FBI could have rested on the defense's argument that Mr. Inman was addled by alcohol and prescription drug abuse when he made his denial. Alternatively, the government says the jury might have accepted the defense argument that Mr. Inman simply did not remember sending the handful of text messages when he was interviewed, or otherwise lacked the *mens rea* for the crime. Either way, the government contends, the jury may have acquitted Mr. Inman without crediting his denial of a vote-selling intention as the truth and that retrial of the extortion and bribery charges is not precluded.

The Court agrees that the proper analysis involves applying the collateral estoppel principles of Double Jeopardy.  But this inquiry must be viewed through a lens of the First Amendment and federalism interests that permeate the case.  Applying the issue-preclusive effect of the jury's partial acquittal brings these concerns to the forefront.  Retrial of bribery and extortion charges based simply on solicitation of otherwise lawful campaign contributions, would leave the jury with no effective way to draw the line between protected First Amendment activity and an unlawful quid pro quo.  It would also leave other political actors with unacceptable uncertainly about where and how to draw the line, chilling core First Amendment political activity.

There may well be some cases where an acquittal on making a false statement to the FBI does not preclude retrial on attempted extortion and solicitation of a bribe.  But the Court is satisfied that this is not one of those cases.  The entire thrust of the government's case was that in the Spring of 2018, Mr. Inman was engaged in a corrupt scheme to fill his campaign coffers by trying to sell his vote to the MRCCM.  The purposeful and intentional effort revealed itself clearly, the government argued, when Mr. Inman tried to cover it up by lying to Agent Ashcroft.  In this, the government argued Mr. Inman's statements to the FBI gave context and meaning to the text messages by which the jury could conclude they amounted to a criminal attempted quid quo pro rather than legitimate, albeit inartful, messages seeking campaign contributions.  As the government put it in its closing argument:

> But when the FBI asks him a series of questions that goes to the heart of this case about whether he ever communicated with the carpenters or with Lisa Canada in the days leading up -- the time leading up to the prevailing wage vote, "Did you ever talk to them about money? Did you ever mention $30,000? Did you ever ask for money from Lisa Canada or the carpenters? Did you send her a text message that referred to $30,000? Did you ask Lisa Canada for any amount of money before the prevailing wage vote?" He denied it. He denied it. He denied it. This wasn't one question, it was a series of questions, and he lied repeatedly during that interview.

27

ECF No. 121, at PageID.1554.

> Ask yourselves: If he did nothing wrong, why is he lying to the FBI
> about it repeatedly? If he had nothing to hide, why is he lying about
> it? If he didn't do anything wrong, improper, why is he lying about
> it every time they ask him the questions?

*Id.* at PageID.1555-1556.

The government was emphatic on this point in its rebuttal:

> Ladies and gentlemen, the only way you can find the defendant not
> guilty in this trial is if you believe his testimony.  That's it.  In the
> face of all of the government's evidence, those text messages that
> you heard almost nothing about for the last 45 minutes, in the face
> of all of the evidence of what his intent was and what he did on
> June 3rd to try to get the money, and then the lies on August 1st, the
> only way you find him not guilty of all of those offenses is if you
> believe him.

*Id.* at PageID.1568.

So by acquitting on Count 3, the jury necessarily rejected not just this particular charge, but also a key predicate to the overall quid pro quo theory that was essential to an extortion and bribery theory premised on otherwise lawful campaign contributions as a criminal quid pro quo. Once the jury decided to acquit on the lying charge—whether because it believed Mr. Inman truthfully denied a vote-selling scheme or because he lacked the requisite *mens rea* for the crime— the critical "plus factor" supporting a quid pro quo exchange disappeared, leaving a jury no clear way to distinguish unseemly campaign contribution politics-as-usual from federal felonious activity.  Under the *Ashe* and *Yeager* framework retrial of the bribery and extortion counts cannot proceed while giving full effect to the jury's partial acquittal in this context.

The conclusion is especially important considering the principles of federalism and First Amendment overbreadth at stake.  As the Court noted earlier, this case lacks the under-the-table transactions that were present in the formative cases on attempted extortion and solicitation of a

bribe such as *McCormick v. United States*, 500 U.S. 257 (1991) (unreported cash contributions) ,and *Evans v. United* States, 504 U.S. 255 (1992) (defendant reported $1,000 campaign contribution but not $7,000 in cash).  In this case, the government's claim that Mr. Inman lied to the FBI about his actions provided the indicia of unlawfulness that would allow a jury to conclude the case was not simply legitimate campaign activity, but an illegal quid pro quo scheme.  The jury's acquittal eliminates that essential prop.  "[C]ampaign contributions only run afoul of the Hobbs Act if they are 'induced by the use of force, violence, or fear,' or when they, 'having been taken under color of official right . . . are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'" *United States v. Abbey*, 560 F.3d 513, 517 (6th Cir. 2009) (quoting *McCormick*, 500 U.S. at 273).  The Court concludes that the jury's acquittal on Count 3 now means the government is estopped from arguing as much.  What is left, then, is what the Court in *McCormick* found could not amount to an illegal extortion.  *See McCormick*, 500 U.S. at 273 ("Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.'").

To be sure, in *McCormick* and *Evans*, the Supreme Court addressed the potential overbreadth problem by relying on limiting instructions stating that only truly quid pro quo deals are covered in the campaign contribution arena.  This Court was also satisfied, before trial, that a limiting instruction was enough to move all three counts forward.  In *McCormick*, *Evans*, and as originally presented to the jury here, there was some other conduct in addition to the campaign

solicitations and contributions to illuminate whether there really was a quid quo pro or not.  The jury's acquittal on Count 3 now means that the only thing at issue is an admittedly clumsy solicitation of an otherwise valid contribution.  The $30,000 amount sought could not lawfully have come from the carpenters' union alone, but the proofs at trial conclusively showed that there were three unions involved at the November 2017 dinner, and each one could lawfully give up to $10,000.  So, there is nothing left in this case beyond soliciting perfectly legal contributions that ultimately were not made.

Consider, for example, the other actors on this vote.  The evidence was overwhelming that the prevailing wage vote was a priority for both sides.  Everyone voting on the repeal measure knew that the flow of campaign dollars would be affected by this—the "lettuce to feed the rabbits" as one of the witnesses put it.  So what about the legislators who received $10,000 in contributions from a single entity close in time to this vote?  Could the government bring charges and ask a jury to assess if there was a quid pro quo based on some evidence of communications between the legislator and the lobbyist?  More generally, the trial proofs demonstrated that lobby groups quite literally keep score—they choose certain votes to put into their score on how good a legislator is for them.  And obviously dollars follow the score.  Is that open to quid pro quo scrutiny?  If it is, the reach of the theory is dramatic and substantially overbroad—inevitably chilling perfectly legitimate and necessary speech, and doing so in the heart of the State legislative process.  On the other hand, if it isn't, the line between federally felonious conduct and legal First Amendment campaign fundraising is too vague.  At least in a case that involves nothing more than talk about and flow of otherwise legal campaign contributions, this is a real First Amendment problem.

For this reason, the Court concludes that a new trial involving a muster of the power of the federal government a second time with a case alleging only solicitation of campaign contributions

in lawful amounts, without any "plus factor" of lying to the FBI, would amount to an impermissible chill on a form of political speech entitled to First Amendment protections. *See generally Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010). It would also unavoidably run afoul of principles of federalism. *See McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016) (holding that a broad view of "official act" would raise "significant federalism concerns," and declining to "'construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards'" of "'good government for local and state officials.'") (quoting *McNally v. United States*, 483 U.S. 350, 360) (1987)); *see also Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) (cautioning, in public official wire fraud case where no efforts to obtain money or property were involved, against using "the criminal law to enforce [the Federal Government's view of] integrity in broad swaths of state and local policymaking" and stating "not every corrupt act by state or local officials is a federal crime."). In this case, a retrial without the plus factor of Mr. Inman's statement to the FBI would not allow a jury to draw a clean line between protected First Amendment activities and a felonious quid pro quo.

**ACCORDINGLY, IT IS ORDERED:**

1. Counts 1 and 2 of the Indictment (ECF No. 1) are **DISMISSED.** An Order of acquittal having entered with respect to Count 3 by earlier Order, this criminal case is therefore **CLOSED.**

2. **IT IS FURTHER ORDERED** that the United States Magistrate Judge's Order imposing conditions of release (ECF No. 10) remains in effect pending the government's decision whether to appeal under 18 U.S.C. § 3731. *See Frazier*, 880 F.2d at 882 (noting that the government may appeal a district court's order dismissing counts of an Indictment on collateral estoppel grounds). Either party may seek

modification of the terms of release under 18 U.S.C. §§ 3142, 3143(c) upon the government's filing of a Notice of Appeal.  If there is no timely Notice of Appeal, the order specifying the terms of release will expire at the conclusion of the time for appeal.

Dated:   April 19, 2021          /s/ Robert J. Jonker
                                 ROBERT J. JONKER
                                 CHIEF UNITED STATES DISTRICT JUDGE