# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: July 07, 2022

Mr. Christopher Kevin Cooke
Secrest Wardle
2025 E Beltline Avenue
Suite 600
Grand Rapids, MI 49546

Mr. Christopher M. O'Connor
Office of the U.S. Attorney
P.O. Box 208
Grand Rapids, MI 49501

Re: Case No. 21-1505, *USA v. Larry Inman*
Originating Case No. : 1:19-cr-00117-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0149p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellant*,

 *v.*

LARRY CHARLES INMAN,

   *Defendant-Appellee*.

No. 21-1505

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00117-1—Robert J. Jonker, Chief District Judge.

Argued: January 27, 2022

Decided and Filed: July 7, 2022

Before: BATCHELDER, WHITE, and BUSH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Christopher M. O'Connor, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Christopher K. Cooke, SECREST WARDLE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Christopher M. O'Connor, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellant. Christopher K. Cooke, SECREST WARDLE, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

JOHN K. BUSH, Circuit Judge. Larry Inman is a former elected representative in the Michigan House of Representatives who was charged with criminal conduct while in office. In this appeal, we address whether his acquittal on a count of making a false statement to the FBI

regarding the taking of a bribe precludes his retrial on counts of extortion and solicitation of a bribe. The appeal turns on the application of issue preclusion, also known as collateral estoppel.

For that doctrine to apply here, an issue of ultimate fact decided in Inman's favor through his acquittal must be fatal to the subsequent prosecution. Because the jury's acquittal on the false-statement charge did not decide any fact that necessarily precludes a verdict against Inman on the extortion and bribery-solicitation charges, we reverse the district court's dismissal of those two counts.

I.

The facts related to Inman's prosecution began in 2017, when a petition was circulated to repeal Michigan's Public Act of 1965, known as the "prevailing-wage" law. After the Board of Canvassers certified the petition, the initiative came up for a vote before the Michigan legislature in early June 2018. *See* Mich. Const. art. 2, § 9 ("Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature."). Inman was part of the majority of the Michigan House who, along with a majority of the Michigan Senate, voted to approve the initiative, which, consequently, repealed the prevailing-wage law.

The initiative garnered plenty of public attention and, with that, campaign-committee contributions. Indeed, the combined amount raised by the Protecting Michigan Taxpayers Committee (the principal committee in support of repealing the prevailing-wage law) and the Protecting Michigan Jobs Committee (the principal committee against doing so) was more than $2 million. The money reportedly was used, in part, to "wine[] and dine[]" legislators. Such spending led to investigations into those expenditures and some of those who benefitted, and Inman became a target.

On May 14, 2019, Inman was charged with three counts related to his actions surrounding the prevailing-wage vote: attempted extortion under color of official right in violation of 18 U.S.C. § 1951 (Count I), soliciting a bribe in violation of 18 U.S.C. § 666(a)(1)(B) (Count II), and making a false statement to the FBI in violation of 18 U.S.C. § 1001(a)(2) (Count III). The United States proffered that Inman unlawfully solicited money

from the Michigan Regional Council of Carpenters and Millwrights (MRCCM) in exchange for his vote. The government also alleged that Inman "corruptly solicited and demanded a political campaign contribution of money" from the MRCCM for his vote, worth "$5,000 or more." Finally, it argued that Inman lied to the FBI in August 2018 when he denied communicating with the MRCCM on campaign contributions and denied soliciting $30,000 from Lisa Canada, the political and legislative director for the MRCCM.

The district court conducted a jury trial on the three counts against Inman. At the trial, the United States based its case on conversations between MRCCM representatives and Inman. It argued that, in the fall of 2017, Inman met Canada and told her he supported the prevailing-wage law but was worried about his reelection in 2018. Canada Tr., R. 100, PageID 845–47. The United States then offered the testimony of Dan Pero, Chief of Staff to the Speaker of the House, who confirmed that Inman told him he was "low on cash at $30,000," and Pero responded that if Inman voted with the unions ("no") on the prevailing-wage vote, "he's picking the wrong friends." Chatfield, Bellino, Pero Tr., R. 131, PageID 1843–44. Ultimately, though, the United States argued that Inman voted "yes" to repeal the prevailing-wage law because he did not receive the $30,000 he asked for from the MRCCM.

The government presented evidence of text messages illustrating Inman's engagement in a quid-pro-quo arrangement. MRCCM representatives testified about such text messages, including one representative who said that he received a text message from Inman in June 2018, before the vote, in which Inman wrote that he was "undecided" on the prevailing-wage-law vote and that if he took "the vote no [sic] to send it to the ballott [sic], [he is] going to need alot [sic] [of] help and a ton of campaign money[.]" Gov. Ex. 11, R. 144-3, PageID 2105; Fashbaugh Tr., R. 130, PageID 1750–52. Two days later, according to the testimony of Jim Kirsch, a lobbyist retained by MRCCM, Kirsch received the following text message[1] from Inman:

> Lisa Canada said all 12 will get $30,000 each to help there campaigns. That did not happen, we will get a ton of pressure on thst vote, [Person B and Person C] will go to the longest neck hold on this one. I have heard most got $5,000, not $30,000.

---

[1]These text messages have been reproduced as they appear in the record, without correction of any grammatical or spelling errors.

Gov. Ex. 37, R. 144-8, PageID 2141–42; Kirsch Tr., R. 113, PageID 1230–33.  In the text message, Inman also allegedly offered advice: "My suggestion is you need to get people maxed out , on Tuesday, I will do my best to hold."  *Id.*  That same day, Canada testified she received a text message from Inman saying:

> I hear the prevailing wage vote may be on Wenesday.  In my opinion, We all need some more help!  Carpenters have been good to me, where are the rest of the trades on checks?  We only have 12, people to block it.  You said all 12 will get $30,000 each to help there campaigns.

Gov. Ex. 34, R. 144-7, PageID 2130–34; Canada Tr., R. 100, PageID 856–60.  Inman allegedly included in the text message to Canada that "we never had this discussion[.]" *Id.* The government also called to the witness stand an FBI agent who had interviewed Inman in August 2018.  The agent testified that Inman denied asking Canada for more than $4,000 she had already given, sending a text message to Canada that referred to $30,000, or asking for any amount of money from anybody else.  This interview was not recorded, and Inman was not allowed to look at his phone or view screenshots of messages while being questioned by the agent.

On the witness stand, Inman maintained that he engaged only in lawful campaign activities, albeit clumsily.  He testified that he voted against the MRCCM's interest by voting "yes" because of conversations with companies in his district and the need to cover for another state representative, Joseph Bellino, because he represented a union-heavy district.

Inman also called his campaign manager and two medical providers as witnesses.  They testified to Inman's use of opioids and his alcohol addiction.  *See* Ackerman Tr., R. 116, PageID 1361 ("He would, you know, kind of forget or go AWOL for a little bit and just not show up to things.").  One of Inman's doctors, Russell Vanhouzen, stated that he prescribed Inman pain medication which could cause "additive side effects of confusion and mental deterioration." Vanhouzen Tr., R. 118, PageID 1415.  He testified that Inman told him he was taking 8 to 12 pain pills a day in October 2018, causing Vanhouzen to prescribe him fentanyl.  *Id.* at 1418. Ashleigh Akerman, Inman's campaign manager, testified that she observed Inman becoming intoxicated after consuming one light beer while on his pain medication.  And Inman himself testified that he would take four to five pills upon waking up, another four or five in the

afternoon, and, on bad days, take "maybe 10 and lay down on my couch in the office." Inman Tr., R. 102, PageID 979. He added that he had trouble with his memory during this time because of his opioid use. Because of this, Inman testified, he had no recollection of sending text messages or having conversations in which he solicited money. The government, for its part, maintained that Inman made the various denials not because of his medications and a hazy memory, but rather because he was attempting to hide unlawful behavior.

The district court then provided instructions to the jury. On Count I, the jury was told that to return a guilty verdict, they would need to find that Inman intended to commit the underlying crime of extortion and did some overt act that was a substantial step towards committing the crime. As to the definition of the crime of extortion, the jury received four instructions:

> First, that the defendant was a public official. Second, that the defendant obtained or received property that he was not lawfully entitled to from a person with that person's consent. Third, that the defendant knew the property would be obtained or received in exchange for an official act. And fourth, that as a result interstate commerce was affected in any way or degree.

Judge's Instructions to the Jury, R. 132, PageID 1889. The court also instructed the jury about the difference between political fundraising and soliciting a bribe:

> It is not unlawful for a public official to attempt to obtain or receive a campaign contribution of money even if that official knows or has reason to believe that he or she may be called upon to make a decision or act on a question or matter that may be of interest to the person or entity contributing the money. That act standing alone is not a crime. However, if a public official attempts to obtain or receive money in exchange for a specific exercise of his or her official power, such an act is a crime, regardless of whether the payment is made in the form of a campaign contribution. The law prohibits a public official from soliciting a campaign contribution in exchange for an agreement to perform or not perform an official act. This is referred to as a quid pro quo or a this-for-that agreement.

*Id.* at 1890. On Count II, solicitation of a bribe, the jury received five more instructions:

> First, that the defendant was an agent of state government or any agency of that government. Second, that the defendant solicited something of value from another person or entity. Third, the defendant did so corruptly with the intent to be influenced or rewarded in connection with some business or transaction of the government or government agency. Fourth, that this business or transaction

involved something of a value of $5,000 or more. And fifth, the government or government agency in a one-year period received benefits of more than $10,000 under any federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

*Id.* at 1893–94. And the court reiterated its instruction on campaign contributions:

Soliciting a campaign contribution standing alone is not a crime. That is true even if the contribution is expected and intended to cultivate generalized favor or goodwill. For the solicitation to amount to criminal bribery, the government must convince you beyond a reasonable doubt the defendant solicited the campaign contribution as a quid[-]pro[-]quo exchange for defendant's official act of his vote on the prospective prevailing[-]wage legislation.

*Id.* at 1895.

On Count III, making a false statement, the court first outlined the five elements the United States needed to prove. *Id.* at 1895–96.[2] It then clarified some elements. It stated that for the statement to be false (element two), the statement must be "untrue when it was made and the defendant knew it was untrue at the time." *Id.* at 1896. It also explained that materiality (element three) is found when a statement "has the natural tendency to influence or is capable of influencing a decision or function of the [FBI]." *Id.* The court further instructed the jury that an act (element four) is done "knowingly and willfully if it is done voluntarily and intentionally and not because of mistake or some other innocent reason." *Id.* The jury could consider Inman's "use and possible addiction to prescription medication, alcohol, or both" when determining Inman's state of mind. *Id.* at 1897–98.

After six days of deliberations, the jury acquitted Inman on Count III (false statement), but it hung on Counts I (extortion) and II (solicitation of a bribe). As to the latter charges, the government moved for a retrial. The court requested briefing from Inman and the government on various issues, including "whether the government is entitled to retrial or whether any zone of judicial discretion remains."

---

[2]"First, that the defendant made a statement. Second, that the statement was false. Third, that the statement was material. Fourth, that the defendant acted knowingly and willfully. And fifth, that the statement pertained to a matter within the jurisdiction of the executive branch of the United States government." *Id.*

After further briefing, the district court dismissed Counts I and II of the indictment, concluding that the government was collaterally estopped from retrying the two counts based on the jury's acquittal of Inman on Count III. It reasoned that "[w]ithout the 'plus factor' of lying to the FBI, retrial here would inevitably risk chilling legitimate First Amendment solicitation of campaign contributions." *United States v. Inman*, 534 F. Supp. 3d 843, 846 (W.D. Mich. 2021). The court explained that "[*w*]*ithout anything more*" than a campaign contribution, a jury "could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor." *Id.* at 852 (quoting *United States v. Terry*, 707 F.3d 607, 615 (6th Cir. 2013)). It stressed the importance of looking at collateral estoppel principles through the "lens of the First Amendment and federalism interests that permeate the case." *Id.* at 860. It stated that, without the false statement, the jury would be left with "no effective way to draw the line protected First Amendment activity and an unlawful quid pro quo." *Id.* According to the district court, the jury's acquittal of Inman on the lying charge—"whether because it believed Mr. Inman truthfully denied a vote-selling scheme or because he lacked the requisite *mens rea* for the crime"—removed the "plus factor" and, thus, precluded the government from retrying Inman on Counts I and II. *Id.* at 861. The government timely appealed.

II.

We review de novo the district court's dismissal of Counts I and II on issue preclusion grounds. *See United States v. Dominguez*, 359 F.3d 839, 841 (6th Cir. 2004).

A.     Principles of Issue Preclusion

The Double Jeopardy Clause of the Fifth Amendment provides that no "person" may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The clause prevents "the State with all its resources and power" from making repeated attempts to convict someone for the same alleged offense. *Yeager v. United States*, 557 U.S. 110, 117–18 (2009) (quoting *Green v. United States*, 355 U.S. 184, 187–88 (1957)). It does not prevent retrial in all cases where the jury fails to reach a verdict. *Richardson v. United States*, 468 U.S. 317, 325 (1984).

That said, some retrials are still barred after a mistrial.  That is because the Double Jeopardy Clause also embodies an interest in the "preservation of the 'finality of judgments.'" *Yeager*, 557 U.S. at 118 (quoting *Crist v. Bretz*, 437 U.S. 28, 33 (1978)).  Based on that interest, the Supreme Court has read the Double Jeopardy Clause to include a component known as "issue preclusion" or "collateral estoppel."[3]  Put simply, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  *Ashe v. Swenson*, 397 U.S. 436, 443 (1970); *see also Bobby v. Bies*, 556 U.S. 825, 834 (2009) ("Issue preclusion bars successive litigation of 'an issue of fact or law' that 'is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment.'" (quoting Restatement (Second) of Judgments § 27 (1980))).

To determine whether an issue is precluded from retrial, we must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."  *Ashe*, 397 U.S. at 444 (citation omitted).  Our examination "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."  *Id.* (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)).  And we exclude hung counts, when the jury is unable to reach a verdict, from our analysis.  *Yeager*, 557 U.S. at 121–22 ("To ascribe meaning to a hung count would" be "guesswork," and not "reasoned analysis."); *see also Bravo-Fernandez v. United States*, 137 S. Ct. 352, 366 (2016) ("[W]hen a jury hangs, there is *no decision*, hence no evidence of irrationality." (citation omitted)).  The burden is on the defendant to show that issue is precluded.  *Yeager*, 557 U.S. at 122 n.6 ("To preclude retrial, [the defendant] must show that the jury necessarily decided an issue in his favor.").

The Supreme Court has emphasized that the test laid out in *Ashe* "is a demanding one." *Currier v. Virginia*, 138 S. Ct. 2144, 2150 (2018).  Retrial is barred only when "the prosecution must prevail on an issue the jury necessarily resolved in the defendant's favor in the first trial" to secure a conviction.  *Id.* (citations omitted).  Put another way, "[a] second trial 'is not precluded

---

[3]"Issue preclusion is the more descriptive term," *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356 n.1 (2016) (cleaned up), so we use it here.

simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question.'" *Id.* (citations omitted).  It must have been *irrational* for the jury to acquit in the first trial "without finding in the defendant's favor on a fact essential to a conviction in the second."  *Id.* (citation omitted).  Additionally, a "determination ranks as necessary or essential only when the final outcome hinges on it."  *Bobby*, 556 U.S. at 835 (citing 18 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4421 (2d ed. 2002)).

B.      Requisite Elements of Inman's Three-Count Indictment

With that background in mind, we first turn to the requisite elements of the counts that Inman faced at trial.  To reiterate, those charges were Count I, extortion under color of official right in violation of 18 U.S.C. § 1951 (the Hobbs Act); Count II, soliciting a bribe in violation of 18 U.S.C. § 666(a)(1)(B); and Count III, making a false statement to the FBI in violation of 18 U.S.C. § 1001(a)(2).  We discuss each count in turn below.

*Count I.*  18 U.S.C. § 1951 defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right*."  18 U.S.C.§ 1951(b)(2) (emphasis added).  Section 1951(b)(2) thus includes two crimes—paradigmatic "extortion" and an offense more akin to bribery.  *See Terry*, 707 F.3d at 612 (quoting *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (describing extortion and bribery crimes as "different sides of the same coin")).  The phrase "under color of official right" has been held to support the prosecution and conviction of public officials.  *See McCormick v. United States*, 500 U.S. 257, 266 n.5 (1991).  As relevant here, the Supreme Court in *McCormick* addressed the level of proof needed to move a campaign contribution received by an elected official from permissible to illegal.  *See id.*  It defined such extortion as "payments . . . made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *Id.* at 273.  In these circumstances, the elected official "asserts that his official conduct will be controlled by the terms of the promise or undertaking."  *Id.*  Without this quid-pro-quo arrangement, it would be merely the permissible solicitation and receipt of campaign contributions, an act inherent in our electoral processes.  *Id.* at 272, 274.

*Count II.*   Relatedly, 18 U.S.C. § 666(a)(1)(B) prohibits a government official from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any time of value of $5,000 or more[.]"  In *Terry*, we addressed what constitutes a bribe of a public official.  707 F.3d at 612.  We noted that a bribe, like extortion, requires a quid-pro-quo arrangement—the receipt of something of value in exchange for official conduct controlled by the terms of the promise.  *See id.*

Existence of such an "arrangement" is analyzed similarly for both extortion and bribery cases.  *See, e.g.*, *id.* (collecting cases).  "[I]t is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose."  *Id.* (quoting *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009)).  "So long as a public official agrees that payments will influence an official act, that suffices.  What is needed is an agreement, full stop, which can be formal or informal, written or oral."  *Id.* at 613.  To determine whether an agreement crossed the line into illegality, "motives and consequences, not formalities" govern.  *Id.* (citation omitted).  And "matters of intent are for the jury to consider."  *McCormick*, 500 U.S. at 270; *see also United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013) (stating that intent "distinguishes criminal corruption from commonplace political and business activities").  *Terry* made clear that "[a]n agreement . . . is the dividing line between permissible and impermissible payments."  *Terry*, 707 F.3d at 614.

*Count III.*   18 U.S.C. § 1001(a)(2), making a false statement to the FBI, does not possess an arrangement element.  Section 1001(a)(2) prohibits "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" to a government agent.  This statement does not need to influence the government agent, and materiality can be met even when the agent knows the statement is false.  *United States v. LeMaster*, 54 F.3d 1224, 1230–31 (6th Cir. 1995).  The person making the statement must also know that the statement was false on its face.  *United States v. Hixon*, 987 F.2d 1261, 1266–67 (6th Cir. 1993).

C.   Nonapplication of Issue Preclusion Here

Inman argues that because the jury acquitted him on his false-statement charge, the United States is precluded by principles of issue preclusion from retrying him on the other two counts. The United States proffers three reasons for why a rational jury could have acquitted Inman on making a false statement to the FBI but without resolving any predicate necessary to the extortion and solicitation-of-a-bribe charges. First, it argues, a rational juror could have believed that Inman did in fact send a text message to Canada or Kirsch, soliciting a campaign contribution in exchange for his vote, but also have reasonable doubt as to whether Inman remembered such an exchange when talking to the FBI on account of Inman's testimony about his opioid and alcohol abuse. Inman testified that he could not recall sending *any* messages on June 3, 2018. Inman Tr., R. 102, PageID 1013–18. He also testified that he was taking upwards of 20 opioid pills a day in June 2018. *Id.* at 979. Inman's counsel argued that Inman's text message to Canada, in particular, was not "an important piece of information that he retained for those two months." Defense Closing Arg., R. 140, PageID 2061–62.

We agree that a rational jury could believe that Inman merely could not recall, or forgot about, this text message to Canada in June 2018 or the earlier text to Kirsch, and for this reason voted to acquit Inman on the charge of lying to the FBI about these communications. It does not logically follow, as Inman argues, that this acquittal means that a jury could not have rationally believed that Inman did intend to sell his vote on the prevailing wage law to the MRCCM. A rational jury could believe that Inman had simply forgotten, because of his deteriorated mental state, about extorting and soliciting bribes from the MRCCM but still committed those offenses.

We emphasize that we are not determining whether this was the case—if Inman was either (1) intoxicated at the time of sending the texts or (2) of sound mind while sending the text and forgot about it later because of the lapse of time or substance abuse. Inman could have been "rambling on" in the text message to Canada because of the influence of drugs, and he may have asked her to keep the conversation private because of fear of retribution, as Inman argues. The jury could also have plausibly believed every piece of Inman's testimony when deciding to acquit him, as Inman also argues. These possibilities, though, are not something the jury *necessarily* decided when acquitting Inman on making a false statement to the FBI. *See Bobby*,

556 U.S. at 835. In other words, telling the truth to the FBI is not an element the United States needs to prove on the public-corruption charges. A rational jury could decide that Inman both attempted to solicit a bribe and extorted the MRCCM, regardless of the acquittal on the false statement charge—the dispositive issue before us. *See Currier*, 138 S. Ct. at 2150.

Furthermore, the United States provides a second explanation the jury could have rationally had for Inman's acquittal on Count III. It argues that the jury could have found that the government failed to prove the *other* elements of 18 U.S.C. § 1001(a)(2) beyond a reasonable doubt, even if it found the statement to the FBI false. In support of this proposition, it states that because the interview between the FBI and Inman was not recorded, the jury could have reasonably doubted whether, in fact, Inman made a relevant statement, that the statement was material, or that Inman acted knowingly and willfully. All of these elements are necessary for a § 1001(a)(2) conviction, and a rational juror could have acquitted Inman after reasonably doubting any one of them. And none of those elements is *essential* to the extortion and solicitation-of-a-bribe charges; they are not the ultimate facts of those crimes. *See Bobby*, 556 U.S. at 835. *Contra Ashe*, 397 U.S. at 445 (holding that the government was precluded from trying Ashe for robbing a poker player after he had been acquitted of robbing another poker player in the same poker game and the jury's acquittal relied on a shared ultimate fact—that Ashe did not participate in the poker game robbery).

In sum, it is not our duty to determine whether the foregoing explanations[4] offered by the United States are *likely* the rationale behind the jury's acquittal. Our responsibility is only to determine that it would be *rational* for the jury to have reasonable doubt that Inman made a false statement to the FBI but find, at the same time, that Inman did intend to communicate a quid-pro-quo arrangement to the MRCCM through its representatives. *See Currier*, 138 S. Ct. at 2150. Lying to the FBI is not a fact essential to a conviction of the extortion and bribery-solicitation charges, so issue preclusion does not apply.

---

[4]Given the sufficiency of the explanations discussed above, we need not address a third, arguably weaker explanation given by the United States that questioned the jury's acquittal—that the jury misunderstood the "materiality" element. *But see Abney v. United States*, 431 U.S. 651, 665 (1977) ("We cannot assume that the jury disregarded [ ] clear and unambiguous instructions and returned a guilty verdict without first finding that the Government had proved [the charges] beyond a reasonable doubt.").

III.

Finally, we address the district court's creation of a "plus" factor for its quid-pro-quo communication analysis. As a way to avoid First Amendment concerns, the district court added an additional element to issue preclusion. The district court held that the jury's acquittal on Count III—Inman's making a false statement to the FBI—includes a "key factual predicate"— "whether he truthfully denied trying to sell his vote on [the] prevailing[-]wage [issue]." *Inman*, 534 F. Supp. 3d at 846. It thus reasoned that retrial was precluded on Counts I and II because Inman did not lie. Without this "plus factor of lying to the FBI," Inman's actions did not cross the line from permissible "campaigning to illegal vote selling," the district court concluded. *Id.* (quotation omitted). And it used the phrase "plus factor" after noting its First Amendment concerns and analyzing our holding in *Terry*. *See id.* at 851–53; *see also id.* at 863 ("[A] new trial involving a muster of power of the federal government a second time with a case alleging only solicitation of campaign contributions in lawful amounts, without any 'plus factor' of lying to the FBI, would amount to an impermissible chill on a form of political speech entitled to First Amendment protections.").

The district court erred in its determination that a lie is a requisite element of 18 U.S.C. §§ 1951 and 666(a)(1)(B). And it misunderstands our holding in *Terry*. We now clarify that no such plus factor is required under *Terry* with respect to issue preclusion and quid-pro-quo arrangements.

In *Terry*, we found "ample evidence" of an agreement between a judge and a donor that crossed the line into bribery. 707 F.3d at 615–16. This evidence was that the judge decided a case to a donor's benefit just after being asked by the donor to do so. We noted that the judge read nothing about the case and was essentially acting "as a donor's marionette." *Id.* at 615. But we clarified that "[n]ot every campaign contribution . . . is a bribe in sheep's clothing. *Without anything more*, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor." *Id.* (emphasis added). We looked both at the time between the contribution and the action, as well as the judge's lack of attention to the case, to determine that the jury was reasonable in

rejecting legitimate explanations for the contribution and finding that there was a corrupt bargain. *Id.*

So, the district court is correct that there must be *something* that moves permissible campaign actions over the line to criminal extortion and solicitation. But the district court read *Terry* too expansively here to require a conviction of lying to the FBI, and it erred by conducting an analysis for issue preclusion similar to the analysis required for First Amendment challenges to criminal statutes. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 717 (2012). The key question when looking at a violation of 18 U.S.C. §§ 1951 and 666(a)(1)(B) is whether there was an agreement between the official and the donor. *See Terry*, 707 F.3d at 614. Here, to show this corrupt agreement, the United States did not need to produce evidence that Inman lied to the FBI. It needed to produce evidence that Inman extorted or attempted to solicit an agreement with MRCCM where Inman would vote in MRCCM's favor on the prevailing-wage law in exchange for payment. At retrial, a jury must then decide whether Inman actually extorted or attempted to solicit such an agreement—a question not answered by the first jury's acquittal on Count III. The jury's acquittal of Inman on making a false statement to the FBI does not preclude retrial on the two remaining counts.

IV.

We reverse the district court and remand the case for proceedings consistent with this ruling.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1505

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

LARRY CHARLES INMAN,

    Defendant - Appellee.

**FILED**
Jul 07, 2022
DEBORAH S. HUNT, Clerk

Before: BATCHELDER, WHITE, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk