UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                                                        No. 1:19-CR-117-RJJ

v.                                                                        Hon. Robert J. Jonker
                                                                              United States District Judge

LARRY CHARLES INMAN,

      Defendant.
_____/

**GOVERNMENT'S MOTION IN LIMINE TO
EXCLUDE EVIDENCE OF DEFENDANT'S
MEDICAL HISTORY AND DRUG USE**

The United States of America respectfully moves this Court for an Order excluding evidence and argument at trial pertaining to Defendant Larry Inman's medical history, drug use, the effects of those drugs, and post-indictment changes to his drug use. Such evidence is inadmissible as irrelevant, unfairly prejudicial, likely to confuse the jury, and an improper appeal to juror sympathies. Whether Inman experienced acute or chronic pain, used opioids and other prescriptions, experienced side effects from his drug use, or sought to reduce his opioid use after indictment is irrelevant to determining whether he attempted to extort the carpenters' union and sell his vote on repealing Michigan's prevailing wage law. That evidence should be excluded under Federal Rules of Evidence 401, 402, and 403.

## RELEVANT HISTORY

Inman was indicted by a grand jury on charges of attempted extortion under color of official right (18 U.S.C. § 1951), solicitation of a bribe (18 U.S.C. § 666), and for making false statements to the FBI (18 U.S.C. § 1001). (R.1: PageID.1-7) The indictment alleged that Inman unlawfully solicited a political campaign contribution from a labor union in exchange for an official act – his vote on a petition to repeal Michigan's prevailing wage law. A trial jury could not reach a verdict on the corruption charges and found Inman not guilty of the false statement count. Retrial on the corruption charges will occur on April 25, 2023.

Prior to the first trial, Inman provided notice of his intent to present a defense of diminished capacity. (R.16: PageID.66-67) This Court issued an order seeking briefing, including on the issue of diminished capacity. (R.17, PageID.68-71). The Court stated that the diminished capacity defense applies "where the defendant claims only that his mental condition is such that he or she cannot attain the culpable state of mind required by the definition of the crime." (*Id.*, citing *United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001)).[1] The Court cited binding legal authority indicating that the diminished capacity defense proffered by Inman only applied to specific intent, and not general intent, crimes. (*Id.*) The Court ordered the parties to file additional briefs regarding whether the "three charges in the indictment each constitute specific intent or general intent crimes." (*Id.*)

---

[1] "Although the diminished capacity defense lacks a universally accepted definition, *see United States v. Pohlot*, 827 F.2d 889, 903-904 (3d Cir. 1987), it is usually offered to negate the mens rea element." *United States v. Gonyea*, 140 F.3d 649, 650 n.2 (6th Cir. 1998).

The government argued that count 3, lying to the FBI, was the only specific intent crime charged in the indictment. (R.19, PageID.91-124) Inman argued that all three crimes required the government to prove specific intent. (R.18, PageID.73) After receiving medical records and disclosures from Inman concerning proffered testimony of a treating provider, Dr. Bruce Baker, the government moved in limine for an order excluding Dr. Baker's anticipated testimony regarding Inman's alleged diminished capacity at the time he committed the charged offenses. (R.55-2, 55-3: Page ID.394-404)

At the final pretrial conference, the Court granted the government's motion in limine excluding expert testimony regarding Defendant's alleged diminished capacity. (R.76, PageID.642) The Court reasoned that there was no cognitive ability or impairment tests performed on Inman, and Dr. Baker did not have the background and experience to testify as an expert "on the issue of what an addiction does to somebody's ability to form an intention" (R.129, PageID.1700-01) The Court also noted that the initial assessment of Inman demonstrated no evidence of delusional thinking, thought process disorder, or hallucinations. (*Id.* Page ID.1717) The Court left open the possibility that the mere fact of addiction and subsequent treatment might be admissible at trial but warned: "I would be fairly cautious about going much further than the simple fact of the diagnosis and availability of the medications. I don't think anything else would qualify or would risk a 403 exclusion anyway on the facts." (R.129, PageID.1716)

At trial, and despite the Court's inclination to significantly limit evidence of Inman's drug use and its effect on him, the jury heard extensive evidence that Inman frequently experienced severe acute and chronic pain due to various medical conditions; that he was consuming a greater quantity of opioids than what appears in his medical records; that he did not tell his doctors about the quantity of opioid pills he allegedly was taking; that he previously hoarded opioids and used that supply to supplement the opioids being prescribed to him; and that he sought and obtained treatment for opioid use after he was charged. Specifically:

- In the first half of his testimony, Inman recounted his various medical conditions, surgeries, and chronic pain. Inman testified that he was dependent on pain medication to get through the day and that he would mix pain medication with alcoholic beverages. He said that in June 2018, he would take four or five pain pills upon waking up, four or five in the afternoon, and when he was "completely horribly in pain" he would "take maybe 10 and lay down on my couch in my office." At night, he took more pills and drank alcohol. (R.102, PageID.979) Inman said his opioid use resulted in "having trouble with memory, I was constantly falling. I was physically and mentally exhausted and [had] difficulty sleeping. And the main complaint I got from my staff was … I wasn't listening, I wasn't comprehending, and I was not memorizing – I didn't have memory as to our previous day's discussion." (*Id.*, PageID.980)

- Inman claimed he hoarded his pain pills so that he could take more Norco pills per day than what was being prescribed by his doctor in 2018. (*Id.*, PageID.981-982) He showed the jury a shoe box containing what he described as about 1,000 pain pills that he said he hoarded since 2012. He said he hoarded the pills because he became concerned when his caucus talked about the possibility of narcotics and pain pills "going away." (*Id.*, PageID.982)

- Inman testified that, after he was indicted, he sought treatment and was weaned off his pain medication, which he described as: "[H]orrible. My head was spinning. I was dizzy. I was weak. I had massive diarrhea. And still problems with memory." He ultimately entered a five-week inpatient rehab program to treat his opioid addiction. (*Id.*, PageID.984-85) Without that intervention, Inman claimed he would have died. (*Id.*, PageID.1040-41) Inman added, "If [the FBI] had not knocked on my door, I believe I would not be alive today." (*Id.*, PageID.1040)

- Despite having an excellent memory of many other events and conversations about the prevailing wage debate going back to fall 2017, Inman claimed no recollection of sending the solicitation messages to either the electricians' union or the carpenters' union representatives in the days leading up to the prevailing wage vote. (*Id.*, PageID.1043-1047, 1055)

- Inman called his June 3 text solicitation to the union "really unorganized, goofy." He claimed he did not even understand most of what he had typed or

the basis for his statements. Inman concluded, "it didn't sound like me, and I had no idea I sent anything like that." (*Id.*, PageID.1015-16) He did, however, offer an explanation for ending his message with "we never had this discussion" – he said he did not want the Speaker of the House to know he was providing information to Canada about the upcoming vote because there would be "repercussions." (*Id.*, PageID.1018)

Inman also elicited testimony from several witnesses, including two of his medical providers, his campaign manager, and his legislative director, to testify about his opioid use and their effect on his ability to function:

- Ashley Akerman, Inman's campaign manager, testified about Inman's problems managing pain after surgeries and the number of prescriptions he was taking. In November 2018 – five months after Inman solicited money in connection with his vote on prevailing wage – he told Akerman he was taking 18 Norco pills per day. (R.116: PageID.1359, 1375) She became concerned about his cognitive abilities and his inability to remember conversations: "He would, you know, kind of forget or go AWOL for a little bit and just not show up to things." (*Id.*, PageID.1361) She also observed him getting drunk after consuming one light beer while taking pain medication. (*Id.*, PageID.1362) She was concerned he was overusing pain medication. (*Id.*, PageID.1366)

- Trey Hines, Inman's legislative director, testified about Inman's past surgeries, the most recent of which was January 2018. Hines described Inman's behavior and physical condition and said that he was taking a lot of

6

pain medication in 2018. Hines observed that Inman was unable to focus and was forgetting meetings and appointments. (R.115, PageID.1339-40)

- Dr. Russell VanHouzen, a retired internist, testified that Inman was a "chronic pain" patient of his between 1988 and 2019. (R.118, PageID.1409, 1419) Inman had "a lot of pain" resulting from a difficult surgery in 2016 and was prescribed Norco, Soma (a muscle relaxer), and Klonopin (a sleep medication), which can potentially cause "additive side effects of confusion and mental deterioration." (*Id.*, PageID.1415) Inman had another surgery that resulted in additional higher dosage Norco prescriptions. (*Id.*, PageID.1416) Inman told him in October 2018 that he was taking 8-12 Norco pills per day, at which time VanHouzen prescribed him a fentanyl patch, a stronger pain medication, to provide baseline pain management, with Norco pills for breakthrough pain. (*Id.*, PageID.1417-18) VanHouzen testified he was concerned with the higher dosage of Norco leading to addiction and mentation. (*Id.*, PageID.1417)

- Dr. Daniel Lathrop, a retired podiatric physician, testified that he treated Inman for foot and ankle problems and associated chronic pain. (R.117, PageID.1388-89.) Dr. Lathrop prescribed him Norco pain medication from 2014 to May 2018, when Dr. VanHouzen started managing Inman's pain. Dr. Lathrop testified that he prescribed on average about 1.3 Norco pills per day to help manage Inman's pain. (*Id.*, PageID.1390.)

7

The government anticipates that Inman will seek to introduce similar evidence at retrial through his own testimony and from other witnesses. However, that evidence is not relevant to determining whether Inman attempted to extort the union or solicit a bribe in exchange for his vote on prevailing wage and therefore is inadmissible. Such evidence would confuse the jury, unfairly prejudice the government's case, and improperly appeal to juror sympathies.

## LEGAL ANALYSIS

Evidence is relevant if it has any tendency to make a fact more or less probable, and that fact is of consequence in determining the action. Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403.

   A. *Inman's Medical History, Drug Use, And Post-Indictment Changes To His Medication Are Irrelevant And Inadmissible At Retrial.*

Count 3 charged Inman with knowingly and willfully making a materially false statement to the FBI during an August 2018 interview. (R.1, PageID.7) Inman's defense was that he had no recollection of sending text messages to the carpenters' union or its representatives in which he solicited money, and specifically the amount of $30,000, from Lisa Canada. In support, he sought to admit extensive evidence of his medical conditions and pain, his drug use and their effect on him, and post-indictment changes to his medication. That evidence was admitted at trial to explain why he had no recollection of sending the June 2018 text messages to union representatives. That evidence is now irrelevant to the remaining counts.

8

At retrial, the jury is tasked with determining whether: (1) Inman sent the text messages to the carpenters' union representatives on June 3, 2018; and (2) whether those messages communicated a quid pro quo of campaign contributions for his vote on prevailing wage. To prevail on counts 1 and 2, which are general intent crimes, the government does not need to prove that Inman remembers sending those messages. The jury no longer needs to determine whether Inman recalled those text messages and lied to the FBI in August when he was asked about them. And, whether Inman knew that it was unlawful or in contravention of a known legal duty to send those messages is not an element of the remaining counts. Instead, the government must prove that Inman knowingly sent those messages to the union and communicated a quid pro quo of money for his vote.

Inman might argue that the evidence is relevant and admissible as evidence of an intoxication defense – that he was incapable of committing counts 1 and 2 because he was so intoxicated by his use of drugs at the time of those events. But voluntary intoxication is <u>not</u> a defense to a crime that requires the government to prove only that the defendant acted knowingly, often referred to as a general intent crime. *See United States v. Bennett*, 975 F.2d 305, 308 (6th Cir. 1992); *United States v. Smith*, 606 F.3d 1270, 1281-82 (10th Cir. 2010); Seventh Circuit Pattern Instruction 6.09(A), comment (2022).

In *Bennett*, the Sixth Circuit rejected an argument that an intoxication defense is permissible to negate intent if the intoxication was so severe that the defendant did not know he possessed a firearm. 975 F.2d at 308. "The defendant

cites no authority for the proposition that the degree of intoxication somehow negates intent for a general intent crime." *Id*. *See also United States v. Veach*, 455 F.3d 628, 631 (6th Cir. 2006) (voluntary intoxication no defense to general intent crimes) (citing *Gonyea*, 140 F.3d at 650); *United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001) (intoxication not a defense to 18 U.S.C. § 111). *Gonyea* instructs that "a specific intent crime is one that requires a defendant to do more than knowingly act in violation of the law. The defendant must also act with the purpose of violating the law. The violation of a general intent crime, by contrast, requires only that a defendant 'intend to do the act that the law proscribes.'" *Gonyea*, 140 F.3d at 653 (citations omitted). Where a statute is silent on a higher mens rea, "general intent is presumed to be the required element." *Veach*, 455 F.3d at 632.

The crimes alleged in counts 1 and 2, attempted extortion under color of official right and solicitation of a bribe, are general intent crimes because neither statute requires the government to prove that Inman acted willfully – that is, with the purpose of violating a known legal duty. The Supreme Court in *Stirone v. United States*, 361 U.S. 212, 218 (1960), stated that "there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion." In *Evans v. United States*, 504 U.S. 255, 268 (1992), the Supreme Court adopted the mens rea of "knowingly" for extortion under color of official right. *Evans* stated: "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id*. at 268.

10

Accordingly, a specific intent element was not included in Sixth Circuit Pattern Criminal Jury Instruction 17.02, which applies to extortion under color of official right. Likewise, the Sixth Circuit Criminal Instruction Committee determined that, for extortion by force, violence, or fear, "the statute does not include a mens rea, and no case law on the mens rea for this type of extortion exists in the Supreme Court." *See* Sixth Circuit Pattern Instruction 17.07, Committee Commentary (Oct. 1, 2021). Citing *Evans* and *United States v. Carmichael*, 232 F.3d 510, 522 (6th Cir. 2000), the Committee found that the government need only show that the defendant acted "knowingly."

In *United States v. Carmichael*, 232 F.3d 510, 522 (6th Cir. 2000), the court of appeals rejected the defendant's argument that the jury should have been instructed that he acted with specific intent, finding that a defendant charged under the Hobbs Act need not intend to violate the law. The court affirmed a jury instruction requiring only that the defendant knowingly extorted another person. *Id. See also United States v. Turner*, 272 F.3d 380, 384 (6th Cir. 2001) ("In order to prevail under a Hobbs Act violation, the Government must prove two elements: 1) interference with interstate commerce, which is a jurisdictional issue; and, 2) the substantive criminal act, which in the instant case is [a conspiracy to commit] robbery.") (citations omitted).[2]

---

[2] Before *Evans*, the Sixth Circuit took a different (now abrogated) view as to Hobbs Act robbery. *See United States v. Dabish*, 708 F.2d 240, 242 (6th Cir. 1983) (18 U.S.C. § 1951 requires proof of specific intent); *United States v. Cobb*, 397 F. App'x 128, 137 (6th Cir. 2010) (citing *Dabish* for proposition that Hobbs Act robbery is a specific intent crime). The Committee rejected those decisions as inconsistent with Supreme Court and other published Circuit precedent.

11

Likewise, 18 U.S.C. § 666(a)(1)(B) is a general intent crime. In *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009), the Sixth Circuit rejected an argument that the government must prove "a specific intent element" to support a conviction under Section 666(a)(1)(B). Rather, the statute requires the government to prove that the defendant acted corruptly. *Id.* at 521. There is no requirement to prove that the defendant intended to violate the law or commit another felony while acting corruptly. *See also United States v. Woodman*, No. 98-4527, 2000 WL 1234328, *6-8 (6th Cir. 2000) (no intoxication defense to obstruction charge where government must prove defendant acted corruptly with the intent to influence, obstruct, or impede a proceeding in the due administration of justice).

At the first trial, this Court did not rely on the Sixth Circuit's "specific or general intent" dichotomy when determining the relevance and admissibility of Inman's medical conditions, his drug use and its effect on him, and post-indictment treatment. Nor did the Court articulate an alternative standard for admission of such evidence. Instead, the Court assumed that the evidence was admissible to allow either party to address whatever intent element was required by all three charges. (R.129, PageID.1699-1700) ("regardless of whether we characterize it as general or specific, a jury is allowed to look at any of the evidence that either side thinks would be germane in arguing whether the intent has been proven beyond a reasonable doubt.) Where the only remaining counts are general intent crimes, however, Inman's medical conditions and drug use when he sent the text messages to the carpenters' union is irrelevant because there is no "intoxication defense"

12

available to him. *Veach*, 455 F.3d at 631 ("To determine whether the district judge properly excluded the defendant's testimony relating to his level of intoxication at the time of the crimes charged, it is thus *necessary* to decide, first, whether [the crimes] are general or specific intent offenses.") (emphasis added)[3]

Consequently, Inman's medical conditions, use of drugs and their effects, and post-indictment changes to his medication use should be excluded under Rules 401 and 402.

B. *The Facts Do Not Support An Intoxication Defense.*

Even if Inman's medical history and drug use were relevant to the remaining charges, he cannot demonstrate a voluntary intoxication defense. First, the evidence of his alleged increased opioid use introduced at trial post-dates the June 2018 text messages at issue. Second, Inman's behavior and the purported effects of those drugs on him does not meet the legal test for a voluntary intoxication defense.

No Sixth Circuit case establishes the quantum of proof that a defendant must demonstrate before asserting an intoxication defense. However, in *United States v. Newman*, the Sixth Circuit observed that voluntary or involuntary intoxication may sometimes preclude "the formation of specific intent and thus serve to negate an essential element of certain crimes," but <u>not</u> where the defendant was "capable of rational thought and intentional behavior." *United States v. Newman*, 889 F.2d 88,

---

[3] The Court instructed the jury that it may consider testimony about "defendant's use and possible addiction to prescription medication, alcohol, or both . . . in deciding whether the government has proved beyond a reasonable doubt the crimes charged in the Indictment and in particular the required state of defendant's mind as described in these instructions." (R.132, PageID.1897-98) That modification to pattern criminal instruction 2.08 is not applicable at retrial.

92-93 (6th Cir. 1989) (affirming conviction despite evidence of intoxication where defendant "performed numerous intricate and delicate tasks in the course of committing his crimes"); *see also United States v. Vaught*, 133 F. App'x 229, 233-34 (6th Cir. 2005) (citing *Newman*, affirming conviction for attempted murder despite evidence defendant was drinking, unsteady on his feet, and slurring speech); *United States v. Rainwater*, No. 92-5504, 1993 WL 47198, *3 (6th Cir. Feb. 23, 1993) (despite consuming large amount of alcohol, defendant retained ability to perform difficult physical tasks, clearly understood situation, and reacted consistent with past behavior).

Other appellate courts have concluded that a defendant must demonstrate what amounts to "incapacitation" before an intoxication defense may be injected into the trial. In the Seventh Circuit, an intoxication defense requires evidence that the defendant's "mental faculties were so overcome by intoxicants that he was rendered incapacitated. In other words, simply showing that the defendant was intoxicated is not enough." *Faucett v. United States*, 872 F.3d 506, 511 (7th Cir. 2017) (citations and quotations omitted). *Faucett* held that a district court properly excluded an intoxication defense, regardless of whether the crime required general or specific intent, where the record demonstrated that the defendant failed to establish evidence that would support a viable intoxication defense. *Id.*

In *United States v. Nacotee*, 159 F.3d 1073, 1076 (7th Cir. 1998), the Seventh Circuit considered an argument that defendant was too drunk to form the intent necessary to commit serious bodily assault or aiding and abetting that assault. The

14

Court found insufficient evidence to support the defense, which requires "either: (1) that the defendant's "mental faculties were so overcome by intoxicants that he was incapable of forming the intent requisite to the commission of the crime," or (2) that "the intoxication was so extreme as to suspend entirely the power of reason." *Id.* at 1076. In that case, the defendant failed to produce evidence that she was drunk enough to "completely lack the capacity to form the requisite intent." *Id.* (citation omitted).

Other circuits have not clearly or consistently articulated what evidence of intoxication is required before a jury may consider the defense, but several cite the Seventh Circuit's test in *Nacotee*. *See, e.g.*, *United States v. Kenyon*, 481 F.3d 1054, 1071 (8th Cir. 2007) (affirming intoxication defense in child sex abuse case where evidence demonstrated use of alcohol and illegal drugs to point of "blanking out" when defendant committed crimes); *United States v. Davis*, 183 F.3d 231, 254 (3d Cir. 1999) (reversing conviction for witness tampering, finding intoxication defense warranted and observing "it is often difficult to determine what might qualify as evidence of interference with ability to form intent").

In this case, even assuming that an intoxication defense is available to negate intent for attempted extortion by a public official and solicitation of a bribe, the standard for admitting such evidence and instructing the jury on an intoxication defense is substantially higher than what Inman has demonstrated. It is insufficient to allege that Inman took more prescription drugs than he was prescribed at various times. It is equally insufficient to allege that, on various

15

unspecified dates, he was unable to recall recent events or that his physical stamina was adversely affected, requiring him to lay down and rest. Inman failed to produce evidence sufficient to show that he was so overcome by intoxicants on June 3, 2018, that he was incapable of acting knowingly or that the intoxication was so extreme that it suspended entirely his power of reason. *See Faucett*, 872 F.3d at 511; *Nacotee*, 159 F.3d 1076. In fact, all that Inman has definitively stated is that he cannot recall sending the text messages to the union. This begs a critical question: If Inman cannot recall even sending those messages, how can he recall how many opioid pills he took and his mental state when he sent those messages? The evidence showed that he cannot recall his mental state on June 3, 2018.

To the contrary, the evidence at trial demonstrated that Inman's mental faculties were not overcome by intoxicants and that he was capable of knowingly sending text messages to the unions seeking money. Whether he consumed opioids at or near the time he sent those messages, in whatever quantity he consumed, there is no evidence those drugs caused him to become extremely intoxicated to the point of suspending entirely his power of reason. *Id.*

The text messages to the unions demonstrate that Inman was capable of complex thought with clarity as to the urgency of the issue given the upcoming vote, the consequences of the union not coming through with money before the vote, and with the understanding that he did not want others to know what he was doing – as evidenced by his coda in both messages: "We never had this discussion." The messages show he was fully oriented as to time, place, and identity and had the

ability to formulate complex reasoning. The two messages he sent were not identical "copy and paste" texts – there are differences in the messages he sent to Lisa Canada and the union's lobbyist, Jim Kirsch. Moreover, before trial, this Court acknowledged that the text messages indicate that Inman did not have a diminished capacity at the time of the offense: "the content of the messages themselves, which certainly seem to have coherence and focus and don't seem to be the product of a mind that's unable to focus on what's being said." (R.129, PageID.1700)

Other text messages Inman sent before and after the June 3 messages also demonstrate that he was not incapacitated by whatever drugs he was taking around that time. The same weekend he sent the text messages to the carpenters' union, Inman went to breakfast with a friend, attended a festival in his district, and performed physical labor in his yard, including moving brush. (R.102, PageID.1058, 1080-81) The evidence of Inman's physical and mental condition contemporaneous to his solicitation of money from the carpenters' union cannot support a finding that he lacked mental cognition or power of reason at the time of the charged offenses.

Additionally, Dr. VanHouzen admitted that in May 2018 – one month before Inman sent the text solicitations to the carpenters' union – he did not observe any signs that Inman was having any difficulties with the medication he was prescribing. When asked if he saw any mental confusion or mental cognition problems, VanHouzen responded: "I didn't see anything at that point, no." (R.118, PageID.1425) The first time Inman ever mentioned confusion to VanHouzen was on

17

October 31, 2018, long after he solicited the union for money on the eve of the prevailing wage vote. (*Id.,* PageID.1427)

Similarly, Dr. Lathrop testified that every time he saw Inman between 2014 and March 2018, Inman never reported nor exhibited any signs that he was not mentally functioning: "He always was completely oriented. We call it oriented times three, yeah." (R.117, PageID.1403) Lathrop also admitted that not a single note in his medical records reflected a time when Inman was not mentally functioning while taking medication prescribed by him. (*Id.*)

Accordingly, for all the foregoing reasons, evidence of Inman's medical conditions, his use of drugs and their effects, and post-indictment changes to his medication use should be excluded under Rules 401 and 402. *See Newman*, 889 F.2d 88, 92-3; *Faucett*, 872 F.3d at 511; and *Nacotee*, 159 F.3d 1076.

C. *The Jury Will Be Confused And Misled By Evidence Of Inman's Medical Conditions And Drug Use.*

Where a defendant has no viable intoxication defense, the admission of Inman's medical issues, drug use, and post-indictment drug treatment – under any theory of relevance – seriously risks confusing and misleading the jury in this case. Any relevance that evidence may have at retrial is substantially outweighed by the danger of confusing or misleading the jury and unfair prejudice.

The extensive admission of testimony concerning Inman's medical problems and surgeries, the ambiguous and unreliable evidence of when Inman was taking more opioids than he was prescribed by his doctors and how many opioid pills Inman consumed on June 3, 2018, will confuse and mislead the jurors. Additionally,

the government's presentation of the case will be unfairly prejudiced by such testimony, which at that level of generality and ambiguity could appeal only to juror sympathies. The jury will be left wondering how to evaluate and weigh such ambiguous and uncertain evidence of Inman's physical and mental condition on June 3, 2018, particularly when they hear such an extensive recital of his medical conditions and drug use spanning many years. Consequently, that evidence should be excluded under Rule 403.

It is improper for a defendant to invite the jury to nullify the prosecution, that is, to decide the case on something other than the evidence and law as instructed by the Court. *See United States v. Walsh*, 654 F. App'x 689, 697 (6th Cir. 2016) (recognizing "the need for 'impartial determination of justice based on law.'") (quoting *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988) (affirming district court's refusal to instruct on jury nullification)). Jury nullification is not a desired outcome in any trial and courts are not to encourage it. *See Wofford v. Woods*, 969 F.3d 685, 710 (6th Cir. 2020) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.")).

Allowing Inman or other witnesses to testify about his history of medical problems and pain, his surgical procedures and post-operative pain, his use of opioids to manage his pain, and his alleged memory, comprehension, and motor skill deficiencies, and post-indictment drug treatment (including Inman's claim that

19

the government's investigation saved his life) constitutes an implicit appeal for jury nullification. Even if Inman does not expressly argue for nullification, the risk that a jury might improperly nullify on that basis is very real if that evidence is admitted. Because that evidence has no bearing on determining whether Inman sent the text messages to the union to solicit money for his vote on prevailing wage, the only potential relevance is to improperly appeal to juror sympathies in search of a verdict that is not based on his conduct on June 3, 2018, or the law.

WHEREFORE, for the foregoing reasons, the government respectfully requests that this Court enter an Order excluding evidence and argument at trial pertaining to Inman's medical history, drug use, the effects of those drugs, and post-indictment treatment.

                                                  Respectfully submitted,

                                                  MARK A. TOTTEN
                                                  United States Attorney

Dated: February 13, 2023                /s/ *Christopher M. O'Connor*
                                                  CHRISTOPHER M. O'CONNOR
                                                  STEPHEN P. BAKER
                                                  Assistant United States Attorneys

                                                  United States Attorney's Office
                                                  P.O. Box 208
                                                  Grand Rapids, Michigan 49501-0208
                                                  (616) 456-2404
                                                  christopher.oconnor@usdoj.gov
                                                  stephen.baker@usdoj.gov