UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LARRY CHARLES INMAN,

      Defendant.

_____/

Case no. 1:19-cr-117

Hon. Robert J. Jonker
United States District Judge

### DEFENDANT'S MOTION TO DISMISS INDICTMENT

Defendant Mr. Larry Charles Inman, through his undersigned counsel Parker Douglas and Areeb Salim of the Office of Federal Public Defender, hereby respectfully moves this Honorable Court to dismiss the remaining counts of the Indictment with prejudice. As explained below, in the context of an alleged political corruption case based on campaign finance contributions, the United States Constitution requires that the statutes serving as the basis of the indictment be narrowly construed. Specifically, guarantees of federalism, free expression, and due process require that the statutes only criminalize instances where a public official *explicitly* agrees to undertake an official act in exchange for the campaign finance contribution. Here, even after taking all facts alleged in the Indictment as true, the Indictment cannot support a conviction under the appropriate narrow reading of either statute. Consequently, the remaining two counts in the Indictment against Mr. Inman should be dismissed.

## Legal Standard

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This includes a motion to dismiss based on a defect in the Indictment. Fed. R. Crim. P. 12(b)(3)(B). Such a motion must be made before trial. Fed. R. Crim. P. 12(b)(3).

On a motion to dismiss an Indictment, the Court must view the Indictment's factual allegations as true and determine only whether the Indictment is "valid on its face." *Costello v. United States*, 350 U.S. 359, 363 (1956). "Generally, motions are capable of determination before trial if they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). "[W]here the defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged in an indictment, the Court is reviewing a question of law, not fact." *United States v. Vertz*, 40 F. App'x 69, 70 (6th Cir. 2002) (citing *United States v. Bowman*, 173 F.3d 595 (6th Cir. 1999)). "[A] pretrial dismissal is essentially a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994). Finally, a reviewing court is permitted to "make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992).

## Brief in Support

After acquittal on Count III of the Indictment (lying to the FBI), Mr. Inman yet faces Count I for attempted extortion under the Hobbs Act and Count II for solicitation of a bribe under 18 U.S.C. § 666(a)(1)(B). Counsel is newer to this case than the Court and counsel for the government, and recognizes that issues related to federalism and our Constitution's First Amendment were addressed in the last trial. Counsel further recognizes that, in barring retrial of Counts I and II based on principles of collateral estoppel, this Court previously held that a "plus factor" is required to sustain a conviction for extortion or solicitation of a bribe, when, as here, the underlying conduct only involves an otherwise legal campaign finance contribution. Finally, Counsel acknowledges that the Sixth Circuit reversed this Court's dismissal of Counts I and II while clarifying that a "plus factor" test before it on appeal is not supported by Sixth Circuit precedent.

Despite this posture, Counsel agrees with the Court that principles of federalism and First Amendment protected speech prohibit the application of the Hobbs Act and 18 U.S.C. § 666(a)(1)(B) to Mr. Inman under the alleged facts in this case, albeit not because of the absence of a "plus factor." Prior counsel did not provide the Court with a precise basis to arrive at this conclusion based on clear law. As such, the issue was inadequately briefed for this Court and the Sixth Circuit in previous proceedings, and the Sixth Circuit did not have the argument here before it. In the remainder of this brief, Counsel will remedy this gap, and demonstrate why Supreme Court guidance mandates dismissal of both Counts in this case.

## I. Federalism and First Amendment Principles Require Courts to Construe Federal Corruption Statutes Narrowly Particularly when they Involve Campaign Contributions

Our federal system grants States "sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (citing *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). A core aspect through which a State exercises this sovereignty is determining "the structure of its government and the character of those who exercise government authority" including by "regulat[ing] the permissible scope of interactions between state officials and their constituents." *McDonnell v. United States*, 579 U.S. 550, 576 (2016) (citing *Ashcroft*, 501 U.S. at 460). Thus, the federal government and judiciary must exhibit restraint when regulating the political activity of state officials, so as not to interfere with state sovereignty. *Id.* Simultaneously and generally, the First Amendment prohibits restrictions upon lawful political speech, unless such restrictions pass strict scrutiny, and this protection includes campaign contributions and expenditures, because they are deemed to be protected speech. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). Taken together, the First Amendment and principles of federalism afford substantial prophylactic protections to the political speech of state officials, including their solicitation and receipt of political contributions from constituents.

Complexity arises when the federal government seeks to prosecute state officials under federal anti-corruption statutes for conduct that exists within the protected arena of political speech. In such circumstances, courts must determine the appropriate balance between the federal executive's enforcement interests, as

4

well as federalism and First Amendment protections. For example, here, the core allegation is that Representative Inman attempted to solicit *legal campaign contributions* from three trade unions in exchange for his support on a critical labor law issue. The government does not allege that Mr. Inman sought any money for personal benefit, nor that the contributions would have exceeded permissible limits. Thus, this case is underpinned by tension between the right of a legislator in the State of Michigan to engage in protected political speech and conduct, and the federal executive's interest in enforcing anti-extortion and bribery statutes.

The Supreme Court's consistent solution to cases involving such tensions has been to construe federal statutes narrowly to avoid overreach by the federal government into state affairs and overbroad restrictions on political speech. *See e.g.*, *McDonnell*, 579 U.S. 579 (narrowly construing 18 U.S.C. § 201 and the Hobbs Act where state governor and his wife accepted $175,000 in loans, gifts, and other benefits from local businessman in exchange for the governor providing the businessman with assistance in launching his product); *United States v. Enmons*, 410 U.S. 396, 410-411 (1973) (rejecting a "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States"); *McNally v. United States*, 483 U.S. 350 (1987) (narrowly construing federal mail fraud statute as protecting only property interests *not* the citizenry's interest in good government).

In *McDonnell*, the Supreme Court expanded upon the risks posed to democracy by prosecuting political figures for corruption. Although the case turned on what constitutes an "official act" under the bribery statute, the Court

spoke directly to what the government is trying to do in this prosecution:

> In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo.*

> *But conscientious public officials arrange meetings for constituents,* **contact other officials on their behalf,** *and include them in events all the time.* The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ballgame. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

> ***This concern is substantial***. White House counsel who worked in every administration from that of President Reagan to President Obama warn that the Government's "breathtaking expansion of public-corruption law would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties." Six former Virginia attorneys general—four Democrats and two Republicans—also filed an *amicus* brief in this Court echoing those concerns, as did 77 former state attorneys general from States other than Virginia—41 Democrats, 35 Republicans, and 1 independent.

*Id.* at 575 (emphasis supplied) (internal citations omitted); *see also McConnell v. Fed.*

*Election Comm'n*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in part and

dissenting in part) ("Favoritism and influence are not ... avoidable in representative politics.").

Following *McDonnell*, the Court has continued its trend of narrowing federal anti-corruption statutes as applied to state officials, *see Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) (rejecting broad interpretation of wire fraud and conspiracy statutes as applied to state officials because "not every corrupt act by state or local officials is a federal crime"), including during the oral argument of *Percoco v. United States* (21-1158) (involving the application of 18 U.S.C. § 666(a)(1)(B) to an individual alleged to have been exercising influence as a state official for the benefit of a local businessman in exchange for money) at the end of last year.[1]

## II. Solicitation of a Facially Lawful Campaign Contribution Only Violates the Hobbs Act and 18 U.S.C. § 666(a)(1)(B) if it is Accompanied with an <u>Explicit</u> *Quid Pro Quo* Agreement

The Supreme Court has noted that further caution is required in cases, such as this one, where the underlying conduct involves campaign contributions because of the integral role that such contributions play in our representative government. Accordingly, the Court has strictly constrained the federal government's ability to prosecute alleged corruption stemming from campaign contributions by requiring that there be an **<u>explicit</u>** *quid pro quo* agreement between the official and the donor. Both Supreme Court and Sixth Circuit case law establishes that the existence of such an agreement is required to support a conviction under the Hobbs Act and 18

---

[1] For example, Justice Thomas commented that "it seems as though we are using a federal law to impose ethical standards on state activity." (35-36); *see generally* Amy Howe, *Justices worry that broad reading of federal bribery law could sweep in lobbyists*, SCOTUSblog (Nov. 28, 2022, 5:05 PM), https://www.scotusblog.com/2022/11/justices-worry-that-broad-reading-of-federal-bribery-law-could-sweep-in-lobbyists/.

U.S.C. § 666(a)(1)(B).  And, as clarified by the Sixth Circuit, subsequent Supreme Court cases addressing alleged corruption stemming from non-campaign contributions, did not abrogate the requirement of an explicit *quid pro quo* in the campaign contribution context.

### a. Solicitation of Campaign Contributions only Violates the Hobbs Act and 18 U.S.C. § 666(a)(1)(B) if it is Accompanied by an <u>Explicit</u> *Quid Pro Quo* Agreement

Solicitation is illegal under the Hobbs Act when it is part of an explicit *quid pro quo* exchange—characterized by the fact that "the payments are made in return for an *explicit* promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273 (emphasis supplied).  This same requirement applies to the solicitation of a bribe under 18 U.S.C. § 666(a)(1)(B). *See United States v. Inman*, 39 F.4th 357, 365 (6th Cir. 2022) (citing *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013)); *see also United States v. Sun Diamond Growers of California*, 526 U.S. 398, 404-405 (1999) ("for bribery *there must be a quid pro quo*"). (emphasis supplied).[2]

The Supreme Court's decision in *United States v. McCormick*, 500 U.S. 257 (1991), provides the framework within which lower courts must analyze alleged *quid pro quo* arrangements stemming from otherwise legal campaign contributions.  In *McCormick*, the defendant, a West Virginia legislator, supported a state program allowing foreign medical school graduates to obtain temporary practice permits. When certain members of the legislature sought to end the program, a lobbyist, on

---

[2] To the extent that *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009), suggests that a quid-pro-quo arrangement is not required for bribery, that holding is belied by the cited Sixth Circuit and Supreme Court precedent.

behalf of foreign doctors, worked to extend it. The defendant sponsored legislation extending the program, which ultimately passed, and then, after discussions with the lobbyist, agreed to sponsor future legislation granting permanent medical licenses.

During his subsequent reelection campaign, the defendant told the lobbyist that his campaign was "expensive," that he had spent substantial money "[from] his own pocket," and that he "had not heard anything from the foreign doctors," 500 U.S. at 260. The lobbyist in *McCormick* responded that he would reach out to the foreign doctors and "see what he could do." *Id*. After he did so, the foreign doctors sent multiple cash payments to the defendant, and the lobbyist delivered to him an envelope containing nine $100 bills. *Id*. The defendant did not list any of the payments as campaign contributions or report them on his personal tax returns.[3] He then sponsored and advocated for the permanent licensing bill, which was passed and signed into law. Two weeks later, the defendant received another cash payment from the foreign doctors. *Id*. The defendant was charged with extortion and convicted at trial.

The Supreme Court ultimately reversed. In affirming the conviction, the Court of Appeals had adopted a multifactor test to determine whether campaign contributions were "illegitimate, extortionate payments" that looked to factors including "whether the official acted in his official capacity at or near the time of the

---

[3] The cash payments were not listed in the campaign's ledger as contributions; they were instead "accompanied only by initials or other codes signifying that the money was for" the defendant. *McCormick*, 500 U.S. at 260.

payment for the benefit of the payor; whether the official had supported legislation before the time of the payment; and whether the official had directly or indirectly solicited the payor individually for the payment." *Id*. at 271-72. The Supreme Court rejected this test, concluding that, even if each of those inquiries went against McCormick "as they very likely [did] in the Court of Appeals' view," **he still would not have violated the Hobbs Act**. *Id*. at 272. Instead, the Supreme Court held that the receipt of campaign contributions is criminal under the statute "only if the payments are made in return for an ***explicit promise or undertaking*** by the official to perform or not to perform an official act." *Id*. at 273 (emphasis added). The Court further explained, "[i]n such situations *the official asserts that his official conduct will be controlled by the terms of the promise or undertaking*." *Id*. (emphasis supplied).

The *McCormick* Court's insistence that the promise or undertaking be "explicit" stemmed from its understanding that the solicitation, payment, and expenditure of campaign contributions is inextricably intertwined with the political process of this nation:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign

contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." ***To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation***.

*McCormick*, 500 U.S. at 272–73 (emphasis added).

Since *McCormick* was decided, its ruling, requiring an explicit *quid pro quo*, has maintained a clear line between a corrupt bargain and legitimate campaign fundraising, in order to prevent prosecutors from chilling democratic participation and punishing conduct that is necessary and central to our system of elective government. Lower courts have followed this rule, even with some confusion over its application. And, the Court has continuously reaffirmed its commitment to rule of, and the underlying democratic principles established in, *McCormick*, including in a case decided after the previous trial in this matter:

As we have explained, influence and access "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." ***To be sure, the "line between* quid pro quo *corruption and general influence may seem vague at times, but <u>the distinction must be respected</u> in order to safeguard basic First Amendment rights." And in drawing that line, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it."***

*Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022) (holding

that loan-repayment limitation on post-election contributions unconstitutionally burdened political speech) (emphasis supplied) (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192, 209 (2014)). *See also*, *Citizens United*, 558, U.S. at 359 (2010) (noting that "[t]he fact that [donors] may have influence over or access to elected officials does not mean that these officials are corrupt.").

Cumulatively, these decisions establish that the prosecution of political figures based on campaign contributions poses great risks to our democracy. Constituents give money to their representatives in the hopes that they will take particular actions and pursue an agenda that aligns with their interests. It is not a crime when elected officials take actions that are supported by those who have contributed to their campaigns and advocated for those actions. It is not a crime for elected officials to accept contributions and then not vote in line with donors' interests. And it is not a crime to inform lobbyists and other constituents about the campaign fund raising difficulties in an election cycle even as they discuss their and other politicians' campaign fundraising situations, and even as they discuss policy interest with constituents, including unions and lobbyists as well as individual citizens. Federal extortion and bribery prosecutions in this context threaten to elide the distinction between legitimate political activity and truly corrupt bargains – and without a clear line between the two, candidates and constituents alike will hesitate in engaging in the former for fear of criminal prosecution.

> **b.** ***Evans v. United States*, 504 U.S. 255 (1992), did not lower the Explicit *Quid Pro Quo* Standard**

*Evans* concerned the prosecution of a member of the Board of Commissioners

of DeKalb County, Georgia for receiving $7,000 in cash not tied to campaign contributions and perhaps $1,000 in campaign contributions from an undercover FBI agent. In exchange for the money, the defendant assured the agent-developer that he would assist the agent-developer in obtaining rezoning approval for a tract of land. The defendant was arrested before he could make good on his promise. On appeal, the defendant challenged the jury instructions because they permitted the jury to "convict him on the basis of the 'passive acceptance of a contribution'" without "requir[ing] the jury to find 'an element of duress such as a demand,'" and "did not properly describe the *quid pro quo* requirement for conviction if the jury found the payment was a campaign contribution." *Id*. at 268. The Supreme Court rejected the defendant's arguments and affirmed his conviction. In so holding, it explained:

> We reject petitioner's criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of *McCormick* ... because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; *fulfillment of the quid pro quo is not an element of the offense*. We also reject petitioner's contention that an affirmative step is an element of the offense of extortion "under color of official right" and need be included in the instruction.... We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.

*Id*. at 268 (emphasis supplied).

Thus, *Evans* held that: (1) an affirmative act of inducement by a public official is not a necessary element under the Hobbs Act, and (2) illegal extortion is complete when the public official receives a payment in return for an agreement to perform an

act. *Abbey*, 560 F.3d at 517. Following *Evans* lower courts differed in parsing out how, if at all, its holding affected the explicit *quid pro quo* requirement in *McCormick. See United States v. McGregor*, 879 F. Supp. 2d 1308, 1316–17 (M.D. Ala. 2012) (collecting cases and explaining that "there is considerable debate over what *McCormick* [and] *Evans* ... require.... The Circuit Courts of Appeals have struggled with these questions."). The core issue was whether *Evans* lowered the bar for a finding of explicit *quid pro quo* in all contexts (minority opinion), or only in cases involving non-campaign contributions. *Id.* at 1318.

The Sixth Circuit has held in favor of the latter interpretation. In *Abbey*, the Court noted that although all § 1951 extortion prosecutions require a showing of *quid pro quo*, "*not all quid pro quos are made of the same stuff.* The showing may still vary based on context." 560 F.3d at 517. (emphasis supplied). The Court explained that:

> *Evans* **modified the standard in non-campaign contribution cases** by requiring that the government show only that the official "obtain[e]d a 'payment to which he was not entitled, knowing that the payment was made in return for official acts.'" **Indeed, in circumstances like this one—***outside the campaign context—* **"[r]ather than requir[e] an** *explicit* **quid-pro-quo promise, the elements of extortion are satisfied by something short of a formalized and thoroughly articulated contractual arrangement (i.e., merely knowing that the payment was made in return for official acts is enough).**

*Id.* at 517-518 (internal citations omitted) (emphasis supplied).

The Court went on to expand upon how, in non-campaign contribution cases, it is not necessary for the benefits received by the public official to be directly linked to a promise to perform a specific act. *Id.* Importantly however, *Abbey*, stands for

the principle that *Evans* did <u>not</u> alter *McCormick*'s holding that an explicit *quid pro quo* must be proven in campaign contribution cases. *See, e.g., United States v. Garcia*, 922 F.2d 409 (2d Cir. 1993) ("*Evans* modified [the *McCormick*] standard in non-campaign contribution cases by requiring that the government show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.").

McCormick* and *Evans* thus present two distinct definitions of and standards for evaluating the legality of an alleged *quid pro quo*: A *quid pro quo* in the campaign contribution arena under *McCormick* must involve a payment made in return for an "explicit promise or undertaking." A *quid pro quo* under *Evans* can be proven inferentially, based on the implication that an official has knowingly accepted a payment intended to compensate him for an official act. *Evans*, 504 U.S. at 274 (Kennedy, J., concurring) ("The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it."). This framework accords with the *McCormick* court's desire to limit its holding to the campaign contribution context "McCormick's sole contention in this case is that the payments made to him were campaign contributions. *Therefore, we do not decide whether a quid pro quo requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value.*" 500 U.S.at 274 n.10.

## III.   An Explicit *Quid pro quo* Requires "Something" More for Campaign Contribution Cases

Having determined that *Evans* did not abrogate or change *McCormick*'s

"explicit" requirement with respect to alleged illegal campaign contributions, the next task is to determine what proof is necessary to establish whether "the payments are made in return for an *explicit promise or undertaking* by the official to perform or not to perform an official act," *McCormick*, 500 U.S. at 273 (emphasis supplied). Put differently, how explicit must the promise or undertaking be, and what facts must the government allege to provide a viable case that such a promise or undertaking was made?

The starting point of the analysis must be the distinction between the *Evans* standard for non-campaign contribution cases and the *McCormick* standard for campaign contribution cases. *Evans* allows the government to prove its case by implication in non-pure campaign contribution cases. 504 U.S. at 268, 274. It follows then that *McCormick*'s explicit requirement for contribution cases requires *something more* than proof by implication. This conclusion is bolstered by a contextual look at Justice Stevens' dissent in *McCormick*, which expressed disapproval of what he saw as the Court's requiring that a campaign contribution *quid pro quo* be made "explicit rather than implicit" — that is, that the illegal agreement be made "in a particular form." *McCormick*, 500 U.S. at 282 (Stevens, J., dissenting). Instead, Justice Stevens argued that there need only be a "mutual understanding" that the payment was made in return for the official's conferring a benefit or avoiding a harm to the payer. *Id.* at 283. Only one year later, the *Evans* Court appeared to take Justice Stevens' proposed standard, or one very close to it, and adopt it as a new rule for non-campaign contribution cases — with Justice Stevens writing for the majority — leaving

*McCormick*'s analysis in campaign finance cases to remain intact.[4]

Sixth Circuit precedent further supports the conclusion that *something* more than proof by implication is required in campaign contribution cases. In *Terry*, the Sixth Circuit explained that "[n]ot every campaign contribution . . . is a bribe in sheep's clothing. *Without anything more*, a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor." *Id.* at 615 (emphasis supplied). Moreover, in reviewing this Court's first decision in this matter, the Sixth Circuit agreed that "the district court is correct that *there must be something* that moves permissible campaign actions over the line to criminal extortion and solicitation." *United States v. Inman*, 39 F.4th 357, 368 (6th Cir. 2022) (emphasis supplied); *see also*, *United States v. Ganim*, 510 F.3d 134, 142 (2007) (Sotomayor, J.) ("proof of an express promise is necessary when the payments are made in the form of campaign contributions."). This approach is confirmed in Supreme Court and Sixth Circuit cases.

For instance, in *Terry* the Sixth Circuit provided further detail regarding the requirements necessary to prove an explicit *quid pro quo* in the context of a campaign contribution, though in *Terry* that exchange was clear, and no further inquiry was necessary to ascertain that:

---

[4] This also accords with an analysis of plain language. An "explicit" promise cannot be satisfied by implication, as it would be contradictory as a matter of plain language to hold that a *quid pro quo* agreement could be simultaneously "explicit" and "implicit." *Compare* Implied, Black's Law Dictionary (11th ed. 2019) (defining "implied" as "[n]ot directly or clearly expressed; communicated only vaguely or indirectly," or "[r]ecognized by law as existing inferentially"), *with* Explicit, Black's Law Dictionary (defining "explicit" as "[c]lear, open, direct, or exact" or "[e]xpressed without ambiguity or vagueness; leaving no doubt") and *Express*, Black's Law Dictionary (defining "express" as "[c]learly and unmistakably communicated; stated with directness and clarity").

No doubt, **a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation**: The donor supports the candidate's election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe. . . . If an official receives money through promises to improperly employ his public influence, he has accepted a bribe. **A donor who gives money in the hope of unspecified future assistance does not agree to exchange payments for actions.** No bribe thus occurs if the elected official later does something that benefits the donor. **On the other hand, if a donor . . . makes a contribution so that an elected official will do what [the donor] asked him to do, and the official . . . accepts the payment with the same understanding, the donor and the official have formed a corrupt bargain. That agreement makes the difference between a run-of-the-mine contribution and a bribe.**

707 F.3d 607 (emphasis supplied).

The above passage demonstrates that for criminal liability for extortion or bribery in the context of campaign contributions, there must be an explicit *quid pro quo* that is clear and unambiguous, meaning that: **(1)** the link between the official act and the payment or benefit — the pro — must be shown by something more than mere implication, and **(2)** there must be a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are *conditioned* upon each other. Without this, the line between permissible and impermissible communications would be nearly impossible to ferret out, which rightly concerned both this Court and the Supreme Court.

The Supreme Court has addressed this, and once more, the best evidence of the of how to treat "explicit" in this context comes from recalling the facts of *McCormick* itself. Whatever an "explicit" *quid pro quo* might entail, it must be more explicit than

the exchange in *McCormick* — in which the Court reversed the conviction for lack of a sufficiently "explicit" *quid pro quo*. The basic structure of the exchange in *McCormick* is analogous to that alleged in this case. In *McCormick* (as here) there is: **(1)** a clear *quid* (contributions to the politician's campaign); **(2)** a *quo* unartfully conveyed (in *McCormick*, sponsoring particular legislation favorable to the lobbyist's clients, which is less clear here); and **(3)** circumstantial evidence supporting a *pro*. There was really no question in *McCormick* that the *quid* and the *quo* were clear and unambiguous, and yet the Court reversed.

*McCormick*'s point was that **the *pro* itself must be clear and unambiguous** — and characterized by more than temporal proximity, winks and nods, and vague phrases like "I will do my best to hold."  Put differently, *McCormick*'s holding demonstrates that a mere or seeming *quid* for a *quo* is not enough for criminal liability in the campaign finance context.  If that feature — an exact exchange between a specific *quid* and a specific *quo* — is all that is necessary to make a *quid pro quo* "explicit," then the Supreme Court would have affirmed the conviction in *McCormick* rather than reversing.

Based on these principles, lower courts across the country have applied *McCormick*'s explicit *quid pro quo* requirement, including at the motion to dismiss stage, to all manner of alleged political bribery cases involving campaign contributions, regardless of what statute they are charged under – including the statutes charged in this case, 18 U.S.C. §§ 666 and 1343/1346. *See United States v. Donagher*, 520 F. Supp. 3d 1034, 1044-45 (N.D. Ill. 2021) (granting motion to

dismiss bribery charges under 18 U.S.C. § 666 in light of *McCormick*; "the Court concludes that the government must allege an explicit *quid pro quo*, as an implied element of the offense, where the 'thing of value' under § 666(a)(2) consists of a campaign contribution."); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849–50 (E.D. Pa. 2018) ("Although *McCormick* involved a prosecution for Hobbs Act extortion under color of official right, courts have applied its explicit *quid pro quo* requirement to prosecutions for honest services fraud and bribery when the thing of value offered in exchange for an official act is a campaign contribution."); *United States v. Menendez*, 132 F. Supp. 3d at 644 (granting motion to dismiss bribery counts under 18 U.S.C. § 201 for failure to meet *McCormick*'s "heightened pleading standard" requiring an explicit *quid pro quo*).[5]

## IV. The Indictment Does Not Adequately Allege a Requisite Explicit *Quid pro quo*

### a. The Indictment Fails to Allege an Essential Element of the Offense

The allegations in the Indictment do not come close to meeting the *McCormick* standard. The Indictment does not allege that any promises or agreements – explicit, express, or otherwise – were made to union representatives or lobbyists, or at any

---

[5] Indeed, the federal government has previously conceded in other cases that *McCormick* applies to prosecutions under 18 U.S.C. §§ 666 and 1343/1346 where the alleged bribe is a campaign contribution. *See, e.g.*, *Pawlowski*, 351 F. Supp. 3d at 849 ("[T]he parties agree [in a bribery prosecution under § 666] that where the '*quid*' or thing of value offered, is a campaign contribution, the Government must prove a *quid pro quo* that is explicit – i.e., an explicit *quid pro quo*."); *Menendez*, 132 F. Supp. 3d at 641-43 ("The government has not disputed the application of the *McCormick* requirement to the bribery and honest services fraud charges . . . ." (citation omitted)). *See also United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act: absent some fairly explicit language otherwise, accepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act.").

point thereafter. And, although the bribery statute (18 U.S.C. § 666(a)(1)(B)) and Hobbs Act do not, on their face, contain any requirement to show an explicit *quid pro quo* agreement, the principles laid out above demonstrate that an *explicit quid pro quo* is an "implicit element" of each statutory offense, such that it must be pleaded in the Indictment. *See United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000); Wayne LaFave et al., 5 Crim. Proc. § 19.3(b) (4th ed.) (2021) ("If courts have added a significant refinement in the interpretation of a particular statutory element, that element often must be pleaded as interpreted rather than as stated in the statutory language, especially if the judicial interpretation substantially limits the scope of the statutory language.").

Because the Indictment fails to allege an essential element of the crime, the Indictment must be dismissed because there is no assurance that the Grand Jury considered that essential element. *United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021), is instructive. In *Donagher*, the court dismissed an indictment's federal bribery charge in the campaign finance context precisely on these grounds, as it thoughtfully observed:

> [E]nsuring that the grand jury considered the explicit quid pro quo element in the context of campaign contributions is anything but a technicality; to the contrary, given the controlling law, doing so is necessary to shield ordinary, constitutionally protected campaign financing activities from criminal prosecution.

> *Id*. at 1046 (citing *McCormick*, 500 U.S. at 271-73).

### b. Even when Assumed True, the Allegations Contained in the Indictment cannot, as a Matter of Law, Support a Finding that an Explicit *Quid Pro Quo* Agreement Existed

Even if the Indictment is read to imply that an explicit *quid pro quo* existed between Mr. Inman and the MRCCM, the facts therein could not support such a finding as a matter of law. The allegations in this case are far weaker than those in other cases where courts have dismissed the bribery charges at the indictment stage under *McCormick*. And, although the texts included in the Indictment show back and forth about contributions and possible votes, they could not support a finding that Mr. Inman's was in *explicit* agreement to vote 'No' in exchange for a campaign donation, because they contain Mr. Inman's advice and information about the political realities faced by him and other Republican Representatives in the Michigan House. Accordingly, Counts I and II of the Indictment must be dismissed as a matter of law.

To support the Indictment, the Government provides two text messages from June 3, 2018, the first to the MRCCM representative, and another to a lobbyist retained by MRCCM.

The first June 3 text reads:

"Hi [Person A], I hear the prevailing wage vote may be on Wenesday (sic). In my opinion, We all need some more help! Carpenters have been good to me, where are the rest of the trades on checks? We only have 12, people to block it. You said all 12 will get $30,000 each to help there campaigns. That did not happen, we will get a ton of pressure on this vote. [Person B and Person C] will go to the longest neck hold on this one. I have heard most got $5,000, not $30,000. Its (sic) not worth losing assignments and staff for $5,000, in the end. They will give you the check back. I am not sure you can hold 12 people for the only help of $5,000. My suggestion is you need to get people maxed out, on Tuesday, *I will*

*do my best to hold.* [Person C] will pull assignments for next term on this
vote. You have no idea the pressure on this one for [Person B's state]
race, to pull this off for the tea party. People will not go down for $5,000,
not that we dont (sic) appreciate it. Please get with the all the trades by
Monday, I would suggest maxing out on all 12, or at least doubling what
you have given *them* on Tuesday, asap, we never had this discussion,
Larry"

Indictment, ECF No.1; PageID.2, ¶ 6 (emphasis supplied).

The second referenced text sent the same day to a lobbyist retained by the
union is nearly identical but for a salutation, an introductory phrase to the first
sentence, removal of the word "them" in the last sentence, and an abbreviated
"signature."  That text reads:

We all need some more help! Carpenters have been good to me, where
are the rest of the trades on checks? We only have 12, people to block it.
[Person A] said all 12 will get $30,000 each to help there (sic) campaigns
That did not happen, we will get a ton of pressure on thst (sic) vote,
[Person B and Person C] will go to the longest neck hold on this one. I
have heard most got $5,000, not $30,000. Its (sic) not worth losing
assignments and staff for $5,000, in the end. They will give you the check
back. I am not sure you can hold 12 people for the only help of $5,000.
My suggestion is you need to get people maxed out , (sic) on Tuesday, I
will *do my best to hold.* [Person C] will pull assignments for next term
on this vote. You have no idea the pressure on this one for [Person B's
state] race , (sic) to pull this off. People will not go down for $5,000, not
that we dont (sic) appreciate it. Get with the all the trades by Monday ,
(sic) I would suggest doubling what you given on Tuesday, asap, we
never had this discussion, get with [Person A]. L"

*Id*. ¶ 7 (emphasis supplied).

Each texts' beginning references the prevailing wage vote in which the union
was interested.  It then describes the political realities of Mr. Inman and other party
members with respect to the need to raise money for the upcoming election.  The text
mentions the financial realities facing possible supporters, and gives a garbled but

logical description of what others might likely do because of the upcoming needs for campaigns, and that they would have campaign issues surrounding their support. Mr. Inman gives the union person and the lobbyist practical advice regarding the political pressure on Republicans who might be supportive of their position.

There is no explicit proposed *quid* or *quo* to support the finding of an explicit *pro*. The only possible *quid* here is to "do my best to hold." *Id.* The only possible *quo* is an unspecified number between $5000 and $30,000. *Id.* The lack of a clear *quid* or *quo* should end the inquiry as a matter of law.

Moreover, even if the above unclear *quid* and *quo* are sufficient at this early stage in the case, the Indictment is fatally flawed because there is no clear *pro*. *McCormick*'s point was that the *pro* itself must be clear and unambiguous — and characterized by more than temporal proximity, winks and nods, and vague phrases. Here, there is no agreement, nor is there any indication that Mr. Inman tried to reach an agreement. Indeed, Mr. Inman's proclamation that he "will do my best to hold," clearly indicates that his actions would not be influenced by any potential actions or contributions by the union.

The other texts the Government cites in the Indictment are a June 4, 2018 text to the union person that merely says: "I will text you tomorrow to make sure we have a solid 12 no votes to block the prevailing wage , (sic) Larry". *Id.* ¶ 8. And another on June 5, 2018: "Hi [Person A], how are you! I have Breakfast event on Wed morning at Karobe , Governors room , 7:30am to 9am , hope you can make it :) and see if there are checks you can get ,thanks ! Larry Inman". *Id.* ¶ 9. As with the previous texts, there

is no explicit *quid pro quo* here. The most these texts evidence is a statement that he would inform the lobbyist of the status of the votes in which she was interested, and then a day later inviting her to a Breakfast fund raiser which is an everyday occurrence in Lansing, particularly leading up to a campaign season. Both of those are perfectly legal under the standards discussed at length here previously.

Overall, the evidence contained in the Indictment is insufficient to allege an explicit *quid pro quo* agreement and thus cannot support a finding of guilt for either two Counts. To hold otherwise, in the context of Mr. Inman discussing legal campaign contribution, would blur the distinctions between legal and illegal discussions regarding campaign contribution.

Once more, it is pertinent to end the analysis where the Supreme Court began in *McCormick*. There, as described above, on appeal was the decision of the Court of Appeals which had adopted a multifactor test to determine whether campaign contributions were "illegitimate, extortionate payments" that looked to factors including "whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor; whether the official had supported legislation before the time of the payment; and whether the official had directly or indirectly solicited the payor individually for the payment." *Id*. at 271-72. The Supreme Court fully rejected this test, concluding that, even if each of those inquiries went against McCormick "as they very likely [did] in the Court of Appeals' view," **he still would not have violated the Hobbs Act**. *Id*. at 272. Instead, the Supreme Court held that the receipt of campaign contributions is criminal under the statute "only if the

payments are made in return for an ***explicit promise or undertaking*** by the official to perform or not to perform an official act." *Id*. at 273 (emphasis added).

Mr. Inman's alleged activities are much less explicit or coherent than those at issue in *McCormick*. The Supreme Court reversed on more extensive and particular facts than those even alleged here, and consequently, the alleged facts are not enough to support the remaining charges in the indictment. This Court should follow the rule of *McCormick* and dismiss Counts 1 and 2 in this matter.

## Conclusion

Based on the forgoing argument and analysis, Mr. Inman asks the Court to find that the Indictment alleges insufficient facts to provide proper notice of an explicit *quid pro quo*, consequently find that Counts I and II are not supported by law, and dismiss those remaining counts and this case.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated: February 13, 2023

/s/ Parker Douglas
PARKER DOUGLAS
Assistant Federal Public Defender
50 Louis, NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420

/s/ Areeb Salim
AREEB SALIM
Attorney Fellow
50 Louis, NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420