UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                          No. 1:19-CR-117-RJJ

v.                                        Hon. Robert J. Jonker
                                         U.S. District Judge

LARRY CHARLES INMAN,

                Defendant.
_____/

R. 188-1 EXHIBIT

OPINION OF RICHARD I. FREDRICK, PH.D., LLC

**RICHARD I. FREDERICK, PH.D., LLC**
**Licensed Psychologist**

February 16, 2023

Re:  United States v. Larry Charles Inman, Case no. 1:19-cr-117

Federal Public Defender
Western District of Michigan
50 Louis Street, NW, Ste 300
Grand Rapids, Michigan  49503

Dear Attorney Douglas,

Please find my opinions regarding the case involving Larry Charles Inman below.

* * *

## I.    Background

### a.  Qualifications and Experience

My name is Richard I. Frederick.  I am engaged in the private practice of psychology in the state of Minnesota.

I earned a doctoral degree in Clinical Psychology from Oklahoma State University in 1986. I earned a master's degree in mathematics with an emphasis in statistics from Texas A&M University in 2004.  I completed a post-doctoral residency in forensic psychology at the Whiting Forensic Institute in Middletown, Connecticut, in 1990. I am a psychologist continuously licensed without interruption since 1988, and engaged full-time in the practice of forensic psychological assessment since 1988.  I also am licensed as a psychologist in the States of Missouri, Arkansas, Oklahoma, Iowa, Florida, Kansas, Texas, Wisconsin, Louisiana, and Michigan.

My professional activity includes 23 years of service to the US Navy as an evaluating and treating psychologist, including assignment in 2003 to the Combat Stress Unit, 4th Medical Battalion, I Marine Expeditionary Force, mobilized to a combat zone for Operation Iraqi Freedom. My role in the US Navy included assessment and testimony for many courts-martial as a mental health expert.  I retired as a US Navy Captain in 2008.  I consult to prosecutors and defense

attorneys in the US Air Force and US Army.  Most of these cases related to sexual misconduct while under the influence of alcohol or other substances.

I am board certified by the American Board of Professional Psychology, with a specialty in Forensic Psychology since 1996.  I was on the Board of Directors for the American Board of Forensic Psychology (ABFP) from 2006 for six years.  I was the National Chair of Examinations for ABFP for three years beginning in 2008 and president of ABFP in 2011.  I am board certified by the American Board of Assessment Psychology since 2007.

From 2008 through 2016, I continually developed and coordinated 50 to 60 full-day continuing education workshops concerning the specialty of forensic psychology as the co-chair of continuing education for the American Academy of Forensic Psychology.  These workshops were presented by a variety of top clinicians and researchers in the discipline of forensic assessment.

From 2011 through 2016, I was a professor of psychology for the Chicago School of Professional Psychology, where I taught graduate-level courses in law and mental health and research design. I taught graduate and undergraduate courses in psychology, statistics, research design, algebra, and pre-calculus at a variety of schools from 1995 through 2016.

I have personally presented since 1998 over 70 full-day continuing education workshops to practicing psychologists in the United States, Canada, Germany, Australia, and New Zealand, on the topics of forensic psychological assessment and the practice of assessment of malingered cognitive impairment, malingered psychopathology, and other feigned disorders.

I authored a widely-used and accepted psychological assessment instrument published by the nation's largest publisher of psychological tests.  The *Validity Indicator Profile* has been in continual release world-wide since 1997.  The *Validity Indicator Profile* is a psychological test used in forensic assessments of cognitive abilities to discern the likely approach to testing exhibited by the person being tested.  It is a test used for the evaluation of malingering.  Since 1997, I have continually received a royalty from the sale of this test and its various reports.

As a recognized expert in forensic psychological assessment, I was selected for membership on the American Psychological Association's *Committee on Psychological Testing and Assessment* from 2011 to 2013.  Among its other responsibilities, that committee was responsible for reviewing, critiquing, and approving the in-process revision of the current (2014) *Standards for Educational and Psychological Testing.*  The *Standards* promotes the sound and ethical use of tests and provides a basis for evaluating the quality of testing practicing.

In 2014, I was selected by the American Academy of Forensic Psychology for its annual award for Distinguished Contributions to Forensic Psychology.

My scientific activity includes original research, writing, and direct involvement in the scientific peer-review process.  I have many original research papers in peer-reviewed, widely-read journals, including *The Clinical Neuropsychologist*, *Psychological Assessment*, *Behavioral Sciences and the Law, Journal of Head Trauma Rehabilitation*, *Assessment*, *Journal of Forensic Neuropsychology, NeuroRehabilitation*, *Journal of Clinical and Experimental Neuropsychology*,

*Archives of Clinical Neuropsychology*, *Law and Human Behavior*, and *Journal of the American Academy of Psychiatry and the Law*. Additionally, I have published a number of books and books chapters in the area of mental health law and forensic psychological assessment.

My professional activity has included involvement in the scientific editorial process. I have served on the editorial boards for *Assessment* and for *Behavioral Sciences and the Law*. I have also served as an ad hoc reviewer for *Psychological Assessment*, *Journal of Personality Assessment*, *Law and Human Behavior*, *Archives of Clinical Neuropsychology*, *Journal of Clinical and Experimental Neuropsychology*, *Journal of Forensic Neuropsychology*, *NeuroRehabilitation*, *Psychological Injury and Law*, *The Clinical Neuropsychologist*, and *Psychology, Public Policy, and the Law*.

My professional activity includes 20 years as expert witness for the US Department of Justice, involved in hundreds of evaluations of criminal defendants for criminal responsibility, competency to proceed, and dangerousness to others. I have produced neutral forensic psychological assessments and provided expert testimony for all federal circuits and numerous federal districts. I retired from the US Department of Justice in 2012.

Since my retirement from the federal government, I have been able to work in forensic psychological matters without restriction. I regularly consult to attorneys on matters pertaining to the proper interpretation and application of psychological test information and the reliability and validity of mental health evidence. My regular and routine work involves reviewing the accuracy, reliability, validity, and appropriateness of psychological test data that have been generated by psychologists in litigated and criminal matters. Part of my review of evidence generated by psychological experts includes the review of videorecorded neuropsychological assessments. I have reviewed over 60 video recordings of such assessments in litigated matters.

My current professional activities also include clinical assessments for courtroom matters, both criminal and civil. I provide clinical consultation to over 120 psychiatrists and provide neutral interpretations to them regarding tests administered in their assessments, using a variety of tests, including the Minnesota Multiphasic Personality Inventories (the MMPI-3 and the MMPI-2-RF). I provide about 600-800 such assessments per year.

A full catalogue of my prior expert experiences from the past six years is attached for your reference.

### b. Involvement in Case

Defense Counsel, Parker Douglas, approached me on this matter on January 9, 2023. You called me and told me that the defendant, Larry Inman, was charged with attempted extortion and solicitation of a bribe while serving as an elected representative of the State of Michigan. During this and subsequent phone calls, we discussed the facts of the case.

Following these discussions, I came to Grand Rapids on January 31, 2023, for a day-long interview with you, Attorney Areeb Salim, and Mr. Inman. I questioned Mr. Inman on many aspects of his history. I did not conduct any psychological testing because Mr. Inman's mental state at the time of his interview with me would not be relevant or dispositive regarding his mental

state during the period of early 2018.  I also spoke with you and Mr. Salim regarding the facts of the case and I asked questions about the required mental state for the offenses that Mr. Inman is charged with. Following the interview, I asked you to draft a letter detailing certain background legal information as a basis to provide my analysis of the events in question.  Thank you for providing that letter on February 9, 2023, the details of which I discuss further below.

After our discussions and reviewing your letter, the specific question I considered, and now answer in this opinion letter, is:

***Was Mr. Inman's capacity, judgment, and/or executive cognitive functions impaired in May and June of 2018 such he would have difficulty in distinguishing or be unable to distinguish how others might perceive his words, and that he was impaired from making such distinctions?***

This inquiry involves two elements: (1) What was the nature of Mr. Inman's impairment, if any? (2) How much impairment would have been necessary for Mr. Inman to have the above described difficulties?

I also note that, it is the province of decision makers (here, likely a jury) to conclude whether his documented behavior reached criminal action.  I am unconcerned with the issue of whether his acts were criminal. My only focus is to answer the above questions.

### c.  Materials Considered

To answer this question, I reviewed the following information:

- Trial testimony of Lisa Canada, Larry Inman, Trey Hines, Ashleigh Ackerman, Chatfield, Bellino, Daniel Pero, Timothy McGuire, Austin Bradley McGuire, Jim Kirsch, Noah Smith, Daniel Lathrop, Dave Fashbaugh, Walker Sharp, Kenneth Childs, and Final Pre-Trial Conference (excerpts regarding Dr. Baker).

- Legal Documents including the Indictment, Defendant's Notice regarding Diminished Capacity and associated Supplemental Disclosure.

- Mr. Inman's medical records through June 2018.

- Letter provided by Attorney Douglas explaining the legal landscape of this case, particularly regarding the importance of state of mind.

- Pictures of shoebox of pills referenced in trial transcripts.

As discussed, I also extensively interviewed Mr. Inman about his medical, mental health, and substance use history.

### i.  Transcripts

Mr. Inman claims that he was regularly abusing alcohol and hydrocodone in June 2018. He testified as such, and other testimony in his first trial contains some information about his

claims.   I have excerpted such information below, and provided a summary chart of my observations.

I have not explored the issue of his treatment for substance addiction in late 2018 and early 2019, and I have not included any statements he made at that later time about his condition in 2018.  It seemed to me that doing so would be time intensive and prove unlikely to offer more than Mr. Inman's testimony about the events.  The events after June 2018 are also not relevant to the inquiry you presented to me for this case.

## Testimony Excerpts

### Testimony of Trey Hines

**Questions by Prosecutor:**

*Q.* How long have you known Mr. Inman?

*A.* I've known him for, I believe, about three and a half. I interned for him the year before I started working as his legislative director.

*Q.* When you were working with Mr. Inman in May and June of 2018 did Mr. Inman ever appear to you to be mentally impaired?

*A.* He seemed like his attitude was changing.

*Q.* **So more of a personality issue change**?

*A.* **Yes.**

*Q.* Was there at any point when you talked with Mr. Inman in May and June of 2018 where you thought "This guy is just out there, he's high, he's not following, he's not tracking reality"?

*A.* **Yes, at certain points I would need to repeat things for him a number of times or I would have to get him back onto a train of thought. He would sort of go off in a different direction and I would need him to focus on whatever the issue was at hand**.

*Q.* So you observed a lack of focus by Mr. Inman?

*A.* I would say so, yes.

*Q.* And sometimes you had to repeat some things to him?

*A.* Yes.

*Q.* A state representative is a very busy individual?

*A.* Yes.

*Q.* Is it even busier when it's campaign season?

*A.* Yes, it is.

*Q.* A lot of appointments?

*A.* Uh-huh.

*Q.* A lot of campaign events?

*A.* Yes.

*Q.* A lot of fundraising?

*A.* Uh-huh.

*Q.* Plus all the business work, right?

*A.* Yes.

*Q.* And so you had to help him keep on track to keep everything moving forward?

*Q. (BY MR. O'CONNOR)* Was there ever a point in May and June of 2018 where Mr. Inman was not competent to discuss issues in the House of Representatives and make decisions on complicated issues when he was voting on official acts in the House of Representatives?

*A.* I don't believe so.

**Questions by Defense:**

*Q.* All right. **Was he in a lot of pain** at that point in time?

*A.* **Yes, he was.**

*Q.* And did you see how he was controlling his pain level?

*A.* Um, **he was taking prescription medication.**

*Q.* And did you at any point in time have some concern about the amount of prescription medication he was taking?

*A.* **It certainly seemed to be a lot**, yes.

*Q.* All right. Did you have occasion to see him put on a fentanyl patch?

*A.* I had never saw him put it on, but he had shown them to me, yes.

*Q.* Did you have any concerns about the use of prescription medications along with a fentanyl patch?

*A.* It -- I mean, with fentanyl being in the news, it certainly was concerning to me, yes.

*Q.* And did you express any opinion to anyone, either Representative Inman or anyone else, that you thought

Representative Inman might be -- **was in danger of losing his mental capabilities as a result of all the drugs he was taking?**

A. **I believe I had spoken with his campaign manager, Ashleigh Ackerman, at some point in time that it seemed like he was I guess you could say losing it, yes.**

Q. All right. When you say losing it, can you describe what you mean by -- when you say losing it?

A. **He became increasingly unable to focus. He wouldn't go along with what either I or she or his scheduler at the time were trying to get him to do, to go to events locally, to go to events in Lansing. He became increasingly obstinate about really doing a lot of things.**

Q. **Did he become forgetful? Did you see occasions where he forgot appointments or forgot meetings**?

A. **Yes, I did.**

Q. And what -- can you describe, what do you recall about that?

A. I remember him **forgetting to go to constituent meetings** in Traverse City. He would -- I would get a call -- we would get a call in the office on like a Friday that the constituent was where he was supposed to meet them and he hadn't been there. Or he would call us to try and reschedule that morning. Those sort of things.

Q. All right. And was this situation occurring during the summer months of 2018?

A. Yes, it was.

Q. Was he describing to you that he was **taking Norcos by the handful**?

A. He had said that, yes.

Q. Did he explain to you that **he had to take a lot of Norco before he could even get out of bed in the morning?**

A. He had said that, yes.

Q. **Did you see lots of prescription bottles around**?

A. Yes.

Q. And are those things that elevated your concerns regarding his potential for self-harm associated with the use of prescription medications?

A. Yes.

Q. All right. And was this true in June of 2018?

A. Um, it might have been. It was -- became increasingly apparent, I guess you could say, over the course of the summer.

*Q.* All right. Did you fear that he was in danger of becoming addicted or was addicted to these medications?

*A.* Yes, I did.

*Q.* Did you think he was addicted to them?

*A.* I -- I don't know if I would use that exact language. **I thought he was dependent on them**.

*Q.* All right. Was it your impression he was **taking these medications every day**?

*A.* Yes.

*Q.* You mentioned his loss of focus. Did you also see him come back from the House on occasion and crash on his couch?

*A.* Yes.

*Q.* And how long would he be asleep on the couch?

*A.* Probably at least 45 minutes to an hour.

*Q.* All right. And is that the -- now, you had been with him for a year at that point in time roughly?

*A.* Yes.

*Q.* So you're talking -- how about in 2017 and prior to this surgery, did you see any of these issues with Representative Inman?

*A.* No.

*Q.* So it was after the surgery in 2018 that this seemed to degenerate?

*A.* Yes.

**Questions by Prosecutor:**

*Q.* You don't pretend to have any professional or technical understanding of prescription medication?

*A.* No.

*Q.* Did Mr. Inman tell you when he added the fentanyl patch?

*A.* No, he did not.

*Q.* So you don't know when he started taking the fentanyl patch?

*A.* I do not.

*Q.* And so you have no idea if he was actually even on the fentanyl patch in May and June of 2018?

*A.* I do not.

*Q.* Did you ever go to the House business office and report any of your observations or concerns?

*A.* I did not.

*Q.* And you didn't live with Mr. Inman; is that right?

*A.* That is correct.

*Q.* So you have no personal firsthand knowledge of how many pills he was taking at home; is that right?

*A.* That's correct.

*Q.* Your observations would be limited to what you see during the day --

*A.* Yes.

*Q.* -- in the office? And besides the observations, you were hearing what Mr. Inman was telling you about his situation?

*A.* Yes.

**Questions by Defense:**

*Q.* So from the time you were driving him back and forth to Lansing in January of 2018 until this peak of a problem in December of 2018, **you saw increasingly degenerative issues associated with Mr. Inman's focus and his ability to concentrate**; fair statement?

*A.* Yes.

*Q.* And in the summer months, May and June of 2018, do you recall if you were receiving text messages or calls or statements from him that he's **taking hands full of Norcos** to stay up?

*A.* He would say things to that effect, yeah.

**<u>Testimony of Ashleigh Ackerman</u>**

**Questions by Defense:**

*Q.* All right. So you ultimately -- your role grew into that of campaign manager?

*A.* Correct.

*Q.* And at some point in time did you realize he was **taking prescription pain medications**?

*A.* Yes.

*Q.* And when did you start to realize that?

*A.* In 2014.

*Q.* All right. Did there come some point in time where you began to be **concerned about the amount of prescription pain medications** he was taking?

*A.* Yeah. I mean, I've always pretty much been concerned about the amount of medications he's been taking.

*Q.* All right. Tell us what your -- do you know what these medications were?

*A.* Um, at one point **he told me he was taking 18 Norcos a day is one**. I mean, that's the only time that I really had a number put and a name put to it.

*Q.* Did you ever **see him with prescription pain medications**?

*A.* Yes. I saw, yes.

*Q.* All right. Can you describe what you saw?

*A.* There was one time where -- you know, he always had like a -- like a **tote bag, you know, like full of prescriptions.** And there was one time when Trey was -- Trey Hines was driving him back after his stomach surgery, and I went into the guest room to I think collect -- to collect something, and there was a -- I think they were dumped out on the bed, and I mean, I would say it encompassed probably this much area of just **bottles, of orange prescription bottles**.

*Q.* Can you motion with your hand kind of over the top of that binder in front of you?

*A.* Yeah.

*Q.* About a **12-inch by 12-inch pile of bottles**?

*A.* Like a large pizza.

*Q.* Large pizza?

*A.* Yeah.

*Q.* All right. Did there come a point in time when you began to be **concerned about Representative Inman's cognitive abilities**?

*A.* Yeah. Yeah. **There was multiple times where we would have back and forths where he wouldn't remember things, and it was just increasingly frustrating to work with him**.

*Q.* Can you pinpoint a time period -- let me specifically direct you to his abdominal surgery when he was released from the hospital. I think we have testimony that that was in January of 2018. From that point in time through 2018 did you have observations with respect to Representative Inman that caused you concern?

*A.* Yes.

*Q.* Tell the jury please what you observed.

*A.* There were -- **there were times when we were supposed to -- we would have conversations for 45 minutes the night before like detailing plans of what we were going to do the next morning, and I know there was one day where I was literally sitting out in the rain waiting for him because we had described this whole -- he was going to pick me up and then -- we just had the whole thing planned out basically, and then he calls me and says, you know, "Where are you? This event already started."** And I said, "Well, I'm waiting out in the rain for you to come pick me up. We talked about this yesterday for 45 minutes. **Like how do you not remember this**?" And there would just be incidents like that. All the time where he just wouldn't remember things that happened. **He would, you know, kind of forget or go AWOL for a little bit and just not show up to things. I'd get calls from people that were concerned about his drinking,** but I don't -- I felt like that was more -- I never witnessed him drinking too much. I think it was a result of, you know, being on pain medications.

*Q.* **Did you ever see Representative Inman ingest one or two drinks and you were concerned about the impact that that amount of alcohol had on him**?

*A.* Correct, yes.

*Q.* Can you tell us about that, please?

*A.* I mean, with -- safe to say he's probably **one of the only people I've seen get drunk off one Bud Light**. I hate to say that, but . . .

*Q.* And did you realize at the time that you saw him in that condition that he also was taking these pain medications?

*A.* Yeah, **I'm sure he was taking his pain medication**. I didn't see him take it, but . . .

*Q.* Did you attribute that **combination of pain medications and alcohol** to the condition you saw?

*A.* Absolutely. Yes.

*Q.* Did he have your cell phone number?

*A.* Yes.

*Q.* Did you text with each other?

*A.* Yes.

*Q.* Did you receive text messages from Representative Inman in and around June and July of 2018 where he expressed to you his levels of pain?

*A.* Yes.

*Q.* Did you receive text messages where he also expressed the amount of pain pills he was taking?

*A.* Yes.

*Q. (BY MR. COOKE)* Let me try it this way, then: Do you recall Representative Inman at any point in time telling you he was **miserable in his lower back and he had pain down the back of his legs**?

*A.* Yes.

*Q.* Do you recall at any time Representative Inman expressing to you in a text that **he's doubled up on pain meds and it's not helping**?

*Q. (BY MR. COOKE)* Do you have a recollection of Representative Inman texting you that the difficulties he was having caused him pain with extensive walking and physical activity?

*A.* Yes.

*Q.* Do you recall Representative Inman telling you that **he had increasing pain, waking up at 3 a.m. with extreme lower back pain and extreme pain down my back side of both legs**?

*A.* Yes.

*Q.* Do you recall Representative Inman telling you that he felt that he had extensive spinal pain?

*A.* Yes. Yeah. It was becoming an issue with him knocking doors. I mean, he wasn't able to do it.

*Q.* And this would have been during the campaign season of 2018 as you recall?

*A.* Yes.

*Q.* Do you recall Representative Inman texting you that he feels that his spinal cord is inflamed causing more pain?

*A.* Yes.

*Q.* Do you recall Representative Inman telling you that his entire spinal cord is inflamed and pain pills are not cutting it anymore?

*A.* I don't recall that text message exactly, but . . .

*Q.* Would it refresh your memory to see the message?

*A.* Sure. Yes.

*Q.* All right. Did you at any point in time believe that **Representative Inman was overusing these prescription pain medications**?

*A.* Absolutely.

**<u>Testimony of Dr. Daniel Lathrop</u>**

**Questions by Defense:**

*A.* I was a podiatric physician and surgeon.

*Q.* What is a podiatric physician?

*A.* That's a doctor that specializes in reconstructive surgery of the feet and ankles.

*Q.* All right. And how long did you practice in that area?

*A.* Almost 48 years.


*A.* Yes. Larry Inman has a severely deformed arthritic right foot and ankle. He has a deformity called cavus foot, which is similar to a clubfoot in ways. **He's been plagued with chronic pain and problems with it for many years**. And so I saw him to manage that problem.

*Q.* All right. And how were you managing that problem?


*Q. (BY MR. COOKE)* How were you treating him for that, sir?

*A.* Well, I used a variety of modalities. I used physical therapy, exercises, foot braces, casts, cortisone shots, cortisone pills, anti-inflammatories, and some narcotics.

*Q.* What narcotics were you using to treat him?

*A.* I used Norco for Larry.

*Q.* All right. And what kind of prescription of Norco did you provide to him beginning in 2014?

*A.* I don't remember exactly, but I remember that it was Norco 10/324. Or 325. That means 10 milligrams of hydrocodone and 325 milligrams of acetaminophen, which is basically Tylenol. Plain Tylenol. And I prescribed for him about 1.3 pills a day to help manage his pain. That was just one of the ways, though, I treated him.

*Q.* I understand. And so your prescriptions were renewable every 90 days or so; is that right?

*A.* Pretty much. Depending on his symptomatology. Every time I saw him he had a sick foot and ankle. I didn't expect it to get better.

*Q.* And were your prescriptions at those 90-day refillables, were they a hundred tabs?

*A.* About 100 tabs, 125. And they are never refillable. He has to come back in and get examined.

*Q.* All right. Did you continue to refill those prescriptions as you saw him based on your examinations?

*A.* Yes, I did, as long as he had the symptoms he had.

**Questions by Prosecutor:**

*Q.* All right. And any time when you saw him every three months for all of that time period did he ever exhibit to you any signs that made you think he was not operating mentally?

*A.* No, **he always was completely oriented. We call it oriented times three**, yeah.

*Q.* And we can go through all those records, but there isn't going to be a single note in any of those pages that suggests that Larry Inman was not functioning mentally, is there?

*A.* No, sir.

**Questions by Defense:**

*Q.* All right. And you saw Larry, although you saw him regularly, it was like once a month or so; is that true?

*A.* No, I wouldn't say -- more like once every three months, right?

*Q.* Once every three months?

*A.* Yeah.

*Q.* So you didn't see him on a day-to-day basis when he was campaigning or talking to his staff or any of those things?

*A.* No.

*Q.* All right, sir.

<u>**Testimony of Noah Smith**</u>

**Questions by Prosecutor:**

*Q.* Where do you work?

*A.* I work at Capitol Services.

*Q.* What is Capitol Services?

*A.* Capitol Services is a multiclient lobbying firm.

*Q.* So you represent a variety of interest groups to lobby on their behalf?

*A.* Absolutely.

*Q.* And how long have you done that?

*A.* I've been a multiclient lobbyist since -- let's see, my oldest son is 14, so 14 years.

*Q.* Can you give us a sense of how long you've known Mr. Inman? How many years?

*A.* Well, about three and a half now.

*Q.* All right. In the three and a half years that you've known Mr. Inman have you ever interacted with him either in person, on the phone, or by text **where you concluded that he was confused or his mind wasn't thinking clearly?**

*A.* **No.**

*Q.* **And any indication that you observed that he was high or on drugs or was confused by something he may have been taking?**

*A.* **No.**

**Questions by Defense:**

*Q.* Now, this Capital Prime event where you saw Representative Inman, did you think he was intoxicated?

*A.* Eventually.

*Q.* Eventually during the evening?

*A.* Yes.

*Q.* And you felt he was intoxicated although you did not believe he had consumed a lot of wine?

*A.* I -- my recollection of that was that **he was intoxicated** because he did.

*Q.* Do you have a recollection of that event as we sit here?

*A.* Of that -- of the statement to Agent Ashcroft or of the dinner?

*Q.* Of the dinner, sir.

*A.* Yes, I remember the dinner.

*Q.* And is that your recollection, that he appeared to be intoxicated?

*A.* Yes.

*Q.* All right. And you also told Special Agent Ashcroft that **you did not believe he had consumed a lot**. Fair statement?

*A.* If that's what I told the special agent, that's what I told him.

*Q.* All right. Do you have a recollection of that yourself?

*A.* Some. He was drinking wine that night.

*Q.* All right.

*A.* I cannot -- I can't attest to exactly how much. I wasn't watching.

*Q.* Did you believe that **Representative Inman was scatterbrained?**

*A.* **That is sometimes a term that many people have used to describe Representative Inman**.

*Q.* Did you -- well, so other people think he's scatterbrained as well as you?

*A.* He could be.

*Q.* Well, did you say that in your statement that you think he's scatterbrained?

*A.* I think I said that.

**Testimony of Jim Kirsch**

**Questions by prosecutor:**

*Q.* And currently you're a lobbyist at Kelley Cawthorne; is that right?

*A.* Kelley Cawthorne, yes.

*Q.* Have you interacted with him enough to know who Larry Inman is in terms of when he's functioning normally?

*A.* I believe I do, yes.

*Q.* Okay. At any point around the time of the vote on prevailing wage **did you at any time observe anything with the defendant that would suggest that his mind was not processing things**?

*A.* **No.**

*Q.* **That he was not able to understand what he was doing?**

*A.* **No.**

*Q.* That he didn't understand what was being asked of him or what he was saying to you?

*A.* No.

*Q.* Did you see any of those at any point around June of 2018 when things were starting to percolate on prevailing wage?

*A.* I did not.

*Q.* **Did he always appear to be operating normally to you?**

*A.* **Yes.**

**Testimony of Lee Chatfield**

**Questions by Prosecutor:**

*Q.* You are currently the speaker of the House of Representatives in the State of Michigan, correct?

*A.* Yes, sir.

*Q.* And so it's fair to say that you got to know Larry Inman enough to know what he's like on a daily basis?

*A.* Yes.

*Q.* Was there ever an occasion, given the time in the House with the defendant, that **you felt like Larry Inman was not able to track a conversation you were having?**

*A.* **No.**

*Q.* **Was there ever a time where he was not able to understand a topic that you were talking about?**

*A.* **Not that I'm aware of, no.**

*Q.* Did you ever interact with him where he wasn't thinking logically?

*A.* To the best of my knowledge, no. Every person in the House thinks differently, and you find that out, but I think we -- **I did not anticipate at any time that he was not thinking logically.**

*Q.* Was he able to speak coherently?

*A.* Yes.

*Q.* Function as a legislator?

*A.* Yes.

*Q.* **Did you ever know him to be high on drugs?**

*A.* **No.**

*Q.* Did you ever take any action or make any recommendations that he not serve as a legislator because he was having any of those problems?

*A.* No.

*Q.* Would the same be true for the time period of May 2018 and June of 2018?

*A.* Can you restate the question?

*Q.* Yeah. With your interactions with him you just described you didn't see those problems that we just went through. I just want to make sure that was true in May of 2018 and June of 2018.

*A.* That is correct.

**Testimony of Larry Inman**

**Questions by Defense:**

*Q.* At some point in time did you have some subsequent surgeries?

*A.* Yes.

*Q.* All right. What happened, sir?

*A.* Um, I had a pain in the middle of the night in my lower abdominal area, drove myself to the hospital, and they determined in the emergency room that my appendix was about to rupture.

*Q.* And did you have an appendicitis then?

*A.* Yes.

*Q.* And did you have complications associated with that?

*A.* Yes.

*Q.* What happened?

*A.* Well, it wasn't much later, maybe three, four days, I'm back in the emergency room with extreme pain in the surgical area, and they took me to the surgical area and found that I had a punctured hole in my lower bowel.

*Q.* All right. And did you have a reparative surgery as a result of that?

*A.* Yes, sir.

*Q.* And how long were you in the hospital?

*A.* Well, that had to be at least two and a half weeks.

*Q.* And are we in this 2016 time period now?

*A.* That is my belief, yes.

*Q.* All right. And when you were discharged from the hospital were you given prescriptions of pain medication?

*A.* Yes, sir.

*Q.* Did you have substantial pain associated with that injury?

*A.* Yes, sir.

*Q.* Did you take regular doses of prescription pain medication as a result of that?

*A.* Yes, sir.

*Q.* Did you have complications then in latter 2016 into early 2017 with that surgery?

*A.* Yes, sir. I continued -- I went back to the hospital three different times and complained of severe pain in the surgical area. They sent me home twice. The third time I came back and insisted that they do an

exploratory surgery. The surgeon agreed and went in and determined that I had an infection, a cyst, sitting on top of my lower bowel where they originally had the surgery.

*Q.* When you first went in with that pain you were discharged and sent home, right?

*A.* Correct.

*Q.* And did you have -- in the middle of the night call for an ambulance?

*A.* That would have been -- yes. That would have been approximately that time.

*Q.* All right. And before you had that ambulance transport you in, did you take pain medication just to get up out of the bed to go?

*A.* Yes.

*Q.* Tell the jury how much pain medication you took just to get out of the bed to go back to --

*A.* I had already been consuming a number of Vicodin, that's Norco. And as pain continued to increase, I continued to increase my dosage. So I probably had probably 12 to 15 at that point in time. And there was no relief, so I was really concerned about something was really wrong and called for an ambulance.

*Q.* All right. And then when you returned to Munson Hospital did you have some additional surgery?

*A.* Yes, sir.

*Q.* What happened?

*A.* They had exploratory surgery, opened me up, and determined that I had an infection, cyst, on top of my lower bowel, so they had to redo the whole surgery all over again and clean me out and sew me up.

*Q.* All right. And was this an open surgery where they – or arthroscopic?

*A.* The appendix was scoped. And the other two surgeries they had cut me open --

*Q.* All right.

*A.* -- in the same similar area.

*Q.* Did you ultimately have some kind of a mesh inserted in your abdominal area?

*A.* Well, that was an additional area, but that was subsequent to these surgeries. But I had intestinal material coming out of my belly button after those surgeries, and I went into the hospital and they did a number of scans and determined I needed additional surgery and ended up having an umbilical hernia repair and ended up having what they said was a 13-inch square mesh in my stomach that they had to implant to secure the umbilical hernia operation.

*Q.* And that operation occurred sometime in early 2017?

*A.* That would have been -- that would have been in late '017, and then -- and then I was having difficulty with that surgery at the beginning of '018.

*Q.* All right. And we heard some testimony that in early 2018 it was necessary to have Brad McGuire and Trey Hines drive you back and forth to Lansing. Is that right?

*A.* Yeah. Well, in between those surgical procedures while they were employed with me I had Brad McGuire assist me driving back and forth because I was in a lot of pain doing those surgeries. And then with Trey, he ended up carrying over when I had the umbilical hernia surgery.

*Q.* All right. So were you prescribed prescription pain medication as a result of all of these surgeries?

*A.* Yes, sir.

*Q.* And were you taking those on a daily basis as a result of those surgeries?

*A.* Yes, sir.

*Q.* And **did your consumption of those prescription pain medications increase over time**?

*A.* Yes, sir.

*Q.* All right. In January of 2018 was Brad driving you back and forth to Lansing or Trey?

*A.* No, that would have been Trey.

*Q.* Was it painful for you to get back and forth to Lansing?

*A.* Oh, it was horrible. I mean every bump in the road I just screamed.

*Q.* All right. And when you returned to Lansing did you at some point in time have to have people assist you to get to your seat?

*A.* Yes. I was very weak. I was in a lot of pain. And I had asked the sergeants, that's the police within the House of Representatives, to help me walk between my office in the Anderson building to the Capitol because I was pretty frail, weak, and in a lot of pain. So I didn't want to fall and just continue to injure myself.

*Q.* Did you go to functions in 2018?

*A.* As best as I could.

*Q.* All right. Throughout that time period were you continuing to take these prescription pain medications?

*A.* Yes, sir.

*Q.* **At some point in time did those dosages of prescription pain medications become ineffective**?

*A.* Yes, sir.

*Q.* And what would you do?

*A.* **I would just take more.**

*Q.* All right. With respect to the June of 2018 time period did you have a regular regimen of ingestion of these medications?

*A.* Yes, sir.

*Q.* What was the regimen, please?

*A.* You get up, you take four or five. In the afternoon you take four or five or -- and then in the afternoon I was completely horribly in pain. I would take maybe 10 and lay down on my couch in the office. And at night when I went out to dinner with whomever or myself, **I ingested more of them and drank alcohol.**

*Q.* All right. And can you tell the jury, please, what kind of effect these medications had on you.

*A.* Well, it was different when I was on large doses of Norco versus the fentanyl patch, which eventually I got on. Taking large doses of Norco, or Vicodin, there's – with me -- I can't testify to anybody else -- there was like a peak of, you know, how much it would cover my pain level. And so, you know, I feel horrible about it, it was a bad choice in the long run for me, **but I did end up taking more Norcos to cover my pain. And eventually I got on a -- so while I was taking those Norcos or those Vicodins I was having trouble with memory, I was constantly falling**. **I was physically and mentally exhausted** and difficulty sleeping. And the main complaint I got from my staff was, you know, **I wasn't listening, I wasn't comprehending, and I was not memorizing** -- **I didn't have memory as to our previous day's discussion**. With the fentanyl, it did increase my ability to cope with pain, but it wasn't to the degree that it did satisfy the pain problem. And so I did take the fentanyl patch and additional Norcos to help me get through the day and the night.

*Q.* Well, how did the fentanyl patch, when you got the fentanyl patch, how did that make you feel?

*A.* Well, it took a couple days to kick in, but, you know, the fentanyl patch is like the ultimate pain medication for like people with cancer and those kinds of things. So, you know, it did help me at the beginning, and I did ramp down a little bit on the Norcos when I was taking the fentanyl patch. But the fentanyl patch, you know, it was like a super high. It was like, you know, you can walk again. You know, you could think -- you know, you could like get up and walk and put your suit on in the morning for God's sake. But that was short-lived. So it did help me in the beginning, but in the end I took the fentanyl patch plus the Norcos in large doses to get me through the day.

*Q.* All right. Let's move forward, then -- and you were doing that in June of 2018, that was your –

*A.* Yes, sir.

*Q.* -- protocol?

*A.* Yes, sir.

*Q.* And continuing out throughout 2018 was that your regimen as far as pain medications?

*Q.* All right. So how is it you could take 10 to 15 Norcos in any given day?

*A.* Well, I'm embarrassed to say this, but from at least 2012 to the beginning of this trial really I had been saving some of the prescription Norco -- Norcos. And, you know, we were talking in caucus about, you know, the possibility of these kinds of narcotics and pain pills probably going away, so I was concerned about that. But I did reluctantly take pills and save them for, you know, a hard day.

*Q.* **So you were hoarding medication,** sir?

*A.* **Yes, sir.**

*Q.* All right. And **did you keep the medication in a shoebox**?

*A.* Yes, sir.

*Q.* All right. Would you recognize that shoebox if you saw it?

*A.* It would be an orange Nike shoebox for gym shoes.

*Q.* Let me show you what I've marked as Defendant's Proposed Exhibit I. Do you recognize that box?

*A.* Yes.

*Q.* Sir, opening that box, were these the medications you were holding?

*A.* Yes, sir.

*Q.* So I marked these as Proposed Exhibits 1 through 19. Were these medications that you hoarded, sir?

*A.* Yes, sir. And there's a lot there.

*Q.* Is there a thousand of these pills or more?

*A.* Approximately a thousand.

**Questions by Prosecutor:**

*Q.* The content, sir, of your text message to Mr. Fashbaugh couldn't be clearer. You're telling him "Looks like prevailing wage is coming up. I've whipped undecided. I've got people all over me. If I vote no to repeal prevailing wage, I'm going to need a ton of campaign money." What isn't clear about that, sir?

*A.* Well, it was at 6:46 p.m. I probably was under a lot of pain medication and alcohol, so, you know, I don't recall sending the details of the text. I probably recall what I'm seeing here, but I don't remember saying something about a ton of campaign money. But I don't recall that part.

*Q.* All right. So on June 3rd of 2018 at 11:06 a.m. this text message goes to Lisa Canada, and your testimony is you have no recollection of sending this message?

*A.* I have no recollection of sending texts in June to anybody. But, you know, if you would like to break this down, I would love to talk to you about it.

*Q.* But you're the one who sends it at 11:06 a.m. on June 3rd of 2018, right?

*A.* Obviously I did based on your information from extracting my phone, but I don't recall sending the text.

*Q.* Well, it came from your phone, right?

*A.* Yeah.

*Q.* And we saw, you saw, you were here, Lisa Canada had it on her phone, right?

*A.* Yeah.

*Q.* So you don't dispute that this was sent to her?

*A.* I did not know I sent this until after the Indictment -- or the investigation.

*Q.* -- to two different people. It communicates the same message, but you send two different text messages to two different people on June 3rd at 11 in the morning three days before the prevailing wage vote.

*A.* Right. And my answer is I do not remember sending that text to Lisa Canada or to Jim Kirsch. Honestly I do not.

**Questions by Defense:**

*Q. (BY MR. COOKE)* On or about early June of 2018 were you complaining about pain to Ms. Ackerman?

*A.* Yes, sir.

*Q.* And were you doing that both in person and through your cell phone?

*A.* Yes, sir.

*Q.* All right. And do you recall what you were explaining to her as far as the levels of your pain?

*A.* Fairly high. Probably, I'm guessing, around 8 out of a 10. And that my spinal cord and my lower spinal area and the lower part of my back were in intense pain.

*Q.* All right. And did you complain to Ms. Ackerman at all or any of your staff about the travels, your travels back and forth to Lansing in that time period?

*A.* Yes. I was very open with my staff about the amount of pain I was having driving back and forth in my truck. Approximately three hours down and three hours back. And the trip really intensified the pain I had.

*Q.* All right. Did you also express to Ms. Ackerman or any of your staff the amount of pain medication you were taking?

*A.* Yes, I was --

*Q. (BY MR. COOKE)* Did you express to Ms. Ackerman or any of your staff the amount of prescription pain medications you were taking?

*A.* I do not recall telling my staff the approximate amount of opioid pain medication I was taking, however, they did know I was taking some. And I expressed to Ms. Ackerman, who is my campaign manager, that I was taking high dosages of Vicodin.

*Q.* All right. And what kind of dosages were you taking in June of 2018?

*A.* Yeah, they -- I believe those were 7.5/325 Vicodin tablets, and I was taking up to -- you know, approximately per day, you know, ramping up through the day and the night, probably anywhere from 20 to 25 probably.

### Summary Table of Observations Revealed in Testimony

| Witness | Relationship | Nature of contact | Observations |
|---|---|---|---|
| Trey Hines | Legislative director | Frequent, personal | Personality change<br>Not tracking<br>Lack of focus<br>"Losing it"<br>Forgetful<br>Taking lots of pain medicine<br>Poor concentration |
| Ashleigh Ackerman | Campaign manager | Frequent, personal | Taking lots of pain medicine<br>Saw all the medicine<br>Would not remember things<br>Frustrating to work with<br>Confused<br>Go 'AWOL' for a bit |

|  |  |  | Not show up to things<br>People tell her they are concerned about his drinking<br>Easily intoxicated by low volume of alcohol<br>In pain |
|---|---|---|---|
| Daniel Lathrop | Personal physician | Occasional, personal | No gross impairment |
| Noah Smith | Lobbyist | Occasional, casual | No gross impairment<br>No usual obvious intoxication<br>Saw intoxicated in public once; "consumed a lot"<br>Scatterbrained |
| Jim Kirsch | Lobbyist | Occasional, casual | Functioning normally |
| Lee Chatfield | Speaker of the House | Frequent, impersonal | Tracking conversations<br>Speaking coherently<br>Not obviously intoxicated |
| Larry Inman | Defendant |  | In frequent pain<br>Taking excessive pain medication<br>Drank alcohol with excessive pain meds<br>Physically and mentally exhausted<br>Hoarding pain meds for years<br>Under a lot of pain medication and alcohol<br>No recall of sending texts |

## Relevant Excerpts of Letter from Attorney Douglas

You note in your letter:

> As we discussed, this matter centers on whether Mr. Inman's statements in text messages to a union representative, Ms. Lisa Canada, and to a lobbyist assisting her, amounted to an illegal "*quid pro quo*" offer and exchange such that Mr. Inman had the requisite intent to commit the two crimes of which he is charged: 1)

Attempted Extortion; and 2) Solicitation of a Bribe. The jury instructions on the two charges from the previous trial, specifying the elements of both charges, are included.

In your letter, to help me understand and frame the potential consequences of substance intoxication related to specific intent, you cite the case of *McCormick v. United States* (1991), in which the US Supreme Court held (as you state):

> that receipt of a campaign contribution violated the statute only if the government could prove an explicit *quid pro quo* — that is, "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *McCormick*, 500 U.S. at 273. "This," the Court concluded, "defines the forbidden zone of conduct with sufficient clarity." *Id.* The Court provided further clarity as it explained its concern with criminalizing common political conduct:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator.... [C]ampaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done.... [T]o hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion....

> The receipt of [political] contributions is ... vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.

In our interview on January 31, I asked you to include in the letter a number of examples of how communication between parties might occur and how differences in these communications might be interpreted as evidence of criminality. You provided five scenarios from federal case

law that change facts slightly to highlight the nuances of what is illegal and legal in the process of making political promises and accepting monies from others.  These scenarios helped me understand how cognitive capacities might be sufficiently impaired by intoxication to make such nuances difficult to perceive or comprehend.

Of course, it is not my place to offer any thoughts on whether the charged behavior in this matter is criminal or not, but as you note in your letter to me, your theory of the case is that

> he did not make an explicit promise to exchange his vote for a campaign contribution, and that his capacity, judgment and/or executive cognitive functions were possibly impaired such he would have difficulty in distinguishing or be unable to distinguish how others might perceive his words, and that he was impaired from making such distinctions.

At the end of the examples regarding possible illegal *quid pro quo*, you note this:

> For criminal liability for bribery in the context of campaign contributions, there must be a *quid pro quo* that is clear and unambiguous, meaning that (1) the link between the official act and the payment or benefit — the pro — must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are conditioned upon each other.

### ii.  Pictures of Shoebox of Pills Referenced in Transcripts

Below are the pictures of the shoebox of pills that was referenced in the transcripts. The pictures were provided to me by Attorney Douglas.





**Conclusions and Explanation**

As I noted to you in our interview on January 31, there appears to be ample evidence in this case that Mr. Inman was ingesting excessive amounts of alcohol and opiates at the time of the alleged criminal activity (early 2018 through June 2018) to the extent that he exhibited impaired judgement, memory, and impulse control.  Cognitive impairment of the sort identified by witnesses, reported by Mr. Inman, and commonly associated with this sort of substance intoxication, can produce errors in fine discriminations when communicating with others.

The level of impairment required to impact judgement is inversely related to the difficulty of making a distinction between two actions. For example, consider the table below:

| **Two Actions** | **Difficulty distinguishing between actions** | **Level of impairment required to create confusion about distinction** |
|---|---|---|
| Murdering vs. Not Murdering | Easy | Severe |
| Threatening vs. Not Threatening | Less easy | Not as severe |
| Illegal possession of marijuana vs. legal possession of marijuana | Potentially difficult (e.g., jurisdiction, amount, culture of acceptance) | Minimal to Moderate |
| Following tax code vs failing to correctly follow tax code | Can be exasperatingly difficult to comprehend compliance vs. non-compliance, may need expert advice | Minimal |

| Conditioning *quid* upon *quo*; not conditioning *quid* upon *quo* | Potentially difficult (many elements and factors at play), may need expert advice | Minimal |
|---|---|---|

I note, of course, that my chart has no quantifiable basis, and I am sure there are other thoughts and rules and laws that might temper these assertions. My point is only that the consideration of "level of impairment" obviously depends on the complexity of the distinctions required by the actor, and that here, the level of complexity of the distinctions would have been high, and we would likely find disagreements about distinctions even among experts.

My opinions on the effects of Mr. Inman's alcohol use and opiates are based on my 35-year history of evaluating and treating substance-abusing sailors, Marines, inmates, and criminal defendants, and my review of the extant literature. I do note, however, that I am not a specialist in psychopharmacology or toxicology, although such advanced knowledge is not necessary to inform my opinion regarding Mr. Inman's judgment at the time of the relevant conduct.

Based on my experience and research, I note that the expectable effects of excess alcohol, opiates, and the mixture of the two drugs include:

- Confusion
- Drowsiness
- Mood shifts
- Impaired judgment
- Disinhibition

The intoxication arising from alcohol or opiates impairs *executive functioning*. Executive functioning refers to the capacity to run and organize our life, to plan and execute actions, and to use higher cognitive skills, such as reasoning, comprehension, and judgment. Effective short-term, working, and long-term memory are necessary elements of effective executive functioning. Some of the elements of executive functioning, which are quite vulnerable to the effects of intoxication are:

- Planning
- Focus
- Task Initiation
- Social Perception
- Defining and Achieving Goals
- Impulse Control
- Effective Observation
- Distraction Management
- Following Multi-Step Directions
- Effective Memory
- Cognitive Flexibility
- Processing Speed
- Staying Organized

- Time Management
- Stress Tolerance

This is a comprehensive list of those skills and abilities that are commonly impaired by alcohol and opiate intoxication.  The list might not be exhaustive, and I have ignored the obvious physical impact of intoxication—visual acuity, depth perception, coordination, and so on.  The general public is aware of the potential harm caused by being intoxicated during important times of working, operating machinery, and important interactions.

A number of charts exist to effectively communicate how little intoxication is needed to significantly impaired executive functions by intoxication.



| BAC | Predictable Effects |
|---|---|
| .02% to .04% | Lightheaded – Relaxation, sensation of warmth, "high," minor impairment of judgment |
| .05% to .07% | Buzzed– Relaxation, euphoria, lower inhibitions, minor impairment of reasoning and memory, exaggerated emotions (good and bad) |
| .08% to .10% | Legally Impaired – Euphoria, fatigue, impairment in balance, speech, vision, reaction time and hearing, judgment and self-control are impaired |
| .11% to .15% | Drunk – "High" reduced and depressive effects (anxiety, depression or unease) more pronounced, gross motor impairment, judgment and perception severely impaired |
| .16% to .19% | Very Drunk – Strong state of depression, nausea, disorientation, dizzy, increased motor impairment, blurred vision, judgment further impaired |
| .20% to .24% | Dazed and Confused – Gross disorientation to time and place, increased nausea and vomiting, may need assistance to stand/walk, impervious to pain, blackout likely |
| .25% to .30% | Stupor – All menal, physical and sensory functions are severely impaired, accidents very likely, little comprehension, may pass out suddenly |
| .31% and up | Coma – Level of surgical amnesia, onset of coma, possibility of acute alcohol poisoning, death due to respiratory arrest is likely in 50 % of drinkers |

## Mixing Alcohol and Hydrocodone, Oxycodone, or Morphine Can Be Deadly

When alcohol and strong prescription medications like hydrocodone, oxycodone, or morphine are mixed, the combination can be dangerous. Combining alcohol with opioids can lead to side effects such as:

- Nausea and vomiting
- Dehydration
- Changes in blood pressure
- Irregular heart rate and rhythm
- Cardiovascular instability
- Dizziness or loss of coordination
- Marked disinhibition
- Abnormal behavior
- Loss of consciousness
- Respiratory arrest
- Coma

It is well understood that mixing two depressant drugs has a catalyzing effect in which one drug promotes the actions of another.

Mr. Inman reports that he was significantly impaired by intoxication for an extended period, including the times of the alleged criminal behavior. He said he was mentally and physically exhausted, and he reported that his memory was spotty, faulty, or altogether absent for some events. If he was using alcohol and opiates in the manner he described, this is completely

credible—which is not the same as saying it happened as he reported.  It is certainly possible to be a believable scenario and to be false.

However, there is support for his claim from two witnesses.  These witnesses, Trey Hines and Ashleigh Ackerman, confirm his report of excessive alcohol and opiate abuse.  They confirm that he was forgetful, not tracking, readily intoxicated, unfocused, and unable to concentrate effectively—all predictable effects of alcohol intoxication, opiate action, and the catalyzing effects of mixing those drugs.  These witnesses had the opportunity and relationship to notice and to be concerned about these observations.

Neither of these two witnesses appear to claim that he was grossly impaired.  Consequently, when other witnesses, including Noah Smith, Jim Kirsch, and Lee Chatfiled, who had no deep involvement with Mr. Inman, testified that they did not observe gross impairment, incoherence, or obvious intoxication, their testimony does little to contradict the observations of Mr. Hines or Ms. Ackerman.

Based on the evidence I have reviewed, I conclude that at the time of the alleged criminal activity:

- Mr. Inman was using alcohol and opiates excessively
- He was often intoxicated or acting under the influence of these intoxicants
- At these times, he experienced predictable and common impairment to his executive functioning skills without typically becoming grossly impaired, incoherent, or unable to reason appropriately

Consequently, it is my opinion that at the time of the alleged criminal activity, his capacity, judgment, and/or executive cognitive functions were likely impaired such he would have difficulty in distinguishing or be unable to distinguish how others might perceive his words, and that he was likely impaired from making such distinctions himself.  He was likely sufficiently impaired during this time period by intoxication so as to experience significant difficulty in his capacity to discern and appreciate nuance in how he communicated and how others might understand his communication.


**Richard I. Frederick, Ph.D.**
**Licensed Psychologist**
**Michigan License:** ████992
**Exp.** ████2023

**Board Certified in Forensic Psychology**
**American Board of Professional Psychology**

**Board Certified in Assessment Psychology**
**American Board of Assessment Psychology**