UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,            No. 1:19-CR-117-RJJ

v.                   Hon. Robert J. Jonker
                     U.S. District Judge

LARRY CHARLES INMAN,

   Defendant.
_____/

## GOVERNMENT'S RETRIAL BRIEF

Defendant Larry Inman faces retrial on counts 1 and 2 of the indictment, which charges him with attempted extortion under color of official right, in violation of 18 U.S.C. § 1951, and solicitation of a bribe, in violation of 18 U.S.C. § 666(a)(1)(B). The United States submits this supplemental trial brief to address anticipated legal issues in the retrial of this matter.

  **I.**  **Inman's Written And Oral Statements To The Unions and The FBI Are Admissible At Retrial.**

Inman made a variety of written and oral statements that are admissible when offered by the government because they are admissions of a party-opponent. Federal Rule of Evidence 801(d)(2)(A) allows the government to admit the defendant's statements. Specifically, the following categories of statements are relevant and admissible at the retrial:

- Written statements Inman made in text messages he sent to third parties, including representatives of the

> Carpenters' union (Lisa Canada and Jim Kirsch) and the Electricians' union (Dave Fashbaugh) in the days before the prevailing wage vote on June 6, 2018.
>
> - Oral statements Inman made to Canada during a consensually monitored and recorded telephone call on June 19, 2018, in which Inman discussed his solicitation of money from Canada and his "Yes" vote repealing prevailing wage, and his apologies for how he handled those matters; and
>
> - Oral statements Inman made to an FBI agent on or about August 1, 2018, October 16, 2018, October 17, 2018, and December 7, 2018.

The relevant statements Inman made to the FBI are summarized as follows: On August 1, 2018, FBI agents executed a federal search warrant at Inman's residence to seize and search his cell phone. Inman agreed to a voluntary interview during the search. During the interview, Inman recalled discussing the prevailing wage issue with Canada and other union representatives in the months leading up to the vote. Inman specifically recalled details concerning the Carpenters' union presentation to him and others in November 2017 at the Capitol Prime restaurant, including that he met with Canada at the event. Inman claimed that Canada told him that $30,000 was available for campaign contributions. He also recalled talking to

2

Canada on the phone about prevailing wage. With respect to campaign contributions, Inman also recalled the contributions made by the Carpenters' union and others to his campaign, including a $4,000 contribution he did not deposit. Inman said he did not deposit that check because he was not sure how he was going to vote on the prevailing wage repeal. He eventually returned that check to the Carpenters' union after he voted "Yes" to repeal the prevailing wage law.

During the interview, Inman flatly denied soliciting campaign contributions from Canada or the Carpenters' union before casting his vote on the prevailing wage law. Specifically, Inman denied having any conversation with Canada about receiving $10,000 or any other amount in connection with his vote on the prevailing wage repeal. He denied sending any text messages regarding $30,000. He denied having any conversation with Canada, or anyone else, about receiving a campaign contribution in return for a specific vote on prevailing wage. Inman denied ever asking Canada for more money during the time leading up to the prevailing wage vote. Inman specifically denied sending text messages seeking more money from Canada or the Carpenters' union, denied sending a text message referring to $30,000, denied asking Canada for $30,000, and denied asking for any money from any trade committee, or from Canada. At the conclusion of the interview, Inman said that everything he told the FBI was the truth.

In October 2018, Inman contacted the FBI agent who interviewed him in August. Inman told the agent that he panicked leading up to the prevailing wage vote and that his text messages indicated that he pressured the Carpenters' union for money.

In a second interview with the FBI in December 2018, Inman claimed he had no memory of the June 2018 text messages he sent to Canada and Jim Kirsch referencing $30,000. He said that his reference in his text message to Canada that "12 will get $30,000 each" was an error. He also claimed no recollection exchanging text messages with Fashbaugh of the Electricians' union about campaign contributions and the upcoming prevailing wage vote.

However, during that interview, Inman recalled many other details about his attendance at the November 2017 union presentation and his conversation with Canada that night. He also recalled sending Canada a text message inviting her to a fundraising event (including the request that she bring checks). Additionally, Inman said that he recalled with clarity the June 19, 2018, phone call from Canada about his vote on prevailing wage but denied talking about the $30,000 during that call. Inman denied he was seeking $30,000 even though other text messages on his phone documented that he needed an additional $30,000 to bring his campaign account balance up to $70,000. Inman stated that the fact he needed an additional $30,000 to bring his campaign account up to $70,000 was not at all related to the $30,000 request in the text messages. Inman also told the FBI he began taking Norco

4

in May 2018 and that, as of December 2018, he was on a fentanyl patch and taking four Norco pills a day.

Inman's statements to the FBI remain relevant to the jury's determination of whether Inman intended to communicate a quid pro quo of his vote on prevailing wage in exchange for an additional campaign contribution. Inman's defense to the charges is that he did not *intend* to communicate a quid pro quo to the union due to his physical and mental state at the time he sent those messages. The core of Inman's defense at the first trial was that he could not recall sending, and did not even understand, his text messages to Canada or Kirsch. The government must be able to test Inman's claims and representations by introducing evidence demonstrating his ability to recall the details of many of his actions and statements going back to his first meeting with Canada in November 2017, the recorded phone call with Canada in June 2018, and his ability to recall details of several events (other than his solicitation of money on the prevailing wage issue right before his vote) during his August and December interviews with the FBI.

Nor is that evidence barred by the first jury's acquittal on Count 3, the false statement charge. Admission of evidence relating to a crime that a defendant had previously been acquitted of committing does not violate principles of double jeopardy or due process. *See Dowling v. United States*, 493 U.S. 342, 348 (1990) (affirming admission of evidence at federal bank robbery trial that defendant committed a home invasion for which he was previously

5

acquitted); *see also United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361-62 (1984) ("[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt.") "If a second trial is permissible, the admission of evidence at that trial is governed by normal evidentiary rules—not by the terms of the Double Jeopardy Clause." *Currier v. Virginia*, 585 U.S. ___, 138 S. Ct. 2144, 2154 (2018). The Supreme Court in *Currier* further observed that its holding in *Dowling* did not depend on the facts in that case—that the two trials involved two different criminal episodes. *Id.* at 2155.

Double Jeopardy principles do not apply to Inman's statements because, as *Dowling* noted, there are any number of possible explanations for a "not guilty" verdict, *Id.*, at 352, because "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge." *United States v. Watts*, 519 U.S. 148, 155 (1997). In other words, "'an acquittal is not a finding of fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . . ." *Id.* (quoting dissent in *United States v. Putra*, 78 F.3d 1386, 1394 (9th Cir. 1996)).

Similarly, the Court of Appeals in this case expressly stated that it was not deciding why the jury found Inman not guilty on Count 3. *See United States v. Inman*, 39 F.4th 357, 366-67 (6th Cir. 2022) (emphasizing that the Court

6

was not determining if Inman was intoxicated or forgot about the texts, if the jury believed all of his testimony, or whether any of the government's proffered possibilities for the verdict were likely the rationale for the acquittal). Moreover, the jury's verdict on Count 3 only applied to the following statements:  that Inman had not communicated with Lisa Canada or the Carpenters' union for the purpose of soliciting campaign contributions before his vote on prevailing wage and specifically denied soliciting $30,000. (R.1: Indictment, PageID.7.) Nothing in the *Inman* decision precludes admission at retrial of the entirety of Inman's statements to the FBI concerning his actions and communications pertaining to the prevailing wage vote.

Finally, Inman cannot seek the admission of his own prior statements. *See* Fed. R. Evid. 801(c), 802; *United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013). The rule of completeness, Fed. R. Evid. 106, is not an exception to the hearsay rule. *Id.* (quoting *United States v. Shaver*, 89 F. App'x 529, 533 (6th Cir. 2004)). Inman cannot avoid testifying under oath by seeking to admit out-of-court statements that he wishes the jury to hear that the government is not introducing into evidence in its case-in-chief.

## II. Inman's Sworn Testimony Is Admissible at Retrial.

Defendant's prior sworn trial testimony is admissible in the government's case-in-chief because he waived his right not to testify at the first trial and those statements are not hearsay. *See* Fed. R. Evid. 801(d)(1)(A) & (2)(A). The government intends to introduce portions of his testimony through

7

an FBI agent by having the agent read Inman's answers to certain questions into the record.

In *Harrison v. United States*, 392 U.S. 219 (1968), the government admitted three confessions of the defendant at his original trial. To counter those confessions, which the defendant contended were unlawfully obtained, the defendant testified and was convicted. He appealed, and the appellate court reversed because it found that the confessions were unlawfully obtained. *Id.* at 220-21. At the retrial, the court admitted the defendant's trial testimony over defense objection that the defendant only testified to counter admission of the illegal confessions and that admitting defendant's trial testimony would be improper. *Id.*

The Supreme Court found that admission of the defendant's testimony at the retrial was improper because that testimony was prompted solely by the government's admission of his unlawfully obtained confessions. *Id.* at 223-226. However, the Supreme Court also made clear that "we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." *Id.* at 222. After a defendant takes the witness

8

stand in his own defense, he waives the protection afforded by the privilege against self-incrimination. *See United States v. Doremus*, 414 F.2d 252, 253 (6th Cir. 1969).

The general rule referenced in *Harrison* appears to be universally accepted. *See Use in Subsequent Prosecution of Self-Incriminating Testimony Given Without Invoking Privilege*, 5 A.L.R.2d 1404, § 3 ("[I]t has generally been held that a defendant who has taken the stand in his own behalf in a criminal prosecution . . . has waived the privilege as to the testimony given so that it may be used against him in a subsequent trial of the same case.") *See also Heller v. United States*, 57 F.2d 627, 629 (7th Cir. 1932) ("If there were a second trial of the same case, any admissions he made as a witness upon the first trial could be shown against him on the second, although on the second he did not testify.").

Several other courts implicitly accept that using a defendant's trial testimony at his retrial does not violate the Fifth Amendment, as the trial testimony was used by the government upon retrial without discussion of the right of self-incrimination. *See United States v. Ndubuisi*, 460 F. App'x. 436, 439 (5th Cir. 2012) (addressing hearsay objections to admission of defendant's trial transcript at retrial); *United States v. Reed*, 227 F.3d 763, 769 (7th Cir. 2000) (appropriate for government to read entire trial transcript of defendant's testimony at retrial because there is no requirement that defendant's statements be inculpatory for admission as a party opponent); *United States v.*

9

*Glover*, 101 F.3d 1183, 1189-92 (7th Cir. 1996) (upholding trial court's decision not to admit entire transcript of defendant's trial testimony at his retrial because defendant failed to demonstrate why selections he wanted admitted were required under rule of completeness).

Inman cannot offer his own prior sworn statements instead of testifying at the retrial because those statements constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802. Specifically, hearsay includes statements that "the declarant does not make while testifying at the *current* trial or hearing[.]" Fed. R. Evid. 801(c)(1) (emphasis added).

### III. Records of a Regularly Conducted Activity.

The government will seek to admit certain documents and records under the "business-record" exception to the hearsay rule. The business records the government will seek to admit include bank records, the Carpenters' union's business records (reflecting campaign contributions and purchases of goods and services in interstate commerce), and records of regularly conducted business of the Michigan House of Representatives.

A business record must satisfy the following requirements to be admissible under Rule 803(6): (1) the record was made at or near the time by, or from information transmitted by, someone with knowledge; (2) the record was kept in the course of a regularly conducted business-like activity; and (3) making the record was a regular practice of that activity. If those requirements are met, the record is admissible unless the source of information or the

10

method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6); *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003).

It is not necessary that the authenticating witness be the actual recorder of the data or have personal knowledge of it. All that is required is that the witness be familiar with the record keeping system. *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986). Business records also may be self-authenticating under Federal Rule of Evidence 902(11) even if they contain information provided by a third party. *See United States v. Smith-Kilpatrick*, 942 F.3d 734, 742 (6th Cir. 2019) ("self-authentication is not concerned with the accuracy of a record, but rather, providing a streamlined method of ensuring that a document is indeed what its proponent claims it is.") (citing Fed. R. Evid. 901(a)). Doubts about the accuracy of business records go to the weight of the evidence, not its admissibility. *Id.* at 6. The Federal Rules of Evidence allow the use of duplicates to the same extent as originals unless there is a genuine question as to their authenticity. Fed. R. Evid. 1003. Federal Rule of Evidence 1001(e) defines "duplicate" to include photocopies.

**IV.    The Court's Prior Rulings Resolving Certain Evidentiary Issues Should Be Enforced At The Retrial.**

Prior to the start of the first trial, the Court granted the government's motion to admit summary charts of text message evidence (R.36); the government's motion in limine to admit text messages between Defendant

11

Inman and Dave Fashbaugh of the IBEW (R.39); and the government's motion in limine to exclude expert testimony regarding diminished capacity (R.72). (R.76: Order, PageID.642.)

The jury's "not guilty" verdict on count 3 has no bearing on the admissibility of the text message evidence that was the subject of the government's first two motions. Additionally, Inman is no longer seeking to introduce testimony from his first expert, Dr. Bruce Baker. Thus, the Court's 2019 pretrial rulings should be enforced at the retrial.

### V. The Government May Call Dr. Edward Jouney In Rebuttal If Inman Introduces Evidence Of Opioid And Alcohol Use.

The Court has excluded the testimony of Inman's expert witness, Richard Frederick, Ph.D., upon finding that "evidence relating to Defendant's condition, diagnoses, and treatment after the prevailing wage vote and after the Indictment would not meet the test of relevance generally. Moreover, any limited probative value such evidence would arguably have is substantially outweighed by the danger of confusing the issues and misleading the jury." (R.211: Order, PageID.3485.) Thus, the Court ruled that "testimony regarding substance abuse diagnosis and treatment in periods following the events at issue is either irrelevant, or excludable under Rule 403." (R.211: Order, PageID.3474.)

However, the Court found that "observations of people who saw and interacted with Defendant Inman during the leadup to the prevailing wage

12

vote—when the text messages central to this case were sent—and Defendant's own accounts of his behavior at the time (if he chooses to testify) are admissible in the Court's view. The precise line and balance will have to await presentation of the proofs at trial." (*Id.*, PageID.3485)

Given the Court's Order excluding Dr. Frederick's opinions, the government will not call its expert, Dr. Jouney, in its case-in-chief. However, if Inman elicits the kind of testimony this Court indicated may be admissible at retrial, the government reserves its right to call Dr. Jouney in rebuttal to assist the jury in understanding and evaluating the testimony elicited by Inman.

Specifically, Dr. Jouney is a physician licensed to practice medicine in the State of Michigan. He is Board Certified by the American Board of Psychiatry and Neurology (ABPN) in the specialties of Adult and Addiction Psychiatry. He is also board certified in Addiction Medicine by the American Board of Addiction Medicine (ABAM). He has spent his professional career during the opioid crisis both treating and evaluating individuals for substance abuse disorders. Dr. Jouney can explain to a jury, from an expert medical perspective, the effects of different narcotics, substances, and alcohol, both singularly and in combination, on an individual user, common side-effects and concerns given dosage, tolerance, and the effect of abuse. He can testify about evaluative tools, used within his profession, to gauge a patient's cognitive function and the information that might be garnered. All of this information

may be helpful to the jury to explain the true scientific effects of the drug abuse that Inman raised in the first trial—and that the Court preserved the opportunity for first-hand witnesses to testify concerning at the second trial – without delivering opinions on the ultimate issue of Inman's intent. Such testimony can give the jury a stronger understanding of the context of substance abuse within which to evaluate Inman's testimony and behavior. The government only reserves the right to offer this testimony in rebuttal, as its relevance and importance will be shaped by the information offered and argued by the defense at trial, consistent with the Court's pretrial order.

**VI.    Stipulations, Exhibits, and Jury Instructions.**

The parties have met and conferred on several pretrial matters, including proposed stipulations, trial exhibits, and proposed jury instructions. The parties are actively working to reach agreement on the few remaining open issues before the final pretrial conference.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: October 13, 2023

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
STEPHEN P. BAKER
Assistant United States Attorneys

United States Attorney's Office
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404
christopher.oconnor@usdoj.gov
stephen.baker@usdoj.gov